UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

BRIDGEPORT MUSIC, INC. and
WESTBOUND RECORDS, INC.,    :

    :    **Case No. 19-cv-01764-PGG**

    **Plaintiffs,**    :

    :

**v.**    :

    :    **MEMORANDUM OF POINTS AND**
    **AUTHORITIES IN SUPPORT OF**
**TUFAMERICA, INC. d/b/a TUFF CITY**    :    **PLAINTIFFS' MOTION FOR**
**RECORDS, and KAY LOVELACE**    **SUMMARY JUDGMENT**
**TAYLOR, individually and on behalf of the**    :
**Estate of LeBaron Taylor,**

    :

    **Defendants.**    :

------------------------------------- X

## TABLE OF CONTENTS

I.     STATEMENT OF FACTS ........................................................................5

    A.    The Parties ..............................................................................5

    B.    The Agreements Between Plaintiffs and Mr. Clinton............................7

        i.    The Agreements Concerning the Westbound Sound Recordings of the Bridgeport Compositions ....................................................................7

        ii.    The Agreements Concerning the Bridgeport Compositions ......................7

        iii.    Mr. Taylor's Death and TufAmerica's Alleged Acquisition of Rights in the Bridgeport Compositions ..........................................................10

II.    LEGAL STANDARD...........................................................................13

III.    IT IS UNDISPUTED THAT BRIDGEPORT OWNS THE BRIDGEPORT COMPOSITIONS SO THE COURT SHOULD GRANT PLAINTIFFS' REQUESTED RELIEF FOR DECLARATORY JUDGMENT ................................................13

    A.    Plaintiffs Entered into Contracts with Mr. Clinton Transferring the Copyrights in the Bridgeport Compositions and as Such Have a Clear, Direct, Documented Chain of Title for the Bridgeport Compositions..........................................14

        i.    Bridgeport's Chain of Title for the Bridgeport Compositions...................14

    B.    Defendants Do Not Have Any Documentation Demonstrating The Transfer of Ownership in the Bridgeport Compositions from Mr. Clinton to Mr. Taylor or Any of His Entities .16

      i.     Defendants' Certificates of Copyright Registration for the Bridgeport Compositions Do Not Prove Ownership of the Bridgeport Compositions ... 17

      ii.    Mr. Taylor's Course of Dealing Concerning the Bridgeport Compositions Demonstrates that the Validity of Defendants' Alleged Copyright Ownership Can Not Be Assumed ... 18

      iii.   Even if Mr. Taylor Did Own Rights to the Bridgeport Compositions, Ms. Taylor Did Not Receive Those Rights After Mr. Taylor's Death ... 20

      C.    Ms. Taylor's Transfer of Ownership in the Bridgeport Compositions to TufAmerica Was Invalid ... 21

IV.   THE APPLICABLE STATUTE OF LIMIATATIONS PRECLUDES DEFENDANTS FROM CONTESTING BRIDGEPORT'S OWNERSHIP OF THE BRIDGEPORT COMPOSITIONS AND BARS ALL OF TUFAMERICA'S COUNTERCLAIMS ... 23

V.    CONCLUSION ... 24

## **TABLE OF AUTHORITIES**

### **Cases**

*Anderson v. Liberty Lobby, Inc*.,
    477 U.S. 242, 248 (1986) ... 13

*Bridgeport Music, Inc. v. Rhyme Syndicate Music*,
    376 F.3d 615 (6th Cir. 2004) ... 24

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ... 13

*Crane v. Poetic Prods*.,
    351 F. App'x 516 (2d Cir. 2009) ... 14

*Dister v. Cont'l Group*, 859 F.2d 1108, 1114 (2d Cir. 1988) ... 13

*Dow Jones & Co., Inc. v. Harrods Ltd*.,
    346 F.3d 357 (2d Cir. 2003) ... 14

*Durham Indus. v. Tomy Corp.*,
    630 F.2d 905 (2d Cir. 1980) ... 17

*Empire Tr. Co. v. United States*,
    226 F. Supp. 623 (S.D.N.Y. 1963) ... 20

*Endicott Tr. Co. v. United States*,
    37 A.F.T.R.2d (RIA) 1516 (N.D.N.Y. Nov. 11, 1975) ... 20

*In re Estate of Bumsted*,
    56 A.2d 725 (1948) ... 20

*Latin Am. Music Co. v. Spanish Broad Sys. Inc.*,
    232 F. Supp. 3d 384 (SDNY 2017) ... 23

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007) .......................................................................................... 14

*Niagara Mohawk Power Corp. v. Jones Chem. Inc.*,
   315 F.3d 171, 175 (2d Cir. 2003) ..................................................................... 13

*Psihoyos v. John Wiley & Sons, Inc.*,
   748 F.3d 120 (2d Cir. 2014) .............................................................................. 23

*Scholz Design, Inc. v. Sard Custom Homes, LLC*,
   691 F.3d 182 (2d Cir. 2012) .............................................................................. 17

*Sohm v. Scholastic Inc.*,
   959 F.3d 39 (2d Cir. 2020) ................................................................................ 24

*Soros Fund Mgmt. LLC v. Tradewinds Holdings, Inc.*,
   2018 U.S. Dist. LEXIS 40164 (S.D.N.Y. Mar. 12, 2018) ................................ 14

*Stern v. Lavender*,
   319 F. Supp. 3d 650 (S.D.N.Y. 2018) ......................................................... 18, 19

*Stokes v. Hombres Lounge Inc.*,
   1:19-cv-03434, 2020 U.S. Dist. LEXIS 188659 (E.D.N.Y. 2020) ................... 17

## **Statutes**

17 U.S.C § 201(a) ......................................................................................................... 14

17 U.S.C § 201(d)(1). .................................................................................................... 14

17 U.S.C. § 204(a) ................................................................................................... 14, 20

17 U.S.C. § 410(c) ........................................................................................................ 17

17 U.S.C. § 507(b) ........................................................................................................ 23

28 U.S.C. § 2201 ........................................................................................................... 13

## **Rules**

Fed. R. Civ. P. 56(a). ..................................................................................................... 13

Fed. R. Civ. P. 56(c) ..................................................................................................... 13

## PRELIMINARY STATEMENT

Plaintiffs Bridgeport Music, Inc. ("Bridgeport") and Westbound Records, Inc. ("Westbound") (collectively "Plaintiffs") move for summary judgment against Defendants TufAmerica, Inc. d/b/a Tuff City Records ("TufAmerica"), and Kay Lovelace Taylor a/k/a Dr. Kay Oliver ("Ms. Taylor"), individually and on behalf of the Estate of LeBaron Taylor (collectively "Defendants").

This is a civil action for declaratory relief in the form of a declaratory judgment to clarify the rights and obligations of the parties with respect to certain musical compositions that Plaintiffs have openly exploited since the late 1960's/early 1970s. (Statement of Material Facts ¶ 76 ("SOMF")). As explained in further detail below, Plaintiffs seek declaratory judgment that: (i) Bridgeport is the rightful owner of the musical compositions at issue in this case; (ii) Defendants do not have any interest in the musical compositions at issue in this case; and (iii) Plaintiffs have not infringed upon any copyrights allegedly owned and/or controlled by Defendants in the musical compositions at issue. Bridgeport will demonstrate that there is no genuine issue of material fact concerning whether it owns the musical compositions at issue, or whether Defendants own any of those musical compositions. The answer is that Bridgeport does, and Defendants do not.  Indeed, Defendants have not produced in this action any ownership documents at all, so both Plaintiffs' request that the Court declare they do not have any ownership in the musical compositions, and TufAmerica's counterclaims must be dismissed.

The six *musical compositions* at issue in this case were written or co-written by George Clinton ("Mr. Clinton") and are titled: (1) "The Victor" a/k/a "Baby I Owe You Something Good"; (2) "Good Old Music"; (3) "Let's Make It Last"; (4) "I'll Wait" a/k/a "I'll Stay"; (5) "Can You Get To That"; and (6) "The Goose (That Laid the Golden Egg)" (jointly, the "Bridgeport Compositions"). (SOMF ¶ 3). Also involved in this action are sound recordings of the Bridgeport Compositions that Mr. Clinton recorded for Westbound including, "The Victor" a/k/a "Baby, I Owe You Something Good," released on the Westbound album *Let's Take it to the  Stage,* "Good Old Music," released on the Westbound album *Funkadelic*, "Let's Make It Last," released on the Westbound album *Cosmic Slop,*  "I'll Wait" a/k/a "I'll Stay," released on the Westbound album *Standing on the Verge of Getting*

*It On*, and "Can You Get To That," released on the Westbound album *Maggot Brain*. (hereinafter referred to as the "Westbound Sound Recordings") (SOMF ¶¶ 36, 42, 49, 56, 64).

Bridgeport has claimed ownership of the Bridgeport Compositions pursuant to written agreements entered into in 1971 and 1983, as well as any single song agreements referenced herein. (SOMF ¶¶ 21, 22, 23, 27, 29). Westbound claims ownership of the Westbound Sound Recordings pursuant to written agreements entered into in 1972 and 1975, as explained in further detail below. (SOMF ¶¶ 24-26, 28). TufAmerica asserts ownership of the Bridgeport Compositions pursuant to agreements with Ms. Taylor dated August 9, 2011 and December 9, 2019. (SOMF ¶¶ 111, 125, 126). TufAmerica does not assert ownership of the Westbound Sound Recordings. (SOMF ¶ 127).

The facts necessary for this Court to rule on Plaintiffs' Motion for Summary Judgment ("Motion") are not in dispute. It is undisputed that Bridgeport owns the Bridgeport Compositions, and the Westbound Sound Recordings are not infringements of the rights in and to the Bridgeport Compositions. (SOMF ¶¶ 21-29). There is also, as previously noted, no evidence in this record that allows Defendants any interest in the Bridgeport Compositions, so Plaintiffs' request that the Court so declare should be granted, and TufAmerica's counterclaims should be dismissed. TufAmerica's counterclaims also fail as a matter of law pursuant to the applicable statute of limitations.

## I.     STATEMENT OF FACTS

### A.     The Parties

Plaintiffs are Detroit based companies that have been in existence for approximately 50-60 years. (SOMF ¶ 6). They have been owned at all times by now 87-year-old Armen Boladian ("Mr. Boladian") and have been responsible for launching the careers of numerous legendary Detroit musical artists. (SOMF ¶¶ 7-8). Mr. Clinton is the author or co-author of the Bridgeport Compositions involved in this action and recorded certain of them for Westbound. (SOMF ¶¶ 5, 36, 42, 49, 56, 64). For nearly 50 years, Plaintiffs exploited the Bridgeport Compositions and Westbound Sound Recordings at issue in this case pursuant to

various agreements with Mr. Clinton without any complaint by TufAmerica, LeBaron Taylor, or Ms. Lovelace Taylor ("Ms. Taylor"), the individual from whom TufAmerica claims it received rights in the Bridgeport Compositions. (SOMF ¶¶ 21-32, 76, 111, 117, 125).

As noted, the other relevant party to this action is LeBaron Taylor ("Mr. Taylor"), who owned several entities, including Revilot Records and LeBaron Music, in the 1960's. (SOMF ¶ 11). Mr. Clinton recorded for Revilot Records in the 1960s before the label went bankrupt. (SOMF ¶ 17). After Revilot Records went bankrupt, Mr. Clinton began recording for Westbound. (SOMF ¶ 18). While certain copyright registrations exist prior to those filed by Bridgeport, no documents exist showing any assignment by Mr. Clinton of his rights in the Bridgeport Compositions to any individual or entity other than Bridgeport, including Mr. Taylor, or any of Mr. Taylor's entities. (SOMF ¶¶ 88-91, 94-97, 99, 107, 119). Mr. Clinton was deposed in this case.  (SOMF ¶ 13) While admitting that he signed a *recording agreement* with Revilot Records, he stated that he did not know whether it contained any provision concerning musical compositions, and he also testified that he never assigned any musical compositions to Mr. Taylor. (SOMF ¶ 93-97) ("Q. Did you ever sign an agreement with LeBaron Taylor, LeBaron Music, or any of LeBaron Taylor's entities assigning publishing to them? A. Not that I can remember.")

Furthermore, as discussed below, the undisputed facts show that Mr. Taylor also knew Bridgeport claimed ownership of the Bridgeport Compositions at issue in this action, and that Mr. Clinton had recorded the Bridgeport Compositions in the Westbound Sound Recordings. (SOMF ¶¶ 81-82). Mr. Taylor died in 2000, and never challenged Bridgeport's ownership of the Bridgeport Compositions throughout his entire life. (SOMF ¶ 83).

B.  **The Agreements Between Plaintiffs and Mr. Clinton**

Mr. Boladian met Mr. Clinton in 1966, who began recording music for Westbound in the late 1960s. (SOMF ¶¶ 16, 18).   Thereafter, Mr. Clinton and Plaintiffs entered into several agreements assigning Mr. Clintons' rights in the Bridgeport Compositions to Bridgeport and his rights in the Westbound Sound Recordings to Westbound. (SOMF ¶¶ ¶¶ 21-32).

i.    **The Agreements Concerning the Westbound Sound Recordings of the Bridgeport Compositions**

**The 1972 Agreement:** On August 30, 1972, Westbound and Mr. Clinton entered into an agreement for Mr. Clinton's exclusive services for the purpose of making master recordings stating all master recordings were unequivocally the exclusive property of Westbound, "... no performance recorded by Company [Westbound] hereunder will infringe or violate any right of any person or firm[,] and [] Company [Westbound] may exploit such master recordings made hereunder without liability or obligation to any other person or firm." Additionally, "[a]ll master recordings made hereunder, as well as all performances embodied thereon and all phonograph records derived therefrom, together with any property rights therein, whether presently existing or hereafter created, will be the exclusive property of Company [Westbound] free of any claim whatsoever by Artist [Clinton, individually and as a member of the group Funkadelic] or by anyone deriving rights from Artist." (the "1972 Agreement") (SOMF ¶¶ 24-26).

**The 1975 Agreement:** Westbound and Mr. Clinton entered into a subsequent termination agreement in which Mr. Clinton acknowledged and agreed that Westbound "shall retain in perpetuity the exclusive worldwide right, title and interest in and to all master recordings and the copyrights thereon embodying the performances of the Group delivered to us [Westbound] prior to the date of this Agreement ...." (the "1975 Agreement") (SOMF ¶ 28).

ii.    **The Agreements Concerning the Bridgeport Compositions**

**The 1971 Agreement:** On August 31, 1971 Bridgeport and Mr. Clinton entered into an agreement wherein Mr. Clinton assigned to Bridgeport an undivided one-half interest in all rights to musical compositions previously and/or subsequently written by Clinton, alone or in collaboration with others, and recorded by Westbound, during a period of five years from the date of the agreement (the "1971 Agreement"). (SOMF ¶ 22).

**The 1983 Addendum to the 1982 Agreement:** On December 2, 1983, through an addendum to a March 4, 1982 Agreement, Mr. Clinton and his publishing company Malbiz Music assigned to Bridgeport complete ownership of all musical compositions written or co-written before that date by Mr. Clinton and owned by Malbiz (the "1983 Addendum"). (SOMF ¶ 29)

**The 1967 Single Song Agreement:** On November 10, 1967 Bridgeport and Mr. Clinton entered into an agreement wherein Mr. Clinton assigned, transferred, and delivered all rights to the Bridgeport Composition "Good Old Music" to Bridgeport (the "1967 Agreement"). (SOMF ¶ 21)

**The 1971 Single Song Agreement:** On August 1, 1974, Mr. Clinton and fellow co-writer Ernie Harris on the one hand, and Bridgeport on the other hand, entered into a separate agreement specifically for the Bridgeport Composition for "Can You Get To That." (the "1971 Can You Get To That Agreement"). (SOMF ¶ 23).

**The 1974 Single Song Agreement:** On June 6, 1974 Bridgeport and Mr. Clinton entered into an agreement wherein Mr. Clinton granted Bridgeport rights in the Bridgeport Composition for "I'll Wait" a/k/a "I'll Stay" (the "1974 Agreement") (SOMF ¶ 24).

Westbound, thus, owns rights to the Westbound Sound Recordings pursuant to the 1972 Agreement and the 1975 Agreement.   (SOMF ¶¶ 24-26, 28). Bridgeport owns rights to the Bridgeport Compositions pursuant to the 1971 Agreement and the 1983 Addendum, as well as the single song agreements. (SOMF ¶¶ 21-23, 27, 29).  While Mr. Clinton and Plaintiffs have been in

litigation over the years concerning rights in the musical works authored or co-authored by Mr. Clinton including the Bridgeport Compositions at issue in this action, that litigation was all resolved in Plaintiffs' favor.[1]

Following Plaintiffs' agreements with Mr. Clinton wherein they were assigned the copyrights in the Bridgeport Compositions and Westbound Sound Recordings, Plaintiffs registered the Bridgeport Compositions and Westbound Sound Recordings with the United States Copyright Office, and Bridgeport registered the Bridgeport Compositions with the public performance organization BMI. (SOMF ¶¶ 21-32, 39-41, 45-47, 52-55, 59-63, 67-69, 72-74).  Plaintiffs also freely exploited the Bridgeport Compositions for a half century. (SOMF ¶ 76). Though there apparently existed separately registered copyrights for the Bridgeport Compositions filed by entities other than Bridgeport, nobody ever claimed, for the last 50 years, that anyone other than Bridgeport owned the Bridgeport Compositions. (SOMF ¶¶ 91, 117, 122). At no time during his life did Mr. Taylor ever claim that he owned any of the Bridgeport Compositions and did not seek to collect any royalties on any of the Bridgeport Compositions. (SOMF ¶¶ 83, 85). He and Mr. Boladian were friends.  (SOMF ¶ 19). Mr. Taylor was a prominent DJ in Detroit when the Bridgeport Compositions were first claimed by Bridgeport. (SOMF ¶ 20). Mr. Taylor was well aware of Bridgeport and Westbound's exploitation of the underlying Bridgeport Compositions. (SOMF ¶¶ 79, 84-85) as he played some of the Westbound Sound Recordings on air without any

---

[1] In 1999, Clinton filed an action in the United States District Court for the Northern District of Florida challenging the validity of the 1983 Addendum. (SOMF ¶ 33). After a full trial, the court ruled that the 1983 Addendum was valid, and that Clinton assigned ownership of all musical compositions written by him and owned by his publishing company, Malbiz Music, as of March 4, 1982, to Bridgeport Music, and that Bridgeport was the owner of all such musical compositions. (SOMF ¶ 34). Clinton's appeal of that Order was dismissed, and his post judgment motion was denied. (SOMF ¶ 35).

issue or raising any concern that he had any claims to the Bridgeport Compositions. (SOMF ¶¶ 20, 76, 81-82).

Mr. Taylor died in the year 2000. (SOMF ¶ 100). Notably, his Will does not make any mention of any ownership of the Bridgeport Compositions or of any intellectual property for that matter. (SOMF ¶ 101-102).

### iii. Mr. Taylor's Death and TufAmerica's Alleged Acquisition of Rights in the Bridgeport Compositions

In 2000, Mr. Taylor passed away leaving behind his widow, Ms. Lovelace Taylor. (SOMF ¶ 100). When Mr. Taylor passed, he did not own any rights in the Bridgeport Compositions. (SOMF ¶¶ 88-90, 107). As mentioned, his Will did not assign or grant Ms. Taylor any rights in the Bridgeport Compositions at issue. (SOMF ¶ 101). Moreover, any rights in the Bridgeport Compositions did not pass to Ms. Taylor through the residuary of Mr. Taylor's Estate. (SOMF ¶ 102).

In 2011, eleven years after Mr. Taylor's death, Ms. Taylor was approached by Aaron Fuchs ("Mr. Fuchs"), the owner of TufAmerica, about entering into a purchase agreement for the Bridgeport Compositions. (SOMF ¶ 103). In an August 9, 2011 Agreement, Ms. Taylor allegedly sold, assigned, and transferred to TufAmerica 50% of the ownership interest and all worldwide copyright, renewals, and/or other rights in certain musical works, on behalf of herself and the various LeBaron entities, including Revilot Records, Red Cap Records, Solid Hit Records, Solid Hitbound Productions, LeBaron Music, Brute records, the Estate of LeBaron Taylor, and all other companies owned and/or controlled by the Estate. (SOMF ¶ 111). TufAmerica and Mr. Fuchs purchased any purported rights for the sum of $6,500. (SOMF ¶ 111). There exist no written assignments between Mr. Clinton and any of those entities assigning any of the Bridgeport Compositions to those entities. (SOMF ¶¶ 88-90, 107, 119). Because she had no written

assignments, Ms. Taylor expressed concern at the time that she did not own the Bridgeport Compositions and told Mr. Fuchs that she could not warrant and represent that she had any rights to grant. (SOMF ¶ 106-118, 112-114). At the time of the purchase, Mr. Fuchs had not performed a general Google search concerning ownership of the Bridgeport Compositions, let alone a Copyright Office or BMI registration search of the Bridgeport Compositions. (SOMF ¶ 111-112). Ultimately, Mr. Fuchs performed zero due diligence before purchasing the Bridgeport Compositions. (SOMF ¶¶ 109-110). Despite this, he moved forward with purchasing a fifty percent alleged share of the Bridgeport Compositions for $6,500. (SOMF ¶ 111).

On December 11, 2017, *six years* after entering into what amounted to a quit claim purchase agreement concerning a purported portion of the Bridgeport Compositions, TufAmerica sent a letter to Plaintiffs on behalf of itself and as purported administrator for LeBaron Music raising various unfounded assertions relating to copyright infringement and ownership of the Bridgeport Compositions. (SOMF ¶¶ 116-117). Plaintiffs responded to TufAmerica's letter, requesting that TufAmerica provide context for its asserted claims. (SOMF ¶ 118). Plaintiffs informed TufAmerica that Bridgeport has had registered copyrights in each of the Bridgeport Compositions at issue for nearly fifty years and has openly exploited each since the 1970s without any objection or claim to ownership by Defendants, or their predecessors in interest. (SOMF ¶ 120). Plaintiffs also informed TufAmerica that Bridgeport registered the Bridgeport Compositions with BMI in the 1970s and has been receiving royalties on the Bridgeport Compositions at issue since that time, again without any objection or claim to rights by Defendants, their predecessors in interest, or anyone else for that matter. (SOMF ¶ 121). Plaintiffs asked TufAmerica to provide any contracts or agreements relating to the Bridgeport Compositions so that Plaintiffs would be able

to more fully evaluate the purported basis of its claims. (SOMF ¶ 118). TufAmerica did not provide the requested contracts or agreements. (SOMF ¶ 119).

On January 5, 2018, TufAmerica sent Plaintiffs a second letter stating that while there may never have been a "formal objection or claim" brought against Plaintiffs prior to this point by Defendants or their predecessors in interest, nothing precludes TufAmerica from now asserting its rights to the Bridgeport Compositions. (SOMF ¶ 122). Notably, TufAmerica failed to include any supportive documentation in response to Plaintiffs' prior request TufAmerica provide any relevant contracts or agreements relating to the Bridgeport Compositions. (SOMF ¶ 119). Plaintiffs were thereby forced to bring this action on January 11, 2018. (SOMF ¶ 123). On April 12, 2019, Defendants brought counterclaims against Plaintiffs for copyright infringement, accounting, and a declaratory judgment that Defendants own and/or control the entirety of the Bridgeport Compositions. (SOMF ¶ 124).

On December 9, 2019, while this action was pending, TufAmerica purported to purchase the remaining share of Ms. Taylor's alleged interest in the Bridgeport Compositions for $6,000. (SOMF ¶ 125). Throughout discovery, Plaintiffs have been able to show a direct chain of title from the author/co-author of these Bridgeport Compositions, Mr. Clinton, to themselves. (SOMF ¶¶ 21-32, 75). Plaintiffs can also demonstrate that there is no dispute concerning whether Defendants or their predecessors were aware of Plaintiffs' nearly 50 years of exploitation of the Bridgeport Compositions. (SOMF ¶¶ 76, 81-82). Thus, there is no genuine dispute of material fact that would prevent the Court from granting judgment as a matter of law on Plaintiffs' claim for declaratory judgment and for all of TufAmerica's counterclaims.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

## II.    <u>LEGAL STANDARD</u>

Summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Whether a fact is "material" is determined by the substantive law defining the claims. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Once a party moves for summary judgment, the non-moving party bears the burden of coming forward with more than "[c]onclusory allegations, conjecture, and speculation." *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (internal quotation and citation omitted). Thus, when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Dister v. Cont'l Group*, 859 F.2d 1108, 1114 (2d Cir. 1988).

## III.    <u>IT IS UNDISPUTED THAT BRIDGEPORT OWNS THE BRIDGEPORT COMPOSITIONS SO THE COURT SHOULD GRANT PLAINTIFFS' REQUESTED RELIEF FOR DECLARATORY JUDGMENT</u>

Pursuant to 28 U.S.C. § 2201, a Court may declare the rights and other legal relations of any interested party seeking such declaration whether or not further relief is, or could be, sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such. *Id.* Further, "the Declaratory Judgment Act 'vests a district court with discretion to determine whether it will exert jurisdiction over a proposed declaratory action or

not.'" *Soros Fund Mgmt. LLC v. Tradewinds Holdings, Inc.*, 2018 U.S. Dist. LEXIS 40164, at \*6 (S.D.N.Y. Mar. 12, 2018) (quoting *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003). The Declaratory Judgment Act "confers on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Crane v. Poetic Prods.*, 351 F. App'x 516, 517 (2d Cir. 2009) (see also *MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 136, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007)).

### A. Plaintiffs Entered into Contracts with Mr. Clinton Transferring the Copyrights in the Bridgeport Compositions and as Such Have a Clear, Direct, Documented Chain of Title for the Bridgeport Compositions

Pursuant to 17 U.S.C § 201(a), copyright in a work vests initially in the authors of the work. Copyright ownership may be transferred "in whole or in party by any means of conveyance or by operation of law."  17 U.S.C § 201(d)(1). However, a "transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed." 17 U.S.C. § 204(a).

As explained in detail above, the written agreements between Bridgeport and Mr. Clinton demonstrate the documented transfer of copyright and chain of title for the Bridgeport Compositions. (SOMF ¶¶ 21-32, 75).  Defendants have no such documents. (SOMF ¶¶ 88-90, 95, 99, 107, 119).

### i.    Bridgeport's Chain of Title for the Bridgeport Compositions

**"The Victor" a/k/a "Baby, I Owe You Something Good":** Bridgeport has the right to exploit the Bridgeport Composition, "The Victor" a/k/a "Baby, I Owe You Something Good" pursuant to the 1971 Agreement and 1983 Addendum. (SOMF ¶ 37).

**"Good Old Music:** Bridgeport has the right to exploit the Bridgeport Composition "Good Old Music" pursuant to the 1967 Agreement, 1971 Agreement, and 1983 Addendum. (SOMF ¶ 43).

**"Let's Make It Last":** Bridgeport has the right to exploit the Bridgeport Composition "Let's Make It Last" pursuant to the 1971 Agreement and 1983 Addendum. (SOMF ¶ 50).

**"I'll Wait" a/k/a "I'll Stay":** Bridgeport has the right to exploit the Bridgeport Composition "I'll Stay" pursuant to the 1971 Agreement, 1974 Agreement, and 1983 Addendum. (SOMF ¶ 47).

**"Can You Get To That":** Bridgeport has the right to exploit the Bridgeport Composition "Can You Get To That" pursuant to the 1971 Agreement, the 1971 Can You Get To That Agreement, and 1983 Addendum. (SOMF ¶ 65).

**"The Goose" a/k/a "The Goose (That Laid the Golden Egg)":** Bridgeport has the right to exploit the Bridgeport Composition "The Goose" a/k/a "The Goose (That Laid the Golden Egg)" pursuant to the 1974 Goose Agreement and 1983 Addendum. (SOMF ¶ 71).

There also exists the 2001 Judgment of the United States District court for the Northern District of Florida holding that the December 2, 1983 Addendum is valid and Bridgeport owns all musical compositions Mr. Clinton wrote on or before March 4, 1982. (SOMF ¶ 34). Plaintiffs have a clear, direct, and documented chain of title for the Bridgeport Compositions and their exploitations of the Bridgeport Compositions. (SOMF ¶¶ 21-32, 75). Defendants on the other hand have produced no written agreements or documentation supporting any claim to the Bridgeport Compositions. (SOMF ¶¶ 88-90, 95, 106-107, 119). Therefore, it is undisputed that Bridgeport is the rightful owner of the Bridgeport Compositions, and the Court should grant Plaintiffs' Motion and dismiss TufAmerica's counterclaims. Indeed, regardless of Plaintiffs' claims, as explained below, TufAmerica does not have any colorable claim to any of the Bridgeport Compositions, so declaratory relief should be granted Plaintiffs on that issue, and TufAmerica's counterclaims must be dismissed.

**B.** **Defendants Do Not Have Any Documentation Demonstrating The Transfer of Ownership in the Bridgeport Compositions from Mr. Clinton to Mr. Taylor or Any of His Entities**

Defendants allege, badly, that Mr. Clinton granted the rights to the Bridgeport Compositions to Mr. Taylor at some point in time prior to Clinton's grant to Bridgeport. (SOMF ¶ 87, 91). Yet, Defendants have not produced, and cannot produce, any transfers, agreements or other documentation between Mr. Clinton and themselves in support of their allegations. (SOMF ¶¶ 88-90, 95, 106-107, 119). Moreover, during his deposition, Mr. Clinton testified that he entered into a recording agreement with Revilot Records in 1965, but he did not know where the alleged agreement is and did not know any of the terms of the agreement. (SOMF ¶ 93). He did not know whether it contained any provision concerning the Bridgeport Compositions, or what any such provision stated if one even existed. (SOMF ¶¶ 93-94).[2] He also stated that he never assigned any of the Bridgeport Compositions to Mr. Taylor or any of Mr. Taylor's entities. (SOMF ¶ 95).

If Mr. Taylor and/or one of his entities entered into an agreement with Mr. Clinton for the Bridgeport Compositions, Mr. Clinton should have received royalties, however, Mr. Clinton testified "I've never seen a royalty statement from [Taylor]." (SOMF ¶ 98). Moreover, public performance royalties collected by BMI for the Bridgeport Compositions were not paid to Mr. Taylor's publishing entity, but instead paid directly to Bridgeport. (SOMF ¶¶ 78, 121). Again, Mr.

---

[2] A company named Groovesville Music was the entity that filed the copyright registration for "I'll Wait" prior to Bridgeport's copyright registrations. (SOMF ¶ 91). There is no evidence in this record who owned Groovesville. (SOMF ¶¶ 12-13). While Mr. Clinton stated that Groovesville may have been a publisher of certain musical compositions pursuant to the Revilot Agreement, but he did not know what the terms in the Revilot Agreement stated, or whether there was any assignment of musical compositions whatsoever. (SOMF ¶ 98). He also does not know who owned Groovesville. (SOMF ¶ 13).

Taylor never complained about Bridgeport claiming ownership and collecting royalties on any of the Bridgeport Compositions during his entire life. (SOMF ¶¶ 78, 121).

> ### i.     Defendants' Certificates of Copyright Registration for the Bridgeport Compositions Do Not Prove Ownership of the Bridgeport Compositions

Defendants allege that Mr. Taylor, Groovesville, and/or the LeBaron Entities filed copyright registrations for each of the Bridgeport Compositions confirming their ownership of the Bridgeport Compositions. (SOMF ¶ 91). Pursuant to 17 U.S.C. § 410(c), "In any judicial proceeding, the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." Though a certificate of copyright registration is prima facie evidence of copyright ownership, the presumption of ownership can be rebutted. *See Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 186 (2d Cir. 2012); *MyWebGrocer, LLC v. Hometown Info, Inc.,* 375 F.3d 190, 192 (2d Cir.2004); *see also Stokes v. Hombres Lounge Inc.*, 1:19-cv-03434, 2020 U.S. Dist. LEXIS 188659, *9 (E.D.N.Y. 2020) (The presentation of a certificate of registration by plaintiff merely shifts the burden of proof to the defendants to show the invalidity of the plaintiff's copyrights). Further, "Where other evidence in the record casts doubt on the question of ownership, validity will not be assumed." *Durham Indus. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir. 1980).

Here, there is simply no evidence at all of any written assignment from Mr. Clinton to Mr. Taylor or one of his entities. (SOMF ¶¶ 91-93, 109, 121). There is also no evidence in this record that Groovesville Music, another copyright claimant was a Taylor entity. (SOMF ¶¶ 12-13). Mr. Clinton in fact testified that Groovesville Music was owned by a person by the name of Don Davis. (SOMF ¶ 14). However, Defendants assert that Mr. Taylor or his entities filed copyright registrations for the Bridgeport Compositions confirming their ownership of the Bridgeport

Compositions. (SOMF ¶ 94). Defendants point only to a registration for "Let's Make It Last" wherein Mr. Taylor is listed as the sole copyright claimant, a registration for "The Goose (That Laid The Golden Egg)" wherein Mr. Taylor is listed as the sole copyright claimant, a registration for the "Good Old Music" wherein Mr. Taylor is listed as the sole copyright claimant, a registration for "I'll Wait" wherein Groovesville is listed as the sole copyright claimant, and the belief that Mr. Taylor or one of his entities "may have filed a copyright registration in connection" with "the I Owe You Something Composition." (SOMF ¶ 91). However, Defendants have produced absolutely no documentation to support their assertions that Mr. Clinton assigned his rights in the Bridgeport Compositions to Mr. Taylor, or one of his alleged entities, so Defendants therefore cannot establish that any preexisting copyright registrations are valid, and moreover, that they have any rights as successor in interest to Ms. Taylor, since Ms. Taylor had no rights in any of the Bridgeport Compositions at all. (SOMF ¶¶ 88-90, 95, 106-107, 119).

> ### ii.    Mr. Taylor's Course of Dealing Concerning the Bridgeport Compositions Demonstrates that the Validity of Defendants' Alleged Copyright Ownership Can Not Be Assumed

The "course of dealing" between a predecessor in interest and other parties concerning the predecessor's allegedly owned works is powerful circumstantial evidence of the validity of ownership where the predecessor maintained ownership in the works throughout the course of his dealing involving the works at all times. *See Stern v. Lavender*, 319 F. Supp. 3d 650 (S.D.N.Y. 2018) (holding that a third party who held a copyright registration for new works added to the predecessor in interest's registered works held the burden of proving that the successor in interest's copyright registration was invalid where the predecessor in interest at all times maintained his ownership in the works in the course of his dealings involving the works). The course of dealing that represents ownership may be supported by legally operative agreements. *Id.*

In *Stern v. Lavender*, the successor in interest and a third-party sought to register copyright claims for the same photographs or for works derived from them. 319 F. Supp. 3d at 663. When the predecessor in interest died, the copyrights in his photographs passed to a trust for which the predecessor in interest's widow served as the trustee. *Id.* at 661. The widow successor in interest and the third-party disputed whether the predecessor in interest owned the copyrights during his lifetime. *Id.* The Court awarded all registrations by both the predecessor and successor in interest the statutory presumption of validity. *Id.* at 677. Therefore, the third party was required to demonstrate sufficient evidence to rebut the presumption that the photographs' registrations were valid. *Id.* The Court concluded that the course of dealing by the predecessor in interest was at odds with the third party's claims of ownership in the photographs because the predecessor in interest maintained at all times that he was the rightful copyright owner in alignment with its first-in-time copyright registrations. *Id.* at 678.

In contrast to *Stern*, Mr. Taylor, as the alleged predecessor in interest, did not maintain a course of dealing that demonstrated that he or one of Mr. Taylor's entities was the rightful copyright owner of the Bridgeport Compositions. (SOMF ¶¶ 82-85). Rather, after Mr. Clinton left Mr. Taylor's label Revilot Records, he made no attempts to stop Bridgeport from claiming ownership of the Bridgeport Compositions or from exploiting the Bridgeport Compositions. (SOMF ¶¶ 82-85). Moreover, Mr. Taylor even played the Westbound Sound Recordings on air without any issue or raising any concern that he had any claims to the Bridgeport Compositions. (SOMF ¶ 20). Mr. Taylor never once complained about not receiving royalties on any of the Bridgeport Compositions for 30 years. (SOMF ¶ 85). He did not mention any claim to ownership of the Bridgeport Compositions in his Will. (SOMF ¶ 101). Mr. Taylor knew he had no claim to

the Bridgeport Compositions.  (SOMF ¶¶ 81-83). These undisputed facts alone should result in dismissal of TufAmerica's counterclaims.

Further, Bridgeport's course of dealing is powerful circumstantial evidence of the validity of its ownership of the Bridgeport Compositions. Plaintiffs have openly exploited the Bridgeport Compositions since the early 1970s. (SOMF ¶ 76). Plaintiffs filed copyright registrations on the Bridgeport Compositions. (SOMF ¶¶ 42-43, 48-49, 55-57, 62-65, 70-71, 75-76). The Bridgeport Compositions have also been registered with BMI on behalf of Bridgeport for nearly fifty years, and Mr. Taylor never disputed the registrations. (SOMF ¶¶ 41, 47, 55, 63, 69, 74, 78, 84). For half a century, Bridgeport has collected public performance royalties from BMI for these Bridgeport Compositions without any objections from Defendants or Mr. Taylor. (SOMF ¶¶ 78, 84).

### iii.    Even if Mr. Taylor Did Own Rights to the Bridgeport Compositions, Ms. Taylor Did Not Receive Those Rights After Mr. Taylor's Death

Transfer of copyright ownership may be bequeathed by will or pass as personal property by the applicable laws of intestate succession. *See* 17 U.S.C. § 204(a). However, even if Mr. Taylor did own the Bridgeport Compositions, his rights did not transfer to Ms. Taylor upon his death. (SOMF ¶¶ 101-102).

"It is well established law that in construing a will the court's function is to determine the intent of the testator from the four corners of the will." *In re Estate of Bumsted*, 56 A.2d 725, 730 (1948) (see *Empire Tr. Co. v. United States*, 226 F. Supp. 623, 629 (S.D.N.Y. 1963)). "Whether a word used in a will is to be construed in its technical or its more general sense is to be determined by considering which will better effectuate the testator's intention." *Endicott Tr. Co. v. United States*, 37 A.F.T.R.2d (RIA) 1516 (N.D.N.Y. Nov. 11, 1975). "In determining that intent we must assume that the testator contemplated the reasonable and natural construction of the language used, rather than that which would provide some absurd or illogical result." *Id.* Here, Mr. Taylor's Will

did not bequeath Ms. Taylor any rights to the Bridgeport Compositions as Defendants allege. (SOMF ¶¶ 101-102).

Even if for argument's sake, Mr. Taylor owned the Bridgeport Compositions at the time of his death, he certainly did not grant his rights in the Bridgeport Compositions to Ms. Taylor, as his Will makes no mention of the Bridgeport Compositions or any intellectual property in general. (SOMF ¶¶ 101-102). Moreover, Mr. Taylor's Will directs that his residuary estate be distributed in equal shares to Tiffani Taylor, Jason Richardson, Eric Taylor, and Laura Davis. (SOMF ¶ 102). Because Mr. Taylor's Will makes no explicit mention of intellectual property, specifically or generally, any copyrights owned by him would have been distributed through his residuary estate. Notably, Ms. Taylor is not a beneficiary of the residuary of Mr. Taylor's Estate. (SOMF ¶ 102). Thus, even if Mr. Taylor owned the Bridgeport Compositions, which he did not, his rights to the Bridgeport Compositions did not pass to Ms. Taylor upon his death.

### C. Ms. Taylor's Transfer of Ownership in the Bridgeport Compositions to TufAmerica Was Invalid

After Mr. Taylor's death, Ms. Taylor was approached by Fuchs, the owner of TufAmerica, about purchasing rights she allegedly held in the Bridgeport Compositions. (SOMF ¶ 103). Ms. Taylor did not have any documentation of her alleged rights in the Bridgeport Compositions and did not engage anyone to research her claim to the Bridgeport Compositions. (SOMF ¶¶ 105-107). She never possessed any written assignment from Mr. Clinton to Taylor or any of the LeBaron Entities concerning the Bridgeport Compositions. (SOMF ¶ 107). At the time of the purchase, Mr. Fuchs understood that Ms. Taylor had no written documents supporting her claim to the Bridgeport Compositions. (SOMF ¶ 108). However, Mr. Fuchs did not engage in any additional research such as searching the Copyright Office or Performance Rights Organization records or engaging anyone to research chain of title of the Bridgeport Compositions. (SOMF ¶¶ 109-110). Fuchs testified that

despite the fact that he has never seen paperwork between Mr. Clinton and Mr. Taylor, he "didn't do all that searching until after [he] had purchased the catalog." (SOMF ¶ 112). TufAmerica's due diligence prior to purchasing rights from Ms. Taylor was limited to Fuch's statement: "I reviewed the discography and I discussed with Ms. Taylor her rights. I knew that she was his wife and she was his successor in interest. [] So that was at that time sufficient for me to move forward." (SOMF ¶ 110). Moreover, Fuchs admitted that he only saw Mr. Taylor's Will for the first time in the days leading up to his February 26, 2021 deposition. (SOMF ¶ 115).

When TufAmerica purchased Ms. Taylor's alleged rights to the Bridgeport Compositions, (1) TufAmerica knew that she had no documentation supporting her claim to the Bridgeport Compositions, (2) Ms. Taylor had not engaged in any research concerning her alleged ownership of the Bridgeport Compositions , and (3) TufAmerica had not engaged in any research concerning the chain of title of the Bridgeport Compositions . (SOMF ¶¶ 105, 108-110). Ultimately, as evidenced by Mr. Taylor's Will, Ms. Taylor was devoid of authority to execute a transfer or sale of any alleged rights in the Bridgeport Compositions on behalf of herself, any of Mr. Taylor's entities, or Mr. Taylor's Estate, as is alleged in the August 9, 2011 Agreement. (SOMF ¶¶ 101-102, 111). Despite this, TufAmerica proceeded with its purchase of the Bridgeport Compositions and waited six years before bringing its claim of ownership to the Bridgeport Compositions to Bridgeport and Westbound's attention. (SOMF ¶¶ 111, 116).

**IV.    THE APPLICABLE STATUTE OF LIMIATATIONS PRECLUDES DEFENDANTS FROM CONTESTING BRIDGEPORT'S OWNERSHIP OF THE BRIDGEPORT COMPOSITIONS AND BARS ALL OF TUFAMERICA'S COUNTERCLAIMS**

"[A]n infringement claim does not 'accrue' until the copyright holder discovers, or with due diligence should have discovered, the infringement." *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 124 (2d Cir. 2014) (quoting 17 U.S.C. § 507(b) (emphasis added). Avoiding proper due diligence when acquiring copyrights does not toll the statute of limitations. *Latin Am. Music Co. v. Spanish Broad Sys. Inc.*, 232 F. Supp. 3d 384 (SDNY 2017). "An ownership claim accrues only once, when a reasonably diligent plaintiff would have been put on inquiry [notice] as to the existence of a right." *Id.* Here, Defendants' ownership claims accrued many more than 3 years before the filing of their counterclaims.

TufAmerica's ownership claim accrued **seven years** prior to Plaintiffs' filing in 2018 when they, undisputedly and with due diligence, should have discovered the alleged infringement of the Bridgeport Compositions. (SOMF ¶¶ 109-111). Ms. Taylor's ownership claim accrued **eighteen years** prior to Plaintiffs' filing when she purports to have inherited the Bridgeport Compositions, while Mr. Taylor, her alleged predecessor in interest, had knowledge of Plaintiffs' exploitation for nearly thirty years. (SOMF ¶¶ 81-83, 101-102). Defendants have provided no logical explanation for why they waited so long to bring these ownership claims when the Bridgeport Compositions were so freely and widely exploited and were registered with the U.S. Copyright Office. (SOMF ¶¶ 42-43, 48-49, 55-57, 62-65, 70-71, 75-76). Defendants have also provided no logical explanation as to why they or their predecessors never inquired into the status of their alleged ownership of the Bridgeport Compositions when they never received royalties for the exploitations of the Bridgeport Compositions. (SOMF ¶¶ 84-85). The statute of limitations for ownership claims has long since passed for both TufAmerica and Ms. Taylor. Even if the statute of limitations does

not bar TufAmerica's counterclaims entirely, its damages are limited solely to any infringing acts occurring in the three years preceding suit. S*ee Sohm v. Scholastic Inc*., 959 F.3d 39, 52 (2d Cir. 2020) (holding "[A] plaintiff's recovery is limited to damages incurred during the three years prior to filing suit."); *see also Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615, 622 (6th Cir. 2004 (holding a publisher's passive receipt of income from a license entered into greater than three years prior to suit is not an infringing act).

## V.    CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Summary Judgment and grant declaratory judgment that:

(1) Bridgeport is the rightful owner of the Bridgeport Compositions.

(2) Defendants do not have an interest in the Bridgeport Compositions; and

(3) Plaintiffs have not infringed upon any copyrights in the Bridgeport Compositions allegedly owned and/or controlled by Defendants by re-recording, commercially releasing, and/or otherwise exploiting the Bridgeport Compositions.

The Court should also dismiss all of TufAmerica's counterclaims for declaratory judgment, copyright infringement, and accounting, for all of the reasons stated above.

DATED: November 8, 2021                    **KING & BALLOW**

By:    */s/ Richard S. Busch*
Richard S. Busch (SB 5613)
KING & BALLOW
1999 Ave. of the Stars; Ste 1100
Century City, CA 90067
Telephone:    424-253-1255
Fax:            888-688-0482
rbusch@kingballow.com
Attorney for Plaintiffs