UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

**BRIDGEPORT MUSIC, INC. and**              :
**WESTBOUND RECORDS, INC.,**
                                            :    **Case No. 19-cv-01764-PGG**
            **Plaintiffs,**                 :

**v.**                                      :    **PLAINTIFFS' APPENDIX TO**
                                                 **RULE 56.1 STATEMENT OF**
                                            :    **MATERIAL FACTS IN SUPPORT**
**TUFAMERICA, INC. d/b/a TUFF CITY**             **OF MOTION FOR SUMMARY**
**RECORDS, and KAY LOVELACE**               :    **JUDGMENT**
**TAYLOR, individually and on behalf of the**
**Estate of LeBaron Taylor,**               :

            **Defendants.**                 :

------------------------------------- X

Plaintiffs Bridgeport Music, Inc. ("Bridgeport") and Westbound Records, Inc. ("Westbound")

(collectively "Plaintiffs") respectfully submit this Appendix to Rule 56.1 Statement in support of their

Motion for Summary Judgment pursuant to Local Rule V(C):


DATED: November 8, 2021                **KING & BALLOW**

                                       By: /s/ *Richard S. Busch*
                                       Richard S. Busch
                                       KING & BALLOW
                                       1999 Avenue of the Stars, Suite 1100
                                       Century City, CA 90067
                                       Telephone: (424) 253-1255
                                       Facsimile: 888-688-0482
                                       rbusch@kingballow.com

                                       *Attorney for Plaintiffs*
                                       *Bridgeport Music, Inc. and*
                                       *Westbound Records, Inc.*

## TABLE OF CONTENTS

| Description | Beginning Page |
|---|---|
| Declaration of Richard S. Busch | 5 |
| Exhibit 1 | 9 |
| Exhibit 2 | 27 |
| Exhibit 3 | 44 |
| Exhibit 4 | 66 |
| Exhibit 5 | 84 |
| Exhibit 6 | 88 |
| Exhibit 7 | 92 |
| Exhibit 8 | 96 |
| Exhibit 9 | 100 |
| Exhibit 10 | 104 |
| Exhibit 11 | 107 |
| Exhibit 12 | 109 |
| Exhibit 13 | 111 |
| Exhibit 14 | 113 |
| Exhibit 15 | 129 |
| Exhibit 16 | 136 |
| Exhibit 17 | 139 |
| Exhibit 18 | 146 |
| Exhibit 19 | 151 |
| Exhibit 20 | 154 |
| Exhibit 21 | 157 |
| Exhibit 22 | 160 |
| Declaration of Armen Boladian | 162 |

PLAINTIFFS' APPENDIX TO RULE 56.1 STATEMENT OF MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| **Exhibit 1** | **174** |
| **Exhibit 2** | **177** |
| **Exhibit 3** | **180** |
| **Exhibit 4** | **182** |
| **Exhibit 5** | **184** |
| **Exhibit 6** | **187** |
| **Exhibit 7** | **191** |
| **Exhibit 8** | **194** |
| **Exhibit 9** | **206** |
| **Exhibit 10** | **209** |
| **Exhibit 11** | **214** |
| **Exhibit 12** | **221** |
| **Exhibit 13** | **226** |
| **Exhibit 14** | **257** |
| **Exhibit 15** | **260** |
| **Exhibit 16** | **262** |
| **Exhibit 17** | **265** |
| **Exhibit 18** | **268** |
| **Exhibit 19** | **270** |
| **Exhibit 20** | **273** |
| **Exhibit 21** | **276** |
| **Exhibit 22** | **279** |
| **Exhibit 23** | **281** |
| **Exhibit 24** | **284** |
| **Exhibit 25** | **287** |
| **Exhibit 26** | **289** |
| **Exhibit 27** | **294** |
| **Exhibit 28** | **298** |

PLAINTIFFS' APPENDIX TO RULE 56.1 STATEMENT OF MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| Exhibit 29 | 301 |
|---|---|
| Exhibit 30 | 303 |
| Exhibit 31 | 306 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

**BRIDGEPORT MUSIC, INC. and**          :
**WESTBOUND RECORDS, INC.,**
                                        :
        **Plaintiffs,**
                                        :    **Case No. 19-cv-01764-PGG**
        **-against-**
                                        :
**TUFAMERICA, INC. d/b/a TUFF CITY**         **Declaration of Richard Busch**
**RECORDS, and KAY LOVELACE**           :
**TAYLOR, individually and on behalf of the**
**Estate of LeBaron Taylor,**           :

        **Defendants.**                 :

------------------------------------- X

I, Richard S. Busch, declare as follows:

        1.      I am a partner in the law firm of King & Ballow and lead counsel for Plaintiffs and

Cross-Defendants, Bridgeport Music, Inc. and Westbound Records, Inc., ("Plaintiffs"), in the

above-captioned matter.  I submit this Declaration in support of Plaintiffs' Motion for Summary

Judgment.  The information contained in this Declaration is based upon my personal knowledge.

If called as a witness in this action, I could and would testify competently to the contents of this

Declaration.

        2.      Attached hereto as **Exhibit 1** is a true and correct copy of the relevant pages of the

February 26, 2021 Deposition Transcript of Aaron Fuchs.

        3.      Attached hereto as **Exhibit 2** is a true and correct copy of the relevant pages of the

February 26, 2021 Deposition Transcript of Ms. Taylor.

        4.      Attached hereto as **Exhibit 3** is a true and correct copy of the relevant pages of the

June 21, 2021 Deposition of George Clinton.

5.    Attached hereto as **Exhibit 4** is a true and correct copy of the relevant pages of the April 15, 2021 Deposition Transcript of Armen Boladian.

6.    Attached hereto as **Exhibit 5** is a true and correct copy of the copyright registration for "Good Old Music", number EU56256, originally attached to Defendants' Amended Answer as Exhibit "D".

7.    Attached hereto as **Exhibit 6** is a true and correct copy of the copyright registration for "The Goose (That Laid the Golden Egg)", number EU27528, originally attached to Defendants' Amended Answer as Exhibit "B".

8.    Attached hereto as **Exhibit 7** is a true and correct copy of the copyright registration for "Let's Make It Last", number EU8922, originally attached to Defendants' Amended Answer as Exhibit "F".

9.    Attached hereto as **Exhibit 8** is a true and correct copy of the copyright registration for "I'll Wait", number EU975770, originally attached to Defendants' Amended Answer as Exhibit "H".

10.    Attached hereto as **Exhibit 9** is a true and correct copy of the copyright registration for "What You Been Growing, number EU27527, originally attached to Defendants' Amended Answer as Exhibit "J".

11.    Attached hereto as **Exhibit 10** is a true and correct copy of email correspondence produced in discovery between Vernon Slaughter and Brian Levenson, dated August 11, 2011 to August 15, 2011. Bates numbers KAY0015-KAY0016.

12.    Attached hereto as **Exhibit 11** is United States Copyright Registration Certificate number SR0000318918 for *Standing on the Verge of Getting It On*, publicly available at https://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi, lasted accessed November 6, 2021.

Plaintiffs' Appendix 6

13.    Attached hereto as **Exhibit 12** is United States Copyright Registration Certificate number EU597869 dated June 30, 1975, and renewed by Bridgeport on September 30, 2003, publicly available at https://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgo, last accessed November 6, 2021.

14.    Attached hereto as **Exhibit 13** is a true and correct copy of the copyright registration information for "Can You Get To That" as it appears in *Maggot Brain*, publicly available at https://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi, last accessed November 5, 2021.

15.    Attached hereto as **Exhibit 14** is a true and correct copy of the Order Setting Procedures for Trial on Counterclaim and Directing Entry of Judgment Dismissing Complaint, United States District Court for the Northern District of Florida Tallahassee Division, Case No. 4:99cv242-RH, dated January 30, 2001, publicly available on Pacer.

16.    Attached hereto as **Exhibit 15** is a true and correct copy of the Order Denying Motion to Vacate Judgment, United States District Court for the Northern District of Florida Tallahassee Division, Case No. 4:99cv242-RH, dated December 5, 2001. Bates numbers BOLADIAN01312-BOLADIAN01317.

17.    Attached hereto as **Exhibit 16** is a true and correct copy of the Letter to Plaintiffs from TufAmerica, dated December 11, 2017.  Bates numbers BM00033.

18.    Attached hereto as **Exhibit 17** is a true and correct copy of the August 9, 2011 Agreement between TufAmerica and Kay Lovelace Taylor. Bates numbers BM00291-BM00296.

19.    Attached hereto as **Exhibit 18** is a true and correct copy of the Last Will and Testament of H. LeBaron Taylor, dated November 1, 1999. Bates numbers KAY0001-KAY0004.

20.     Attached hereto to **Exhibit 19** is a true and correct copy of Bridgeport and Wesbound's Response to TufAmerica's December 11, 2017 Letter, dated December 22, 2017. Bates numbers BM00037 – BM00038.

21.     Attached hereto as **Exhibit 20** is a true and correct copy of TufAmerica's Response to Plaintiff's December 22, 2018 Letter, dated January 5, 2018. Bates numbers BM00035-BM00036.

22.     Attached hereto as **Exhibit 21** is a true and correct copy of the December 9, 2019 Agreement between TufAmerica and Ms. Taylor. Bates numbers TUF0007-TUF0008.

23.     Attached hereto as **Exhibit 22** is a true and accurate copy of the copyright registration information for *Cosmic Slop*, number PA0000527433, publicly available at https://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi, last visited November 5, 2021.


I declare under the penalties of perjury under 28 U.S.C. 1746 that the foregoing is true and correct.

Dated: November 8, 2021

By: /s/ *Richard S. Busch*
Richard S. Busch
King & Ballow
315 Union Street, Suite 1100
Nashville, TN 37201
(615) 726-5422
rbusch@kingballow.com
*Attorneys for Plaintiffs*

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRIDGEPORT MUSIC, INC., and
WESTBOUND RECORDS, INC.,

Plaintiffs

vs. CIVIL ACTION NO.
19-CV-1764 PGG

TUFAMERICA, INC., d/b/a
TUFF CITY RECORDS, and
KAY LOVELACE TAYLOR,
individually and on behalf
of the estate of LEBARON TAYLOR,

Defendants.

````````````````````````````

REMOTE VIDEO DEPOSITION OF
AARON FUCHS

FEBRUARY 26, 2021
1:30 P.M.

MAGNA LEGAL SERVICES
(866) 624-6221
WWW.MAGNALS.COM
````````````````````````````

Page 2

```
 1              REMOTE APPEARANCES OF COUNSEL
 2   On behalf of the Plaintiffs:
 3        Richard S. Busch, Esquire
          King & Ballow
 4        1999 Avenue of the Stars - Suite 1100
          Century City, California  90067
 5        (424) 253-1255
          rbusch@kingballow.com
 6
 7   On behalf of the Defendants and
     Counterclaim Plaintiff:
 8
          Brian D. Caplan, Esquire
 9        Reitler, Kailas & Rosenblatt
          885 Third Avenue - 20th Floor
10        New York, New York  10022
          (212) 209-3050
11        bcaplan@reitlerlaw.com
12
13   ALSO PRESENT:
14   Kevin Chang, Videographer
15
16
17
18
19
20
21
22
23
24
25
```



Plaintiffs' Appendix 11

Page 3

```
 1                    INDEX OF EXAMINATION

 2                                                Page

 3   WITNESS:  AARON FUCHS

 4   Examination

 5   By Mr. Busch                           7

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Page 4

```
 1                  INDEX TO EXHIBITS
 2                                              Page
 3   Exhibit Number 1,
          Notice                                  8
 4
     Exhibit Number 2,
 5        Agreement                              41
 6   Exhibit Number 3,
          Email - Bates Number Kay0015-16       44
 7
     Exhibit Number 4,
 8        Email - Bates Number Kay0022-23       46
 9   Exhibit Number 5,
          Email - Bates Number Tuff0117-123     51
10
     Exhibit Number 6,
11        Email - Bates Number Tuf0129          53
12   Exhibit Number 7,
          Letter - Bates Number BM00039-40      56
13
     Exhibit Number 8,
14        Letter - Bates Number Tuf126-28       58
15   Exhibit Number 9,
          Bates Number Kay007-8                 58
16
     Exhibit Number 10,
17        Letter - Bates Number Tuf0075         65
18   Exhibit Number 11,
          Supplemental agreement
19        Bates Number Tuf0007-8                66
20
21
22
23
24
25
```



Page 5

```
 1                    STIPULATION
 2        The remote videotaped deposition of AARON
 3   FUCHS, called as a witness by the Plaintiffs,
 4   pursuant to all applicable rules on the 26th day of
 5   February, 2021, before Deborah West, Licensed Court
 6   Reporter #314, and Notary Public, in and for the
 7   State of Tennessee.
 8        It being agreed that Deborah West, a Tennessee
 9   Licensed Court Reporter may report the deposition
10   in machine shorthand, afterwards reducing the same
11   to typewritten form.
12        It being further agreed that all formalities
13   as to notice, caption, certificate, transmission,
14   et cetera, are expressly waived, INCLUDING the
15   reading of the completed deposition by the witness,
16   and the signature of the witness.
17
18
19
20
21
22
23
24
25
```



```
 1   (1:32 P.M.)
 2              THE VIDEO SPECIALIST:  Good
 3         afternoon.  We are now on the record.
 4         This begins videotape number 1 in the
 5         deposition of Aaron Fuchs in the matter
 6         of Bridgeport Music, Inc., et al v.
 7         TufAmerica, Inc., et al, in the United
 8         States District Court, Southern District
 9         of New York, Case Number 19-CV-1764 PGG.
10              Today is Friday, February 26th,
11         2021, and the time is 1:33 p.m. Eastern
12         Standard Time.
13              This deposition is being taken
14         remotely via Zoom at the request of King
15         & Ballow.  The videographer is Kevin
16         Chang of Magna Legal Services and the
17         court reporter is Debbie West, also of
18         Magna Legal Services.
19              Will counsel and all parties present
20         state their appearances and whom they
21         represent, after which the court reporter
22         will swear in the witness.
23              MR. BUSCH:  Richard Busch on behalf
24         of Bridgeport Music and Westbound
25         Records.
```



Page 33

1    him for one year before his death?

2         A     I didn't know that.

3    BY MR. BUSCH:

4         Q     Did you know that all Dr. Oliver had

5    was that she found the reel tapes in the basement

6    with no other paperwork?  Did you know that?

7              MR. CAPLAN:  Objection to form.

8              THE WITNESS:  I don't know -- I

9         don't know how she came across those

10        tapes.  It was just clear to me she was

11        his successor and the tapes were hers to

12        do business with.

13   BY MR. BUSCH:

14        Q     Did you search the copyright

15   registrations to see who filed copyrights on those

16   songs, sir?

17        A     No.

18        Q     Did you check PRO websites to see

19   who was listed as the publisher on those songs?

20        A     No.  I check credits on records.

21        Q     Did you ever listen to the master

22   tapes in your possession?

23        A     Ever?

24        Q     Did you ever listen to those reel

25   tapes that you received from Dr. Oliver?



Page 35

1          Q      What is Mr. Becker's job?  Who does
2    he work for?

3          A      Engineer.

4          Q      Where does he work?

5          A      He works at the studio.

6          Q      What is his phone number?

7          A      I don't have it on hand.

8          Q      You can provide it though?

9          A      Yes.

10         Q      Will you provide it to us after this
11   deposition?

12         A      Unless, you know, Brian has no
13   objection, I don't.

14              MR. CAPLAN:  We will take that under
15           advisement.

16   BY MR. BUSCH:

17         Q      Since you didn't search the
18   copyright office website or the PRO website, you
19   would not have known then, sir, when you purchased
20   these assets from Dr. Oliver that Bridgeport Music
21   was listed as the owner of the publishing on these
22   songs and that Westbound Records owned the sound
23   recordings of these songs, correct?

24              MR. CAPLAN:  Objection to form.  You
25           can answer.



```
 1                    THE WITNESS:  I didn't do all that
 2              searching until after I had purchased the
 3              catalog.
 4    BY MR. BUSCH:
 5         Q    Why did you wait until you -- let me
 6    ask you this:  First of all, how long after you
 7    purchased the catalog did you do the searching?
 8         A    It had been a few years.
 9         Q    Why did you not do it before you
10    purchased the catalog?
11         A    When you run a small label in the
12    record business in New York City, you can't always
13    do what you want to when you want to.
14         Q    You mean there is someone out there
15    stopping you?
16         A    Sometimes you have to protect the
17    ground you stand on in New York.
18         Q    What does that mean?
19         A    It's a priority.
20         Q    What's that mean, if you're
21    distracted for a moment someone is going to attack
22    you?
23                    MR. CAPLAN:  Objection.
24              Argumentative.
25                    THE WITNESS:  Sometimes there are
```



Page 43

1    you reviewed a discography, correct?

2          A     I reviewed the discography and I

3    discussed with Kay Taylor her rights.  I knew that

4    she was a wife and she was his successor in

5    interest.  So I did it with -- and I knew that she

6    had tapes.  So that was at that time sufficient for

7    me to move forward.

8          Q     Sir, I deposed Dr. Oliver, Kay

9    Taylor, two hours before this deposition.

10               Do you know that she testified that

11   she had no idea what rights or lack of rights

12   Mr. Taylor had in those tapes?  She just found them

13   and had no paperwork and knew nothing about them.

14               Is that what she communicated to

15   you?

16               MR. CAPLAN:  Objection.

17               THE WITNESS:  She was represented by

18          a lawyer.

19   BY MR. BUSCH:

20          Q     I see.  Did he tell you what I just

21   said --

22          A     No.

23          Q     -- which is that she knew nothing

24   about it?

25          A     No.



Page 44

1          Q     I see.  Okay.  Let's go to Exhibit

2    Number 3.

3                (Exhibit Number 3 marked.)

4    BY MR. BUSCH:

5          Q     This is an email -- do you know a

6    person named Vernon Slaughter?

7          A     Yes.

8          Q     Who is Vernon Slaughter?

9          A     Kay Taylor's lawyer.

10         Q     Do you know somebody by the name of

11   Brian Levenson?

12         A     Yes.

13         Q     Who is Brian Levenson?

14         A     My lawyer.

15         Q     Do you see this email from Vernon

16   Slaughter to Brian Levenson August 15, 2011, 11:01

17   p.m.?

18         A     Yes.

19         Q     Do you see where Mr. Slaughter

20   writes, "Brian, please adjust paragraph 4.  Kay

21   does not have any contracts and therefore cannot

22   warrant and represent that she has.  Call me if you

23   want to discuss.  I suggest that you remove the

24   second sentence."

25                Do you see that?



Page 45

```
 1            A     Yes.

 2            Q     Do you see the email below that

 3    where Ms. Taylor writes to Vernon Slaughter, "Hi,

 4    Vernon, I read the contract and I just have one

 5    additional comment.  As stated on the telephone, I

 6    have no written documents, just the tapes.  So I am

 7    a bit uncomfortable with number 4."

 8                  Do you see that?

 9            A     Yes.

10            Q     Did your lawyer, Mr. Levenson, pass

11    on to you that Ms. Taylor said she has no written

12    documents, just the tapes?

13            A     Yes.

14            Q     Do you know if paragraph 4, the

15    representations and warranties, was adjusted as a

16    result?

17            A     Yes.

18            Q     Okay.  As a result of seeing -- of

19    being advised that Ms. Taylor, who now goes by

20    Dr. Oliver, Ms. Oliver, did not have any documents,

21    just the tapes, that did not cause you, Mr. Fuchs,

22    to then do further due diligence such as check the

23    copyright office, data bank, or the PRO website to

24    see who was listed as the owner of the

25    compositions, did it?
```



Page 50

```
 1           Q      Okay.  Have you ever reviewed the
 2    will of LeBaron Taylor?
 3           A      No.
 4           Q      How do you know -- do you know if
 5    there is any reference in the will to Mr. Taylor
 6    having any intellectual property whatsoever to pass
 7    on to any of his heirs?
 8           A      I have never read his will.
 9           Q      Do you know it has been produced in
10    this case by your side?
11           A      Produced?
12           Q      Do you know that your lawyer,
13    Mr. Caplan, produced the will in this case?
14           A      I have seen it.
15           Q      Did you read it?
16           A      Casually.
17           Q      Did you see there was no reference
18    whatsoever to intellectual property being bestowed
19    upon any of the heirs of Mr. Taylor?
20                  MR. CAPLAN:  Objection as to form.
21              Calls for a legal conclusion.  And you're
22              misrepresenting --
23                  (Simultaneous speaking.)
24    BY MR. BUSCH:
25           Q      Excuse me, sir.  Did you see there
```



Page 51

```
 1   was no reference whatsoever to any intellectual
 2   property in that will?
 3                   MR. CAPLAN:  Objection to form.
 4                   THE WITNESS:  I don't remember
 5            whether that was there or not.
 6   BY MR. BUSCH:
 7         Q    That's what you're relying on?
 8         A    I saw the will yesterday for the
 9   first time, or day before yesterday.
10         Q    Okay.  Go to Exhibit Number 5, if we
11   could.
12                   (Exhibit Number 5 marked.)
13   BY MR. BUSCH:
14         Q    This is an email from Archie Ivy to
15   Nick Schmitt, team@georgeclinton,
16   management@georgeclinton.  Who is Nick Schmitt?
17         A    My lawyer.
18         Q    Do you know what this email
19   concerns?
20         A    Yes.
21         Q    What does it concern?
22         A    I wanted to move forward in my
23   ongoing wish to get him involved in my Parliaments
24   reissue.
25         Q    Did Mr. Clinton ever -- this email
```



Page 68

1          Q      Have you seen any contracts between
2     Revilot and any members of Parliaments, including
3     George Clinton?
4          A      No.
5          Q      Do you know what releases Revilot
6     had with the Parliaments, singles or albums?
7          A      Not off the top of my head.  You
8     know, if I had some time there would be no problem
9     finding, you know -- again, discographies.
10          Q      Do you know why Parliaments left
11     Revilot and went to Invictus Records?
12          A      No.
13          Q      Do you know how much money Revilot
14     paid George Clinton and the Parliaments?
15          A      No.
16          Q      Do you know how much money, if
17     anything, LeBaron Taylor paid George Clinton or the
18     Parliaments?
19          A      No.
20          Q      Do you know how many copies of "I
21     Wanna Testify" Revilot sold and received payments
22     for?
23          A      No.
24          Q      Do you know when Revilot went out of
25     business?



Page 69

1          A       Sometime before '69.  I know that
2     they ceased putting out records, '69, '70.
3          Q       Okay.  Do you know if that's when
4     they went bankrupt?
5          A       No.
6          Q       Do you know whether any of the
7     publishing that related to songs that were released
8     on Revilot were in the name of Revilot?
9          A       Were what?
10          Q       In the name of Revilot?
11          A       I don't understand the question.
12          Q       Do you know whether the publishing
13     on the songs that Revilot put out were purportedly
14     owned in the name of Revilot?
15                  MR. CAPLAN:  Objection to form.
16                  THE WITNESS:  The names were
17              separate.  The record company was
18              Revilot, the publishing company was
19              LeBaron Music.
20     BY MR. BUSCH:
21          Q       I am asking -- you have never seen
22     one contract between LeBaron Taylor, George
23     Clinton, or Revilot, correct?
24          A       Correct.
25          Q       So you don't know who the names of



1                    REPORTER CERTIFICATE

2    STATE OF TENNESSEE

3    COUNTY OF KNOX

4         I, Deborah West, Licensed Court Reporter, LCR

5    #314, in and for the State of Tennessee, do hereby

6    certify that the remote deposition of AARON FUCHS,

7    was reported by me and that the foregoing

8    transcript, pages 1 through 75, inclusive, is a

9    true and accurate record to the best of my

10   knowledge, skills and ability.

11             I further certify that I am not related

12   to, nor an employee or counsel of any of the

13   parties to the action as defined under T.C.A

14   Section 24-9-136, nor am I financially interested

15   in the outcome of this case.

16        In witness thereof, I have hereunto set my

17   hand on this the 8th day of March, 2021.

18   Signature of the witness was not discussed.

19

20

21

22                        _____

                          Deborah West, LCR 314 TN

23                        Expiration:  6/30/2022

24

25



Plaintiffs' Appendix 26

# EXHIBIT 2

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


BRIDGEPORT MUSIC, INC., and
WESTBOUND RECORDS, INC.,

      Plaintiffs

vs.                          CIVIL ACTION NO.
                                19-CV-1764 PGG

TUFAMERICA, INC., d/b/a
TUFF CITY RECORDS, and
KAY LOVELACE TAYLOR,
individually and on behalf
of the estate of LEBARON TAYLOR,

      Defendants.

``````````````````````````````


REMOTE VIDEO DEPOSITION OF
KAY A. OLIVER

FEBRUARY 26, 2021
11:00 A.M.


MAGNA LEGAL SERVICES
(866) 624-6221
WWW.MAGNALS.COM



Page 2

```
 1            REMOTE APPEARANCES OF COUNSEL
 2   On behalf of the Plaintiffs:
 3        Richard S. Busch, Esquire
          King & Ballow
 4        1999 Avenue of the Stars - Suite 1100
          Century City, California  90067
 5        (424) 253-1255
          rbusch@kingballow.com
 6
 7   On behalf of the Defendants and
     Counterclaim Plaintiff:
 8
          Brian D. Caplan, Esquire
 9        Reitler, Kailas & Rosenblatt
          885 Third Avenue - 20th Floor
10        New York, New York  10022
          (212) 209-3050
11        bcaplan@reitlerlaw.com
12
13   ALSO PRESENT:
14   Kevin Chang, Videographer
15
16
17
18
19
20
21
22
23
24
25
```



Page 3

```
 1                    INDEX OF EXAMINATION
 2                                                  Page
 3   WITNESS:  KAY A. OLIVER
 4   Examination
 5   By Mr. Busch                             7
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Plaintiffs' Appendix 30

Page 4

```
 1                    INDEX TO EXHIBITS
 2                                              Page
 3   Exhibit Number 1,
         Last Will & Testament of
 4       LeBaron Taylor                         15
 5   Exhibit Number 2,
         Agreement                              25
 6
     Exhibit Number 3,
 7       Bates number Kay15-16                  29
 8   Exhibit Number 4,
         Bates number Kay22-23                  35
 9
     Exhibit Number 5,
10       Bates number BM39-40                   36
11   Exhibit Number 6,
         Photograph of master tape list        37
12
     Exhibit Number 7,
13       Letter dated 1/12/18                   38
14   Exhibit Number 8,
         Letter - Bates Tuff7-8                 39
15
16
17
18
19
20
21
22
23
24
25
```



Page 5

```
 1                    STIPULATION
 2        The remote videotaped deposition of KAY A.
 3   OLIVER, called as a witness by the Plaintiffs,
 4   pursuant to all applicable rules on the 26th day of
 5   February, 2021, before Deborah West, Licensed Court
 6   Reporter #314, and Notary Public, in and for the
 7   State of Tennessee.
 8        It being agreed that Deborah West, a Tennessee
 9   Licensed Court Reporter may report the deposition
10   in machine shorthand, afterwards reducing the same
11   to typewritten form.
12        It being further agreed that all formalities
13   as to notice, caption, certificate, transmission,
14   et cetera, are expressly waived, INCLUDING the
15   reading of the completed deposition by the witness,
16   and the signature of the witness.
17
18
19
20
21
22
23
24
25
```



```
 1   (11:00 A.M.)
 2              THE VIDEO SPECIALIST:  Good morning.
 3         We are now on the record.  This begins
 4         the videotaped-deposition of Dr. Kay
 5         Oliver in the matter of Bridgeport Music,
 6         Inc. et al, v. TufAmerica, Inc., et al,
 7         filed in the United States District
 8         Court, Southern District of New York.
 9         Case Number 19-CV-1764 PGG.
10              Today is Friday, February 26, 2021,
11         and the time is 11:02 a.m. Eastern
12         Standard Time.
13              This deposition is being taken
14         remotely via Zoom at the request of King
15         & Ballow.  My name is Kevin Chang with
16         Magna Legal Services and I will be your
17         videographer for today.  The court
18         reporter is Debbie West, also with Magna
19         Legal Services.
20              Will counsel and all parties present
21         state their appearances and whom they
22         represent, after which the court reporter
23         will swear in the witness.
24              MR. BUSCH:  Richard Busch on behalf
25         of the plaintiffs, Bridgeport Music and
```



Page 7

1             Westbound Records.

2                   MR. CAPLAN:  Brian Caplan on behalf

3             of the defendants TufAmerica, Inc., and

4             Kay Lovelace Taylor.

5                   KAY A. OLIVER,

6    called as a witness and having been first duly

7    sworn, was examined and testified as follows:

8                   EXAMINATION

9    BY MR. BUSCH:

10         Q    Good morning, Dr. Oliver.  My name

11   is Richard Busch and I represent the plaintiffs in

12   this lawsuit, Bridgeport Music and Westbound

13   Records.  Good morning.

14         A    Good morning.

15         Q    Would you please state your name for

16   the record?

17         A    Kay A. Oliver.

18         Q    And you are a doctor; is that

19   correct?

20         A    I am an educational doctor.  My

21   doctorate is in education.

22         Q    Would you like to be referred to as

23   Dr. Oliver during the deposition today?

24         A    Yes.

25         Q    Then I will do that.  Before we



```
 1                    MR. CAPLAN:  Objection.  Lack of
 2           foundation.
 3                    THE WITNESS:  I had no knowledge.
 4    BY MR. BUSCH:
 5           Q     Dr. Oliver, you said you found some
 6    reels.  Let me back up.
 7                    When did Mr. Taylor pass away?
 8           A     In 2000.
 9           Q     So you were married to him for just
10    one year?
11           A     Correct.
12           Q     I am sorry about that.  When did you
13    say you found some reels?  You said you found some
14    reels.
15           A     Yeah.  I was moving from the house
16    and, of course, you have to clean the house out,
17    and found reels in the basement of our home.
18           Q     I am sorry, I thought you were
19    finished.  I apologize.  Continue, please.
20           A     That's basically it.  I found reels
21    in the basement of our home.
22           Q     What reels did you find?
23           A     They were boxes and they looked like
24    movie reels to me.  I didn't know what they were.
25    And when I opened up the box, there was a sheet of
```



Page 15

1    paper describing the music.  I guess songs by

2    different artists that were on those reels.

3          Q    These were recordings?

4          A    Yes, I think so.

5          Q    Okay.  Now I understand that you do

6    not have in your possession and have never had any

7    written assignment from George Clinton to LeBaron

8    Taylor or any of his entities actually assigning

9    ownership in any songs or recordings to LeBaron

10   Taylor or any of his entities; is that correct?

11         A    That's correct.

12         Q    Can you please pull up Exhibit

13   Number 1, 1-4.

14              (Exhibit Number 1 marked.)

15   BY MR. BUSCH:

16         Q    Do you recognize this document up on

17   the screen, Exhibit Number 1?

18         A    Yes.

19         Q    And what do you recognize this

20   document to be?

21         A    Part of his will, I believe.

22         Q    Mr. Taylor's will?

23         A    Yes.

24         Q    Is this a true and correct copy of

25   the last will and testament of H. LeBaron Taylor?



Page 25

1          Q      Okay.  You have never seen any such

2    paperwork, correct?

3          A      I can't recall.

4          Q      Whatever you had in that regard, you

5    gave to your lawyers like Mr. Caplan, correct?  So

6    if those documents existed, you would expect that

7    Mr. Caplan would have those now, correct?

8          A      I suppose.

9          Q      Okay.  Let's now put up, if we

10   could, Exhibit Number 2, on the screen, please.

11               (Exhibit Number 2 marked.)

12   BY MR. BUSCH:

13         Q      Dr. Oliver, do you recognize what I

14   am putting up on the screen here?  Exhibit Number

15   2.  It appears to be an agreement involving

16   yourself and TufAmerica, Tuff City, and other

17   people.

18               Do you recognize this document?

19         A      I do.

20               MR. CAPLAN:  Objection.

21   BY MR. BUSCH:

22         Q      What do you recognize this document

23   to be?

24         A      An agreement between myself and Tuff

25   City giving him partial rights to the reels that I



Page 26

1    had in my possession.

2          Q     That's dated August 9th, 2011,

3    correct?

4          A     Correct.

5          Q     How did you learn -- first of all,

6    is TufAmerica an individual?  You said granting

7    "him."  Is there an individual owner of TufAmerica

8    that you're aware of?

9                MR. CAPLAN:  Objection.  Foundation.

10   BY MR. BUSCH:

11         Q     Go ahead, Dr. Oliver.  Please

12   answer.

13         A     I thought it was Aaron Fuchs was the

14   owner of Tuff City as I knew it.

15         Q     How did you become acquainted with

16   him or Tuff City?

17         A     Through a reference that was given

18   to me.

19         Q     Okay.  Who gave you that reference?

20         A     A lawyer that used to do some

21   business with the family.  He is since deceased.

22         Q     Okay.  So you had no relationship

23   with Tuff City or its owner prior to the time that

24   a lawyer gave you their information, contact

25   information, with respect to the reels that you



Page 28

1          way.

2     BY MR. BUSCH:

3          Q     Did you tell any of these -- did you

4     tell the people at Tuff City that you did not have

5     any documentation showing that Mr. Taylor actually

6     owned any of the songs on the reels?

7          A     He did ask me if I had any paperwork

8     that went along with it and I told him, No, I did

9     not.  Everything that I had, everything that I

10    found in those boxes I had forwarded with the

11    reels.

12         Q     Before selling whatever interest in

13    these works Mr. Taylor may or may not have, did you

14    engage anyone to research this chain of title or

15    copyright registrations held in these works?

16         A     I did not.

17         Q     As you sit here today, you do not

18    know, do you, Dr. Oliver, whether Mr. Taylor

19    actually has any ownership interest in the songs

20    that are on the reels that you found in the

21    basement of your home, do you?

22              MR. CAPLAN:  Objection to form.

23              THE WITNESS:  I don't have any legal

24         documents stating that.

25



Page 31

1    and represent that you have valid, signed

2    agreements with each and every artist, et cetera.

3                    Do you see that?

4          A      That I -- no, I don't.

5          Q      It says, "Taylor warrants and

6    represents."  Do you see that?

7          A      And that's exactly why I said to

8    Vernon Slaughter that I had concerns about him

9    putting that into the contract.

10         Q      That's my question.  It's a very --

11   I asked you earlier in this deposition if you

12   expressed concerns -- if you had any concerns about

13   not having the paperwork, and this email expresses

14   the concerns that you had at the time, correct?

15         A      The question, I took it that you

16   asked me earlier, was did I have any concerns about

17   not having paperwork.  And I said I just didn't

18   think about that, or something to that nature.

19                    But here something is in writing now

20   and it's going back saying that I said it.  Of

21   course, I have concerns about something that

22   someone is saying that I said.

23         Q      In this email, this language that

24   you're quoting, you are representing and warranting

25   that you have valid, signed agreements with each



Page 32

```
 1   and every artist, producer, and songwriter, and any

 2   other copyright holder and the rights owner

 3   associated with these copyrights and those

 4   agreements transfer all right, title, and interest

 5   to Taylor.

 6               You see that, correct?

 7        A    I do.

 8        Q    In fact, you don't have that

 9   paperwork, correct?

10        A    That's why I said I have concerns

11   that it's in the contract.  Now if it's in the

12   contract, then we have an issue.

13        Q    Is that language --

14               MR. CAPLAN:  Richard, I would like

15            to make an objection.  This is not the

16            language that made it into the final

17            agreement.

18               I have given you leeway because of

19            the fact, in the attorney-client

20            relationship between Dr. Taylor and her

21            attorney, Mr. Slaughter, because of the

22            fact that this particular email exchange

23            was sent on to the representative for

24            TufAmerica.

25               So I just want you to understand
```



Page 39

```
 1            Q       January 12, 2018?

 2            A       Yes, I think so.

 3            Q       Okay.  Prior to this, nobody advised

 4     you of Bridgeport Music and Westbound Records

 5     copyright registrations on these songs or prior

 6     releases, correct?

 7            A       No.

 8            Q       Meaning that's correct, right?

 9            A       Correct.

10            Q       Now, look at Exhibit Number 8,

11     please, Tuff 7 and 8.  This is a letter dated

12     December 9th, 2019, to you from Tuff City, correct?

13            A       Yes, it is.

14                    (Exhibit Number 8 marked.)

15     BY MR. BUSCH:

16            Q       And in this letter -- let me

17     rephrase the question.

18                    Your initial agreement with Tuff

19     City granted Tuff City 50 percent ownership of

20     whatever Mr. Taylor had that you inherited.  And in

21     this letter-agreement you are granting the other 50

22     percent, correct?

23            A       Correct.

24            Q       Why did you do that?

25            A       I was tired of it.  I was spending
```



Page 45

1                   REPORTER CERTIFICATE

2    STATE OF TENNESSEE

3    COUNTY OF KNOX

4        I, Deborah West, Licensed Court Reporter, LCR

5    #314, in and for the State of Tennessee, do hereby

6    certify that the remote deposition of KAY OLIVER,

7    was reported by me and that the foregoing

8    transcript, pages 1 through 45, inclusive, is a

9    true and accurate record to the best of my

10   knowledge, skills and ability.

11             I further certify that I am not related

12   to, nor an employee or counsel of any of the

13   parties to the action as defined under T.C.A

14   Section 24-9-136, nor am I financially interested

15   in the outcome of this case.

16       In witness thereof, I have hereunto set my

17   hand on this the 8th day of March, 2021.

18   Signature of the witness was not discussed.

19

20

21

22                       _____

                         Deborah West, LCR 314 TN

23                       Expiration:  6/30/2022

24

25



Plaintiffs' Appendix 43

# EXHIBIT 3

Page 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK


BRIDGEPORT MUSIC, INC.,
AND WESTBOUND RECORDS, INC.,

     Plaintiff,

vs.                               CIVIL ACTION NO.:
                                   19-CV-1764(PGG)

TUFAMERICA, INC. DBA
TUFF CITY RECORDS, ET AL.

     Defendant.

_____/


DEPOSITION OF GEORGE CLINTON

VIRTUAL VIDEOCONFERENCE

Monday, June 21, 2021

1:01 p.m. - 6:25 p.m.









Pages: 1 - 161

Stenographically
Reported By: Annie M. Zuccarelli



Plaintiffs' Appendix 45

Page 2

```
 1   A P P E A R A N C E S:
 2   APPEARING ON BEHALF OF PLAINTIFFS,
     BRIDGEPORT MUSIC, INC. AND WESTBOUND RECORDS, INC.
 3   KATHERINE M. IVES, ESQUIRE
     LORNE G. HILLER, ESQUIRE
 4   KING & BALLOW
     315 Union Street
 5   Suite 1100
     Nashville, Tennessee 37201
 6   (615) 259-3456
     kives@kingballow.com
 7   lhiller@kingballow.com
 8   APPEARING ON BEHALF OF THE DEFENDANTS,
     TUFAMERICA, INC., DBA TUFF CITY RECORDS
 9   AND KAY LOVELACE TAYLOR
     BRIAN D. CAPLAN, ESQUIRE
10   JULIE B. WLODINGUER, ESQUIRE
     REITLER KAILAS & ROSENBLATT LLP
11   885 3rd Avenue
     20th Floor
12   New York, New York 10022
     (212) 209-3050
13   bcaplan@reitlerlaw.com
     jwlodinguer@reitlerlaw.com
14
15   APPEARING ON BEHALF OF GEORGE CLINTON
     EDWIN F. MCPHERSON, ESQUIRE
16   MCPHERSON LLP ATTORNEYS AT LAW
     1801 Century Park East
17   24th Floor
     Los Angeles, California 90067
18   (310) 553-8833
     emcpherson@mcpherson-llp.com
19
20
     ALSO PRESENT:
21
     BOB BEHRENS - VIDEOGRAPHER
22   ARCHIE IVY
     JOEL MARTIN
23   SARAH CATLETT
     ARMEN BOLADIAN
24
25
```



Page 3

```
 1              C O N T E N T S
 2    EXAMINATION OF GEORGE CLINTON           PAGE
 3         By Mr. Caplan                   6, 154
 4          By Ms. Ives                       109
 5    CERTIFICATE OF OATH                     158
 6    CERTIFICATE OF REPORTER                 159
 7    ERRATA SHEET                            160
 8    NOTIFICATION LETTER                     161
 9
10
11
12              E X H I B I T S
13         (Attached to transcript)
14
15  GEORGE CLINTON  DEFENDANTS' EXHIBIT        PAGE
16    Exhibit    1  Subpoena                    12
17    Exhibit    2  Website of George Clinton   36
18    Exhibit   11  Agreement                   50
19    Exhibit    4  45 of "I'll Wait"           59
20    Exhibit    5  45 of "(I Owe You) Something" 60
21    Exhibit    6  45 of "Let's Make It Last"  63
22    Exhibit    7  45 of "The Goose
23                  (That Laid The Golden Egg)" 66
24    Exhibit    8  45 of "What You Been Growing" 68
25    Exhibit    9  45 of "Good Old Music"      69
```



```
                                                    Page 4
 1     Exhibit    3  45 of "(I Wanna) Testify"        76

 2     Exhibit   10  Reel-to-reel masters             78

 3     Exhibit   18  Songwriter's agreement           86

 4     Exhibit 18-A  Agreement                        88

 5     Exhibit 18-B  Agreement                        91

 6     Exhibit 18-C  Agreement                        92

 7     Exhibit 18-D  Agreement                        94

 8     Exhibit   19  Agreement                        98

 9     Exhibit   20  Agreement                        99

10     Exhibit   21  Agreement                       100

11     Exhibit   22  Letter                          101

12     Exhibit   28  Certificate of Recordation      107

13

14  GEORGE CLINTON  PLAINTIFFS' EXHIBITS             PAGE

15    Exhibit   45  Addendum                         112

16    Exhibit    8  Agreement                        115

17    Exhibit    9  Termination Agreement            120

18    Exhibit   61  Deposition transcript            130

19    Exhibit   46  Motion                           132

20    Exhibit   47  Order                            133

21    Exhibit    6  E-mail thread                    130

22    Exhibit  101  Single song agreement            143

23    Exhibit  107  Single song agreement            144

24

25
```



Page 5

1              P R O C E E D I N G S

2        THE VIDEOGRAPHER:  Good afternoon.  We are now

3   on the record.  Today's date is Monday, June 21st,

4   2021, and the time is now approximately 1:01 p.m.

5   This begins the videotaped deposition of George

6   Clinton in the matter of Bridgeport Music, Inc., et

7   al versus TufAmerica, Inc., et al.

8        Will counsel please identify yourselves for the

9   record.

10       MR. CAPLAN:  Brian Caplan and Julie Wlodinguer

11   on behalf of the defendants TufAmerica, Inc. and Kay

12   Lovelace Taylor.

13       MS. IVES:  Katherine Ives and Lorne Hiller for

14   plaintiffs Bridgeport Music and Westbound Records.

15       THE VIDEOGRAPHER:  Will the court reporter

16   please swear in the witness.

17       MR. MCPHERSON:  Actually, I didn't know if

18   anyone else was on.  I noticed there's a Joel and a

19   Sarah on here.

20       This is Ed McPherson of McPherson, LLP, I'll be

21   representing Mr. Clinton as a third-party witness.

22       THE VIDEOGRAPHER:  Will the court reporter

23   please swear in the witness.

24       COURT REPORTER:  Would you raise your right

25   hand, please?



Page 40

1        A.    As far as I know, yes.

2        Q.    Do you know what record label, if any, released

3    "Heart Trouble" as a recording?

4        A.    Other than this Jobete -- I've seen the Jobete

5    record, I don't know the release status of it.

6        Q.    Okay.  Does Jobete function as a record label

7    as well as a publishing company?

8        A.    No, I mean, it was actually -- it was

9    actually -- you said the publisher.  It was actually

10    Golden World was the label and Jobete was the publisher.

11    I never seen it released anywhere but I saw the record.

12        Q.    Okay.  And on the next page of Exhibit 2,

13    page 7, there's a reference to a track called, "Don't Be

14    Sore At Me," are you familiar with that recording?

15        A.    Yes.

16        Q.    And was that released by a record label?

17        A.    That would have been released by Revilot.

18        Q.    And then below that there's a track called

19    "Little Man" on page 7 of Exhibit 2.  Do you know what

20    record label released "Little Man"?

21        A.    Revilot.

22        Q.    And the next page, page 8 of Exhibit 2, there's

23    a reference to a recording entitled "Time," T-I-M-E, are

24    you familiar with that recording?

25        A.    Yes, Revilot.



Page 47

1        Q.    But you were in Detroit?

2        A.    Yes.

3        Q.    And did you and the members of Parliament

4    ultimately sign an agreement with Mr. Taylor or his

5    company?

6        A.    I don't recall -- I don't recall the group

7    signing, I'm not sure how we did that.  I did the record

8    with some people in Detroit and we called it Parliament.

9    I got the group there later, they weren't there when I

10   did the record.  So I'm not sure if we ever did a

11   contract with the members of the group, I'm not sure of

12   that.

13       Q.    Did you sign an agreement with LeBaron Taylor

14   or Revilot Records?

15       A.    Yes.

16       Q.    Was it with LeBaron individually or Revilot

17   Records or some other entity, if you recall?

18       A.    Revilot Records, as far as I know.

19       Q.    And was that agreement signed in or about

20   sometime in 1965?

21       A.    Somewhere around in there, yes.

22       Q.    And do you know whether or not you still have a

23   copy of that agreement?

24       A.    No, I don't.

25       Q.    Do you know whether that agreement is in the



Page 48

1    warehouse or not?

2        A.    No, it's not.

3        Q.    How do you know it's not in the warehouse?

4        A.    I haven't seen the agreement since we did it.

5        Q.    As you sit here today, do you know any of the

6    terms of that agreement?

7        A.    No, I don't.

8        Q.    Are you familiar with the term, "re-recording

9    restriction"?

10        A.    No, I'm not.

11        Q.    Do you know how long the Revilot Records

12    agreement was for?

13        A.    No, I don't.

14        Q.    Do you know whether or not the Revilot Records

15    agreement included a restriction on you re-recording

16    master recordings that you delivered to Revilot?

17        A.    No.

18        Q.    Okay.

19        A.    I don't know.

20        Q.    Do you recall whether or not the Revilot

21    Records agreement -- what the royalty rate was in the

22    Revilot record's agreement?

23        A.    No, I don't.

24        Q.    Do you recall whether or not the Revilot

25    Records agreement had any music publishing components to



Page 49

1    it?

2        A.    Yes, it did, it was Groovesville.

3        Q.    Did you understand that Groovesville was an

4    entity owned by LeBaron Taylor and a gentleman by the

5    name of Don Davis?

6        A.    That was my understanding.

7        Q.    Did you have a lawyer in 1965 and 1966?

8        A.    No, I didn't.

9        Q.    Did you have an accountant in '65 and '66?

10       A.    No, I didn't.

11       Q.    Did the word Parliament -- the name Parliament

12   appear anywhere on the Revilot Records agreement, if you

13   recall?

14       A.    Say that again.

15       Q.    Did you use the name Parliament in connection

16   with signing to Revilot Records?

17       A.    Yes.

18            MR. MCPHERSON:   Object to form.

19   BY MR. CAPLAN:

20       Q.    So was it your understanding that you would be

21   performing under the name Parliament for Revilot

22   Records?

23       A.    Yes.

24       Q.    Who were the members of Parliament when you

25   signed with Revilot Records in 1965 or '66?



Page 62

1    Q.    -- bought a few Eldorados with money you got

2    from LeBaron?

3    A.    I recall getting the Eldorado but I never seen

4    no royalty statements from none of these publishers that

5    you're talking about.  I've never seen a royalty

6    statement from him.

7    Q.    How many Eldorados did LeBaron Taylor buy you?

8    A.    One.

9    Q.    What year was that?

10    A.    '77.

11    Q.    19 --

12    A.    I mean, '67.

13    Q.    Were you appreciative of the Eldorado in 1967?

14    A.    Sure.  We were appreciative.

15    Q.    Was it a new Eldorado?

16    A.    It was a new Eldorado.

17    Q.    I wanted to make sure you weren't getting any

18    of that used stuff.

19    A.    No, it was new.  And then Grady Thomas crashed

20    it on the first tour.

21         MR. MCPHERSON:  Oh, no.

22    BY MR. CAPLAN:

23    Q.    How long after you had it?

24    A.    A month, two months.

25    Q.    Oh, I'm sorry.



Page 71

1      Q.    And did you understand the publishing was
2   controlled by reason of the Revilot recording agreement
3   that you had signed?
4            MR. MCPHERSON:   Object to form.
5            THE WITNESS:  It was -- no.  It was
6        Groovesville Music.
7   BY MR. CAPLAN:
8      Q.    Now, you said that you understood Groovesville
9   Music to be owned by LeBaron Taylor and Don Davis.  Have
10  you ever seen any paperwork to that effect?
11     A.    No.  That was just my -- that was the
12  understanding when they presented the deal to me.  Him
13  and Don were partners in both the record company and the
14  label and subsequently they split one taking the label
15  the other taking the publishing.  I didn't know anything
16  about it.
17     Q.    Did you ever see any written agreement --
18     A.    No.
19     Q.    -- with respect to this split that you just
20  referenced?
21     A.    No.
22     Q.    Are you familiar with a track called "All Your
23  Goodies Are Gone"?
24     A.    Yes.
25     Q.    By the way, to your knowledge, did Don Davis



Page 83

1     A.   Not that I know of.

2     Q.   To your knowledge, did LeBaron Music or LeBaron

3  Taylor ever assign any publishing rights in those seven

4  songs, to the extent it had any, to Bridgeport Music?

5     A.   No.

6     Q.   When -- did there come a time that you

7  approached or had discussions with Armen Boladian about

8  signing a recording agreement and/or a publishing

9  agreement with his companies?

10    A.   Yes.

11    Q.   Did you understand that Mr. Boladian owned a

12  publishing company called Bridgeport Music?

13    A.   Yes.

14    Q.   Did you understand that Armen Boladian owned a

15  record company called Westbound?

16    A.   Yes.

17    Q.   Did Mr. Boladian ever ask you to see a copy of

18  your agreement with Revilot Records?

19    A.   No.

20    Q.   Did you ever provide Mr. Boladian with a copy

21  of your agreement with Revilot Records?

22    A.   No.

23    Q.   Did you rerecord for Westbound any of the

24  tracks that you had recorded for Revilot?

25    A.   Yes.



Page 84

1     Q.   Which ones?

2     A.   "Good Old Music" -- not -- no.  No.  Yes, "Good

3  Old Music" was one.  I think, "Let's Make It Last."

4  "Baby (I Owe You) Something Good" and, "I'll Stay".

5     Q.   Were those recorded during the 1970s?

6     A.   They were recorded during the 1970s, 1960s --

7  yes, 1970s.  Some of them might have been done in 1969.

8     Q.   Okay.  Was there a claim that you couldn't use

9  the name Parliament at any point in time?

10    A.   There wasn't no claim.  We just took it for

11  granted we couldn't.

12    Q.   And when you say "we," are you talking about

13  you and the members of Parliament?

14    A.   Yes, myself, basically, as the producer.  And I

15  just took it for granted that it wasn't safe to do -- to

16  use Parliament because we couldn't find LeBaron for a

17  couple of years.  I mean, we didn't -- I never saw him

18  but we couldn't get in touch with him.  Those records --

19  a lot of those records came out after he was gone from

20  Detroit.  So we didn't know what to do, we decided not

21  to use the Parliament name so that's when we used

22  Funkadelic.

23    Q.   You decided not to use the name because of your

24  belief that the Revilot agreement would prohibit you

25  from using the name Parliament for another record label?



Page 110

1      Q.    Did you sign a recording agreement with Revilot

2    Records?

3      A.    Yes.

4      Q.    And was that a publishing agreement?

5      A.    I was having songwriter's -- a couple of

6    songwriter's agreement for, "(I Wanna) Testify," "All

7    Your Goodies Are Gone" and, "I Can Feel the Ice

8    Melting," those are the ones I can remember.

9      Q.    Okay.  So those were separate song agreements,

10   not part of the overall recording agreement?

11     A.    No.

12     Q.    Okay.  And do you have that recording -- and

13   you do not have that recording agreement now; is that

14   correct?

15     A.    No.

16     Q.    Okay.  And you haven't seen it in more than

17   50 years; is that correct?

18     A.    Correct.

19     Q.    And to the best of your recollection, that

20   recording agreement did not contain a provision on music

21   publishing, did it?

22     A.    No, not to my recollection.  I don't remember

23   that.

24     Q.    Did you ever sign an agreement with LeBaron

25   Taylor, LeBaron Music or any of LeBaron Taylor's



Page 111

1  entities assigning publishing to them?

2      A.   Not that I can remember.  I'm not saying that I

3  didn't, I just don't remember that.

4      Q.   As far as Groovesville is concerned, is it

5  correct that was a Don Davis owned company?

6      A.   My understanding, they were partners in the

7  beginning and somewhere along the line they separated

8  and it ended up being Don Davis.

9      Q.   Okay.  And you don't recall what you signed

10 with them -- with Groovesville for; is that correct?

11     A.   No.

12     Q.   Did you ever receive publishing royalties from

13 Revilot?

14     A.   As a record company, no.

15     Q.   Did you ever receive publishing royalties from

16 any of LeBaron Taylor's entities?

17     A.   LeBaron Taylor's?  You're talking about Revilot

18 records?

19     Q.   Uh-huh.

20     A.   Groovesville?  I received royalties for,

21 "Testify," "The Ice Melting" and, "All Your Goodies Are

22 Gone."  Those are --

23     Q.   And --

24     A.   Those are the ones I can remember.  There

25 probably were some more but I don't remember them and



Page 112

1    they came from Groovesville and then Windswept.

2        Q.    Okay.  And did LeBaron never contact you to

3    advise that the songs being claimed by Bridgeport on

4    Westbound recordings were actually his songs?

5        A.    No.

6        Q.    And earlier you discussed the addendum

7    agreement.  And is that correct that you litigated the

8    validity of that addendum and that you lost?

9        A.    What addendum?

10        Q.    So on your direct examination we were talking

11    about an addendum with a list of songs and you were

12    saying that you had not signed that agreement?

13        A.    Yes.

14        Q.    Okay.  And so do you remember litigating the

15    issue of the validity of that agreement?

16        A.    I remember the -- Armen testified that he cut

17    and pasted that agreement and the justice found that it

18    was a cut and paste and the other parts of the contract

19    had been altered.  That was my understanding from what

20    Armen had said.

21        MS. IVES:  All right.  Could we look to, Lorne,

22        Exhibit 45 on pages 3 and 4?

23        (Plaintiffs' Exhibit No. 45, was marked for

24        identification.)

25    BY MS. IVES:



Page 128

1    affiliated?

2        A.    LeBaron Taylor was part owner of

3    Groovesville -- I mean, and Revilot from what I

4    understand.

5        Q.    Okay.  So that's just your understanding,

6    though, you don't know for certain?

7        A.    No, I don't know for sure.

8        Q.    Okay.

9            MS. IVES:  And so can we go back to Exhibit 4,

10        Lorne?

11            THE WITNESS:  I can't see it.  You have to read

12        it to me.

13    BY MS. IVES:

14        Q.    Yes.  Sorry.  Just give me one second.

15            MR. CAPLAN:  When you say Exhibit 4, it's a

16        little confusing.

17            MS. IVES:  And I'm so sorry.  I mean

18        Exhibit 45, what it was labeled as.  I apologize.

19            So if you scroll up to the top --

20            MR. HILLER:  I'm putting these in the chat, it

21        just takes a second to jump between the screens.

22            MS. WLODINGUER:  I see it coming through.

23            MS. IVES:  I apologize.  Last time I didn't

24        give as much background information so I wanted to

25        go to the first page of this one so we can see



Page 158

1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA:

4    COUNTY OF ORANGE:

5

6        I, ANNIE M. ZUCCARELLI, Notary Public, State of

7    Florida, do hereby certify that GEORGE CLINTON virtually

8    appeared before me on June 21, 2021, and was duly sworn

9    and produced a driver's license as identification.

10

11       Signed this 27th day of June, 2021.

12

13

14

15

16                    _____
                      ANNIE M. ZUCCARELLI
17                    Notary Public, State of Florida
                      My Commission No.:  GG320905
18                    Expires:  4/08/2023

19

20

21

22

23

24

25



Plaintiffs' Appendix 62

Page 159

1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA:

3    COUNTY OF ORANGE:

4

5        I, Annie M. Zuccarelli, Notary Public, State of

6    Florida, certify that I was authorized to and did

7    stenographically report the deposition of GEORGE

8    CLINTON; that a review of the transcript was requested;

9    and that the foregoing transcript, pages 01 through 161,

10   is a true and accurate record of my stenographic notes.

11       I further certify that I am not a relative,

12   employee, or attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorneys or counsel connected with the action, nor am I

15   financially interested in the action.

16

17       DATED this 27th day of JUNE, 2021.

18

19

20       _____

         ANNIE M. ZUCCARELLI
21

22

23

24

25



```
                                                    Page 160

 1                         ERRATA SHEET

 2         DO NOT WRITE ON TRANSCRIPT-ENTER CHANGES HERE

 3            DEPONENT:  GEORGE CLINTON
              CASE NO:   19-CV-1764(PGG)
 4            DATE:      JUNE 21, 2021

 5

 6   PAGE NO. LINE NO.  CORRECTION & REASON

 7   _____  _____   _____

 8   _____  _____   _____

 9   _____  _____   _____

10   _____  _____   _____

11   _____  _____   _____

12   _____  _____   _____

13   _____  _____   _____

14   _____  _____   _____

15   _____  _____   _____

16   _____  _____   _____

17   _____  _____   _____

18   _____  _____   _____

19   _____  _____   _____

20   _____  _____   _____

21   _____  _____   _____

22   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it
23   are true.

24
     _____
25   DATE                              GEORGE CLINTON
```



Page 161

1    JUNE 27, 2021
     GEORGE CLINTON
2    c/o EDWIN F. MCPHERSON, ESQUIRE

3    In Re:  June 21, 2021, Deposition of GEORGE CLINTON

4    Dear GEORGE CLINTON:

5         This letter is to advise that the transcript for the
     above-referenced deposition has been completed and is
6    available for review.  Please contact our office at
     (866) 624-6221 to make arrangements for read and sign or
7    sign below to waive review of this transcript.

8         It is suggested that the review of this transcript
     be completed within 30 days of your receipt of this
9    letter, as considered reasonable under Federal Rules*;
     however, there is no Florida Statute to this regard.
10

         The original of this transcript has been forwarded
11   to the ordering party and your errata, once received,
     will be forwarded to all ordering parties for inclusion
12   in the transcript.

13                            Sincerely,

14
                             Annie M. Zuccarelli
15

     cc:  BRIAN D. CAPLAN, ESQUIRE
16        KATHERINE M. IVES, ESQUIRE

17   Waiver:

18   I,_____, hereby waive the reading and signing
     of my deposition transcript.
19
     _____     _____
20   Deponent Signature          Date

21   *Federal Civil Procedure Rule 30(e)/Florida Civil
     Procedure Rule 1.310(e)
22

23

24

25



# EXHIBIT 4

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------X

BRIDGEPORT MUSIC, INC., and WESTBOUND

RECORDS, INC.,                          Civil Action No.

                                        19-cv-01765-PGG

        Plaintiffs,

        -vs-

TUFAMERICA, INC., d/b/a/ TUFF CITY

RECORDS, and KAY LOVELACE TAYLOR,

individually and on behalf of the

Estate of LeBaron Taylor

        Defendants.

_____/

            ZOOM VIDEOTAPED DEPOSITION OF ARMEN BOLADIAN,

        Taken by the Defendant on the 15th of April, 2021 at 1:01
        p.m.

APPEARANCES:

For the Plaintiff            MR. RICHARD BUSCH, ESQ.
Counterclaim Defendant       MS. KATHERINE IVES, ESQ.
& Witness:                   KING & BALLOW LAW OFFICES
                             1999 Avenue of the Stars
                             Suite 1100
                             Century City, California  90067
                             (424) 253-1255

For the Defendants           MR. BRIAN D. CAPLAN, ESQ.
And Counterclaim Plaintiff:  MS. JULIE WLODINGUER, ESQ.
                             885 Third Avenue
                             New York, New York  10022
                             (212) 209-3050

                    MAGNA LEGAL SERVICES
                      866-624-6221
                     www.MagnaLS.com



Page 2

1                          TABLE OF CONTENTS

2    WITNESS:

     Page

3    ARMEN BOLADIAN

4        Examination By Mr. Caplan

     5

5

6            EXHIBITS:

     Page

7    Exhibit 1A          Deposition Notice                    8

8    Exhibit 1B          Deposition Notice                    8

9    Exhibit 2           Document Request                     27

10   Exhibit 3           "I Wanna Testify" 45                 30

11   Exhibit 4           What You Been Growing 45             41

12   Exhibit 5           Solid Hit                            42

13   Exhibit 6           I'll Wait 45                         42

14   Exhibit 7           I Owe You Something 45               43

15   Exhibit 8           The Goose That Laid The Golden Egg 45  43

16   Exhibit 9           Songwriter Agreement                 46

17   Exhibit 10          Listing of Parliament Reel-to-Reel Tapes  47

18   Exhibit 11          1971 Agreement                       52

19   Exhibit 12          "I'll Wait" Copyright Registration   54

20   Exhibit 13          "Let's Make It Last" Copyright Registration  56

21   Exhibit 14          "The Goose That Laid The Golden Egg  57
                         Copyright Registration"

22

     Exhibit 15          "What You Been Growing" Copyright

23                       Registration                        58

24   Exhibit 16          ""Good Old Music"" 45                58

25   Exhibit 17          ""Good Old Music"" Copyright Registration  59



 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Plaintiffs' Appendix 69

Page 4

1                                    Thursday, April 15, 2021

2                                    1:01 p.m.

3              THE VIDEOGRAPHER:  Good afternoon.  We're now on the

4      record.  This begins videotape number 1 in the deposition of mm

5      Boladian in the matter of Bridgeport Music, Incorporated, et al

6      versus TufAmerica, Incorporated, et al in the United States

7      District Court, Southern District of New York.

8              Today is April 15th, 2021, and the time is 1:03 p.m.

9              This deposition is being taken remotely via web

10     conferencing at the request of Reitler Kallas & Rosenblatt,

11     L.L.C.

12             The videographer is Bailey Diaz of Magna Legal Services

13     and the court reporter is Lisa of Magna Legal Services.

14             Will counsel and all parties present please state their

15     appearance for the record and whom they represent.

16             MR. CAPLAN:  Brian Caplan and Julie Wlodinguer for the

17     defendants TufAmerica, Inc., and Kay Lovelace Taylor.

18             MR. BUSCH:  And, I'm sorry, Julie, do you want to make

19     -- I guess I'll just do mine.  Richard Busch for the Plaintiffs

20     Bridgeport and Westbound Music -- Bridgeport Music and Westbound

21     Records and also for the witness.

22             MR. CAPLAN:  Can the witness be sworn in?

23             THE COURT REPORTER:  Will all counsel please stipulate

24     to the swearing in of the witness remotely?

25             MR. CAPLAN:  So stipulated.



Page 16

```
 1        that's difficult to say really.  Maybe up until the last ten
 2        years.
 3   Q    Did you have a company that you used for the promotion of other
 4        record labels?
 5   A    No.
 6   Q    You did it individually?
 7   A    Individually, yeah.
 8   Q    Okay.
 9   A    Well, actually, I had Record Distributors that are the
10        distributor, where we distributed, like I said, many labels and
11        it kind of all went through Record Distributors.
12   Q    You said that -- you said that at a point in time you did
13        wholesale record distribution?
14   A    Yes.
15   Q    Did you form -- did you form a company for that enterprise?
16   A    Yes, it was called Record Distributors Corporation.
17   Q    What year was that entity formed?
18   A    We're going back -- we're going back into the late '60s, because
19        I remember we handled LeBaron Taylor's label, Revilot Records,
20        and that was around '67, '66, '67.  That was in the '60s,
21        definitely.
22   Q    And how many years did that entity stay in business, Record
23        Distributors Corp?
24   A    Record Distributors, we just dissolved that the last couple of
25        years, I think.  Isn't it, Kel?
```



Page 18

```
 1    A    No.  I'm sure not, no.

 2    Q    Do you recall the titles of the 45s or compositions that were

 3         being -- the records, excuse me, that were being distributed by

 4         Record Distributors Corp in the '60s?

 5    A    Not every title.

 6    Q    But some of 'em?

 7    A    I remember some.

 8    Q    Okay.  Do you remember -- strike that.

 9              Was it -- did you have written agreements with record

10         companies to distribute their product or was it verbal

11         agreements?

12    A    Most of it was verbal.

13    Q    Okay.  Did you have a written agreement with LeBaron Taylor for

14         Revilot Records or was that verbal?

15    A    That was verbal as well.

16    Q    And when did you meet LeBaron Taylor for the first time?

17    A    I can't remember the first time, but LeBaron Taylor was an air

18         personality in Detroit, local Detroit radio station, and then he

19         formed Revilot Records, which we distributed for him.  And, I

20         mean, I've known him, you know, before even at the record label

21         because he was a D.J. and we would take records over to promote

22         them at their -- at his -- at the radio station he worked for,

23         along with other stations in the area.

24    Q    Do you remember the name of the -- of the radio station that he

25         worked at?
```



Page 20

1       question.

2   A   Okay.

3   Q   When you distributed 45s, if they had the name "BMI" on it,

4       what did you understand BMI to mean?

5           MR. BUSCH:  Objection, assumes facts not in evidence,

6       assumes that BMI is on record 45s.

7   BY MR. CAPLAN:

8   Q   Okay.  Well, we'll take a step back.

9           Did you have -- did you ever distribute any 45s in the

10      1960s that had the name BMI on the front cover of the -- of the

11      record?

12  A   Sometimes it would and sometimes it would not.

13  Q   Okay.  And when it had the name BMI, did you understand that

14      meant Broadcast Music, Inc.?

15  A   Broadcast Music, Incorporated usually, yes.

16  Q   Okay.  And did you understand --

17  A   Even though BMI could be Bridgeport Music, Incorporated as well.

18  Q   When it was BMI, though, on the ones that you were

19      distributing, that was for BMI, the Performing Rights Society?

20  A   Correct.

21  Q   Okay.  If there was a name above BMI on the 45s that you

22      distributed in the 1960s, did you understand that to be the

23      claimed music publisher?

24  A   In some cases, yes.  In some cases it might be incorrect, you

25      couldn't always --



Page 21

1   Q   Okay.

2   A   -- go by what was on the label.

3   Q   Got it.  Thank you.

4           What year was Bridgeport Music, Inc. formed?

5   A   I believe it was Bridgeport Music in the 1960s.

6   Q   Do you recall what year in the 1960s?

7   A   Early 1960s.

8   Q   Early 1960s?

9   A   Yeah.

10  Q   Do you have any documentation that reflects when Bridgeport

11      Music Inc. was formed?

12  A   We might have something somewhere.  We should.  I mean, that's a

13      memorable thing, I should have that somewhere.

14  Q   You probably have it framed on your wall.  But we would ask for

15      just a document that reflects the date of incorporation of

16      Bridgeport.

17          MR. BUSCH:  If it exists and we can find it, we'll take

18      it under advisement.

19  BY MR. CAPLAN:

20  Q   What does Bridgeport Music, Inc. do?

21  A   Bridgeport Music is the copyright holder for various different

22      songs.

23  Q   Is it a music publisher?

24  A   Yes, sir.

25  Q   Okay.  Have you been the sole owner of Bridgeport since its



1     formation?

2  A  Yes.

3  Q  Were you involved in the day-to-day operations of Bridgeport

4     when it was first formed?

5  A  Well, when it was first formed, yes.

6  Q  When did you remove yourself from the day-to-day operations of

7     Bridgeport, approximately when?

8  A  Well, I think when Yvonne Taylor kind of stepped in and Jess

9     Janice, when they did the administering, although we would send

10     some writers' agreements to her and various different

11     information she needed, as well as Norman Kurtz, or any of them,

12     we would have to send some writers' agreements, copyright forms,

13     various information that they needed to register the songs

14     properly and document them, register them with BMI as well.

15  Q  In the 1960s, did Bridgeport Music have employees?

16  A  No.

17  Q  Okay.  Did you consider yourself to be an employee of your own

18     company?

19  A  Well, I was an employee of the different companies that I had, I

20     mean, where everybody there was Westbound, there was Bridgeport,

21     but we also had record distributors, so most of my -- the money

22     that come in would come in through record distributors at the

23     time.  I mean, Bridgeport didn't have an awful lot going on way

24     back then in the very beginning.

25  Q  And in the 1970s, were you the only employee of Bridgeport or



Page 25

```
1   Q   Late '70s?

2   A   Yeah, I believe so, yeah.

3   Q   Okay.  And when did -- when did Jane Peterer for -- for Jane

4       Peterer Music Corp take over for Mr. Kurtz, approximately when?

5   A   I can't remember the exact date.

6   Q   Okay.  And you said that Joel Martin Affiliated has been the

7       administrator for approximately ten years?

8   A   Yeah, it was about the beginning of 2009; 10, 11 years, right.

9   Q   Did you form a company called Westbound Records?

10  A   Yes, sir.

11  Q   And approximately when did you form Westbound Records?

12  A   That was in the '70s.

13  Q   Early '70s?

14  A   I'm sorry late -- late '60s.

15  Q   And have you been the sole shareholder of Westbound since its

16      formation 'til today?

17  A   Yes, sir.

18  Q   And what does Westbound Records do?

19  A   Westbound Records is a recording company that goes in the studio

20      and makes records with various different artists and owns the

21      master recordings to various different songs, compositions.

22  Q   And from the time of its formation during the late '60s and the

23      early '70s through the end of the '70s, who was involved in the

24      day-to-day operations of Westbound?

25  A   Well, when you say day-to-day operations, Westbound was
```



Page 29

```
 1   A   Right.

 2   Q   Was that a "yes"?

 3   A   Repeat that again, sir.

 4   Q   Yeah.  I was asking if Joel Martin himself would know if Joel

 5       Martin Affiliated's records were reviewed for purposes of

 6       responding to the document requests that we've posed in this

 7       case?

 8   A   I would have to say yes.

 9   Q   Are you familiar with a gentleman by the name of George

10       Clinton?

11   A   Yes.

12   Q   When did you first meet him?

13   A   I met George when he first came to Detroit and he recorded, "I

14       Wanna Testify."  He was all excited about the record gaining a

15       lot of popularity, was always -- not every day, but he would

16       frequently come by to see how things were going.  He was very

17       excited about the way the record was shaping up and the hit it

18       was becoming.

19   Q   Okay.  "I Wanna Testify" was recorded with Revilot Records?

20   A   As far as I recall, that's the first one that I remember

21       becoming a hit.

22   Q   Okay.  And did Record Distributors distribute Revilot Records

23       title "I Wanna Testify"?

24   A   Right.

25   Q   So when Mr. Clinton was inquiring on to how well the song was
```



Page 34

1      records that we had sold.

2  Q   Right.

3  A   It didn't have to do with any other kind of payments or any

4      disbursements or anything, it was strictly payment for product

5      that already finished records that were sold.

6  Q   And did Record Distributors take a fee for the distribution of

7      the records that it sold?

8  A   Yeah, they would sell it to us at a certain price and we would

9      -- I think we were making somewhere around 13 to 15 cents or

10     something a record, something in that neighborhood.  I could be

11     off a nickel or four cents, but it wasn't very much.  They were

12     -- they were 45s at the time, and they were retailing anywhere

13     from 79 to 99 cents, so, you know.

14 Q   Do you recall approximately how many units of "I Wanna Testify"

15     were sold by Record Distributors Corp?

16 A   No, but it was -- it was substantial because it was like number

17     1, not only in Detroit but out of state, in Michigan, I mean, it

18     was -- the record was rapidly moving across the country, so, I

19     mean, you never really know where you may sell a record to a one

20     stop in Detroit, they may turn around and sell it to somebody in

21     Cleveland, you never know.

22 Q   Ultimately you signed George Clinton and the Parliaments to a

23     record deal?

24 A   Not the Parliaments, it was Funkadelic.

25 Q   At the time that you signed George Clinton and Funkadelic to a



Page  35

1      record deal, did you inquire if they had any obligations to any

2      other record label?

3    A   They were free and clear, to my knowledge.

4    Q   And what led you to believe they were free and clear?

5    A   Because when they went from Revilot, they went to

6        Holland-Dozier-Holland record label.

7    Q   What was the name of that record label?

8    A   I'm trying to think of the label.  All of a sudden it slipped my

9        mind.  I'll think of it.  Let's go on to the next one.

10   Q   When did -- when did Parliament change its name to Funkadelic?

11   A   They didn't.  They didn't.  The Parliaments were always

12       Parliaments.  Funkadelic was another group of fellas, they were

13       the musician, Bernie Morrell and --

14   Q   Let's break it down if we can.  Who were the members of

15       Parliament?

16   A   Who were the members of Parliament?

17   Q   Yes.

18   A   Parliament --

19   Q   Back in the '60s we're talking about.

20           MR. BUSCH:  Hold on a second, Armen.  Brian, you're

21       cutting him off a lot of times in the middle, and I know it's

22       not easy, but he's in the middle of saying things and you go on

23       to the next question, he's, you know, stammering a little bit,

24       and you're doing that.  You guys both need to stop speaking over

25       each other.  I would appreciate it if you would let Mr. Boladian



Page 38

```
 1   Q   Mr. Boladian, you wanted to elaborate on one of your prior
 2       answers?
 3   A   Yes, the Parliament, when they left Revilot, they went to
 4       Invictus Records, which was a company owned by
 5       Holland-Dozier-Holland, and they did an album entitled Osmium.
 6   Q   How do you spell the album?
 7   A   I think it's O-s-m-u-n (sic), something like that.
 8   Q   Okay.  Approximately what year did Parliament move over to
 9       Invictus?
10   A   What year?  I don't know.
11   Q   Late '70s -- late '60s, early '70s?
12   A   It was after the Revilot situation, I don't recall exactly what
13       year, but that was the next label.
14   Q   When you say Revilot, were you referring to the Revilot
15       bankruptcy?
16   A   You know, I don't know whether it was a bankruptcy or whether
17       they just folded the company.  I have no direct knowledge of how
18       or why they closed down.
19   Q   And to the best of your knowledge, they, Revilot, closed down
20       '69 or '70; would that be accurate?
21   A   I don't -- I don't remember the exact year.
22   Q   Okay.  How many years did Record Distributors CORP distribute
23       records that were produced by Revilot?
24   A   It wasn't long.  It was maybe two or three releases.  "I Wanna
25       Testify," "Open the Door to Your Heart" with Darrell Banks, and
```



Page 43

```
 1      corporate entities, I can take 14 hours with this witness if I
 2      needed to, so why are you pushing --
 3              MR. BUSCH:  He's 86 years old and he's blind and this
 4      lawsuit is BS, and I'm telling you to move it along.  I would
 5      like you to move the deposition along because putting things up
 6      on the screen to a blind man does not help.
 7              MR. CAPLAN:  I was doing it for your benefit.
 8              MR. BUSCH:  I don't want you to do it for my benefit.
 9      I don't need you to do it, I'm not being deposed.
10  BY MR. CAPLAN:
11  Q   In the 1960s, did you see a Revilot Records release for a
12      composition entitled "I'll Wait"?
13  A   No.  No.
14              MR. CAPLAN:  Mark as Exhibit 7 TUF0047.  You don't need
15      to put it on the screen, Julie.
16              (EXHIBIT 7.)
17  BY MR. CAPLAN:
18  Q   In the 1960s, did you see a 45 release for a song called -- I
19      can't read this.  I -- "I Owe You Something" by Pat Lewis?
20  A   No.  Was that on Revilot also?
21  Q   That was on Solid Hit.
22  A   No, I did not.
23              MR. CAPLAN:  Let's mark as Exhibit 8 Bates stamped
24      TUF0044.
25              (EXHIBIT 8.)
```



Page 63

```
 1              THE WITNESS:  No.

 2   BY MR. CAPLAN:

 3   Q   Okay.

 4              MR. BUSCH:  Did you say "no," Armen, it wouldn't

 5        surprise you?

 6              THE WITNESS:  No, it would surprise me, but we've never

 7        heard from anybody on anything.  LeBaron, when he was living,

 8        nobody ever confronted us with anything.

 9              MR. CAPLAN:  I will -- I will object to your lawyer

10        correcting your answer, but --

11              MR. BUSCH:  I didn't correct it, I asked him if he

12        understood it, and he made it very clear what his answer was

13        going to be, Mr. Caplan.  Please.

14              MR. CAPLAN:  The record will speak for itself.

15              MR. BUSCH:  It will.  You're trying to trick an

16        86-year-old man, it's not right.  You're asking questions in an

17        odd way.  He answered the question.  He said multiple times he's

18        never been confronted about anything.  Please.

19              MR. CAPLAN:  To suggest that I'm trying to trick him

20        when I'm --

21              MR. BUSCH:  You're asking questions, "Would it

22        surprise," isn't it -- you know, things he hasn't seen things he

23        doesn't know.  Come on.  Please, let's get this over with.

24        You'll make your case.  You'll make your case.  Go ahead.

25   BY MR. CAPLAN:
```



Page 68

```
 1                        CERTIFICATE

 2    STATE OF MICHIGAN        )

 3                            ) SS

 4    COUNTY OF MACOMB         )

 5         I, Lisa M. Jasmin, a Notary Public in and for the above

 6         county of state, do hereby certify that the witness, whose

 7         attached deposition was taken remotely before me in the

 8         entitled cause on the date and at the time and place herein

 9         before set forth, was by me first duly sworn to testify to the

10         truth, the whole truth, and nothing but the truth; that the

11         testimony contained in said deposition was by me reduced to

12         writing remotely of said witness by means of stenography; that

13         said testimony was thereafter reduced to written form by

14         mechanical means; and that the deposition is, to the best of my

15         knowledge and belief, a true and correct transcript of my

16         stenographic notes said taken.

17         I further certify that I am not of counsel to either party

18         nor interested in the event of this cause.

19

20

21              LISA M. JASMIN - CSR-3922

22              Notary Public, Macomb County

23              My Commission Expires:  8-4-25

24    Dated:  April 29, 2021

25
```



Plaintiffs' Appendix 83

# EXHIBIT 5

# EXHIBIT D

Page 1

**FORM E**

# Application for Registration of a Claim to Copyright

in a musical composition the author of which is a citizen or domiciliary of the United
States of America or which was first published in the United States of America

| CLASS | REGISTRATION NO. |
|---|---|
| **E** | Eu 56256 |
| | DO NOT WRITE HERE |
| | EP        EU |

**Instructions:** Make sure that all applicable spaces have been
completed before you submit the form. The application must
be SIGNED at line 9. For published works the application
should not be submitted until after the date of publication given
in line 4(a), and should state the facts which existed on that
date. For further information, see page 4.

Pages 1 and 2 should be typewritten or printed with pen and
ink. Pages 3 and 4 should contain exactly the same information
as pages 1 and 2, but may be carbon copies.

Mail all pages of the application to the Register of Copy-
rights, Library of Congress, Washington, D.C., 20540, together
with:

   (a) If unpublished, one complete copy of the work and the
registration fee of $6.

   (b) If published, two copies of the best edition of the work
and the registration fee of $6.

   Make your remittance payable to the Register of Copyrights.

**1. Copyright Claimant(s) and Address(es):** Give the name(s) and address(es) of the copyright owner(s). In the case of
published works the name(s) should ordinarily be the same as in the notice of copyright on the copies deposited.

Name _____ LEBARON TAYLOR _____

Address _____ 8832 PURITAN, DETROIT, MICHIGAN _____

Name _____

Address _____

**2. Title:** GOOD OLD MUSIC
(Give the title of the musical composition as it appears on the copies)

**3. Authors:** Citizenship and domicile information must be
given. Where a work is made for hire, the employer is the
author. Organizations formed under U.S. Federal or State
law are U.S. citizens.

Authors include composers of music, authors of words, ar-
rangers, compilers, etc. If the copyright claim is based on new
matter (see line 5) give information about the author of the
new matter.

Name _____ George Clinton _____ Citizenship: U.S.A. __X__ Other _____
(Give legal name followed by pseudonym if latter appears on the copies)    (Check if U.S. citizen)    (Name of country)

Domiciled in U.S.A. Yes ____ No ____ Address 525 Elizabeth Apt. 1    Author of words and music
                                       Newark, N.J.    (State which: words, music, arrangement, etc.)

Name _____ Citizenship: U.S.A. _____ Other _____
(Give legal name followed by pseudonym if latter appears on the copies)    (Check if U.S. citizen)    (Name of country)

Domiciled in U.S.A. Yes ____ No ____ Address _____ Author of _____
                                                           (State which: words, music, arrangement, etc.)

Name _____ Citizenship: U.S.A. _____ Other _____
(Give legal name followed by pseudonym if latter appears on the copies)    (Check if U.S. citizen)    (Name of country)

Domiciled in U.S.A. Yes ____ No ____ Address _____ Author of _____
                                                           (State which: words, music, arrangement, etc.)

➡➡ **NOTE:** Leave all spaces of line 4 blank unless your work has been PUBLISHED. ◀◀

**4. (a) Date of Publication:** Give the date when copies of
this particular version of the work were first placed on sale,
sold, or publicly distributed. The date when copies were made

or printed, or the date when the work was performed should
not be confused with the date of publication. (NOTE: The
full date (month, day, and year) must be given.)

_____ _____ _____
(Month)          (Day)           (Year)

**(b) Place of Publication:** Give the name of the country in which this particular version of the work was first published.

➡➡ **NOTE:** Leave all spaces of line 5 blank unless the instructions below apply to your work. ◀◀

**5. Previous Registration or Publication:** If a claim to copy-
right in any substantial part of this work was previously
registered in the U.S. Copyright Office in unpublished form,

or if any substantial part of the work was previously published
anywhere, give requested information.

Was work previously registered? Yes ____ No ____ Date of registration _____ Registration number _____

Was work previously published? Yes ____ No ____ Date of publication _____ Registration number _____

Is there any substantial NEW MATTER in this version? Yes ........ No ........ If your answer is "Yes," give a brief general
statement of the nature of the NEW MATTER in this version. (New matter may consist of compilation, arrangement, adapta-
tion, editorial revision, and the like, as well as additional words and music.)

Plaintiffs' Appendix

EXAMINER

Page 2

*Complete all applicable spaces on next page*

**6. If registration fee is to be charged to a deposit account established in the Copyright Office, give name of account.**

**7. Name and address of person or organization to whom correspondence or refund, if any, should be sent:**

Name ____ LEBARON MUSIC ____ Address ____ 8832 Puritan, Detroit, Michigan 48238

**8. Send certificate to:**

(Type or print name and address)

Name ____ LEBARON MUSIC

Address ____ 8832 PURITAN

DETROIT     MICHIGAN     48238
(City)          (State)          (ZIP code)
(Number and street)

**9. Certification:**
(Application not acceptable unless signed)

I CERTIFY that the statements made by me in this application are correct to the best of my knowledge.

(Signature of copyright claimant or duly authorized agent)

## Application Forms

Copies of the following forms will be supplied by the Copyright Office without charge upon request.

Class A — Form A—Published book manufactured in the United States of America.

Class A or B
Form A–B Foreign—Book or periodical manufactured outside the United States of America (except works subject to the ad interim provisions of the copyright law).
Form A–B Ad Interim—Book or periodical in the English language manufactured and first published outside the United States of America.

Class B
Form B—Periodical manufactured in the United States of America.
Form BB—Contribution to a periodical manufactured in the United States of America.

Class C — Form C—Lecture or similar production prepared for oral delivery.

Class D — Form D—Dramatic or dramatico-musical composition.

Class E
Form E—Musical composition the author of which is a citizen or domiciliary of the United States of America or which was first published in the United States of America.
Form E Foreign—Musical composition the author of which is not a citizen or domiciliary of the United States of America and which was not first published in the United States of America.

Class F — Form F—Map.

Class G — Form G—Work of art or a model or design for a work of art.

Class H — Form H—Reproduction of a work of art.

Class I — Form I—Drawing or plastic work of a scientific or technical character.

Class J — Form J—Photograph.

Class K
Form K—Print or pictorial illustration.
Form KK—Print or label used for an article of merchandise.

Class L or M — Form L–M—Motion picture.

Form R—Renewal copyright.

Form U—Notice of use of copyrighted music on mechanical instruments.

### FOR COPYRIGHT OFFICE USE ONLY

Application received

MAY 31 1968

One copy received

MAY 31 1968

Two copies received

Fee received

101214 MAY 31 '68

Renewal

U.S. GOVERNMENT PRINTING OFFICE: 1965—O—791-325

Page 2

# EXHIBIT 6

# EXHIBIT B

account:

h. 48238

subject to

tside the

erica or

States of

Page 1

## Application for Registration of a Claim to Copyright

**in a musical composition the author of which is a citizen or domiciliary of the United States of America or which was first published in the United States of America**

**FORM E**

| CLASS | REGISTRATION NO. |
|---|---|
| **E** | Eu 27528 |
| | DO NOT WRITE HERE |
| | EP        EU |

**Instructions:** Make sure that all applicable spaces have been completed before you submit the form. The application must be **SIGNED** at line 9. For published works the application should not be submitted until after the date of publication given in line 4(a), and should state the facts which existed on that date. For further information, see page 4.

Pages 1 and 2 should be typewritten or printed with pen and ink. Pages 3 and 4 should contain exactly the same information as pages 1 and 2, but may be carbon copies.

Mail all pages of the application to the Register of Copyrights, Library of Congress, Washington, D.C., 20540, together with:

*(a)* If unpublished, one complete copy of the work and the registration fee of $6.

*(b)* If published, two copies of the best edition of the work and the registration fee of $6.

Make your remittance payable to the Register of Copyrights.

**1. Copyright Claimant(s) and Address(es):** Give the name(s) and address(es) of the copyright owner(s). In the case of published works the name(s) should ordinarily be the same as in the notice of copyright on the copies deposited.

Name      LEBARON MUSIC

Address      8832 Puritan, Detroit, Michigan 48238

Name

Address

**2. Title:**      THE GOOSE (THAT LAID THE GOLDEN EGG)

(Give the title of the musical composition as it appears on the copies)

**3. Authors:** Citizenship and domicile information must be given. Where a work is made for hire, the employer is the author. Organizations formed under U.S. Federal or State law are U.S. citizens.

Authors include composers of music, authors of words, arrangers, compilers, etc. If the copyright claim is based on new matter (see line 5) give information about the author of the new matter.

Name      George Clinton                   Citizenship: U.S.A.   X   Other
(Give legal name followed by pseudonym if latter appears on the copies)    (Check if U.S. citizen)        (Name of country)

Domiciled in U.S.A. Yes ____ No ____ Address   545 Elizabeth, Apt. 101    Author of   words and music
                                      Newark, N.J.                 (State which: words, music, arrangement, etc.)

Name      Ernie Harris    545 Elizabeth #101    Citizenship: U.S.A.   X   Other
(Give legal name followed by pseudonym if latter appears on the copies)    (Check if U.S. citizen)        (Name of country)

Domiciled in U.S.A. Yes ____ No ____ Address   545 Elizabeth #101    Author of   words and music
                                      Newark, N.J.                 (State which: words, music, arrangement, etc.)

Name      Eddie Hazel                   Citizenship: U.S.A.   X   Other
(Give legal name followed by pseudonym if latter appears on the copies)    (Check if U.S. citizen)        (Name of country)

Domiciled in U.S.A. Yes ____ No ____ Address   545 Elizabeth #101    Author of   words and music
                                      Newark, N.J.                 (State which: words, music, arrangement, etc.)

➤➤ NOTE: | Leave all spaces of line 4 blank unless your work has been PUBLISHED. | ◄◄

**4. (a) Date of Publication:** Give the date when copies of this particular version of the work were first placed on sale, sold, or publicly distributed. The date when copies were made or printed, or the date when the work was performed should not be confused with the date of publication. (NOTE: The full date (month, day, and year) must be given.)

_____
        (Month)        (Day)        (Year)

**(b) Place of Publication:** Give the name of the country in which this particular version of the work was first published.

➤➤ NOTE: | Leave all spaces of line 5 blank unless the instructions below apply to your work. | ◄◄

**5. Previous Registration or Publication:** If a claim to copyright in any substantial part of this work was previously registered in the U.S. Copyright Office in unpublished form,

or if any substantial part of the work was previously published anywhere, give requested information.

Was work previously registered? Yes ____ No ____ Date of registration _____ Registration number _____

Was work previously published? Yes ____ No ____ Date of publication _____ Registration number _____

Is there any substantial **NEW MATTER** in this version? Yes ......... No ......... If your answer is "Yes," give a brief general statement of the nature of the **NEW MATTER** in this version. (New matter may consist of compilation, arrangement, adaptation, editorial revision, and the like, as well as additional words and music.)

Plaintiffs' Appendix 90

| EXAMINER |
|---|
| OR |

*Complete all applicable spaces on next page*

6. If registration fee is to be charged to a deposit account established in the Copyright Office, give name of account:

7. Name and address of person or organization to whom correspondence or refund, if any, should be sent:

Name   LEBARON MUSIC                    Address   8832 Puritan, Detroit, Mich.

8. Send certificate to:

(Type or          Name       LEBARON MUSIC
print
name and     Address    8832 Puritan
address)                              (Number and street)
                        Detroit          Michigan          48238
                         (City)            (State)          (ZIP code)

9. **Certification:**      I CERTIFY that the statements made by me in this application are correct to the best of my
(Application not           knowledge.
acceptable
unless signed)                                              LeBaron Taylor
                                           (Signature of copyright claimant or duly authorized agent)

## Application Forms

Copies of the following forms will be supplied by the Copyright Office without charge upon request.

Class A   Form A—Published book manufactured in the United States of America.

Class A   Form A–B Foreign—Book or periodical manufactured outside the United States of America (except works subject to
or B          the ad interim provisions of the copyright law).
          Form A–B Ad Interim—Book or periodical in the English language manufactured and first published outside the
              United States of America.

Class B   Form B—Periodical manufactured in the United States of America.
          Form BB—Contribution to a periodical manufactured in the United States of America.

Class C   Form C—Lecture or similar production prepared for oral delivery.

Class D   Form D—Dramatic or dramatico-musical composition.

          Form E—Musical composition the author of which is a citizen or domiciliary of the United States of America or
              which was first published in the United States of America.
Class E   Form E Foreign—Musical composition the author of which is not a citizen or domiciliary of the United States of
              America and which was not first published in the United States of America.

Class F   Form F—Map.

Class G   Form G—Work of art or a model or design for a work of art.

Class H   Form H—Reproduction of a work of art.

Class I   Form I—Drawing or plastic work of a scientific or technical character.

Class J   Form J—Photograph.

Class K   Form K—Print or pictorial illustration.
          Form KK—Print or label used for an article of merchandise.

Class L   Form L–M—Motion picture.
or M

          Form R—Renewal copyright.

          Form U—Notice of use of copyrighted music on mechanical instruments.

| FOR COPYRIGHT OFFICE USE ONLY | |
|---|---|
| Application received<br>NOV 29 1967 | |
| One copy received<br>NOV 30 1967 | |
| Two copies received | |
| Fee received<br>44306 NOV 29 '67 | |
| Renewal | |

*Page 2*

---

### (right column, partially cut off)

**Applica**

In a musica
States

Instruction
completed
be SIGNE
should not
in line 4(a
date.  For
   Pages 1 a
ink.  Pages
as pages 1

1. Copyrig
published

Name   LE

Address   8

Name

Address

2. Title:

3. Authors
given.  Wh
author.  O
law are U.S

Name   Ce
           (Gi

Domiciled in

Name   Tem
           (Gi

Domiciled in

Name
           (Gi

Domiciled in

4. (a) Dat
this particu
sold, or pub

(b) Plac

5. Previous
right in an
registered i

Was work pre

Was work pre

Is there any
statement of
tion, editori

# EXHIBIT 7

# EXHIBIT F

Page 1

| CLASS | REGISTRATION NO. |
|---|---|

# Application for Registration of a Claim to Copyright

**FORM E**

a musical composition the author of which is a citizen or domiciliary of the United States of America or which was first published in the United States of America

**E**  **Eu  8922**

DO NOT WRITE HERE
EP    EU

**Instructions:** Make sure that all applicable spaces have been completed before you submit the form. The application must be SIGNED at line 9. For published works the application should not be submitted until after the date of publication given in line 4(a), and should state the facts which existed on that date. For further information, see page 4.

Pages 1 and 2 should be typewritten or printed with pen and ink. Pages 3 and 4 should contain exactly the same information as pages 1 and 2, but may be carbon copies.

Mail all pages of the application to the Register of Copyrights, Library of Congress, Washington, D.C., 20540, together with:

(a) If unpublished, one complete copy of the work and the registration fee of $6.

(b) If published, two copies of the best edition of the work and the registration fee of $6.

Make your remittance payable to the Register of Copyrights.

**1. Copyright Claimant(s) and Address(es):** Give the name(s) and address(es) of the copyright owner(s). In the case of published works the name(s) should ordinarily be the same as in the notice of copyright on the copies deposited.

Name        LeBaron Taylor

Address     8832 Puritan, Detroit, Michigan 48238

Address

**2. Title:** "LET'S MAKE IT LAST"
(Give the title of the musical composition as it appears on the copies)

**3. Authors:** Citizenship and domicile information must be given. Where a work is made for hire, the employer is the author. Organizations formed under U.S. Federal or State law are U.S. citizens.

Authors include composers of music, authors of words, arrangers, compilers, etc. If the copyright claim is based on new matter (see line 5) give information about the author of the new matter.

Name    George Clinton        Citizenship: U.S.A. __X__ Other ____
(Give legal name followed by pseudonym if latter appears on the copies)    (Check if U.S. citizen)    (Name of country)

Domiciled in U.S.A. Yes ____ No ____ Address  545 Elizabeth    Author of  words and music
                                               Newark, N.J.    (State which: words, music, arrangement, etc.)

Name    T. Lewis        Citizenship: U.S.A. __X__ Other ____
(Give legal name followed by pseudonym if latter appears on the copies)    (Check if U.S. citizen)    (Name of country)

Domiciled in U.S.A. Yes ____ No ____ Address  545 Elizabeth    Author of  words and music
                                               Newark, N.J.    (State which: words, music, arrangement, etc.)

Name    G. Bouser        Citizenship: U.S.A. __X__ Other ____
(Give legal name followed by pseudonym if latter appears on the copies)    (Check if U.S. citizen)    (Name of country)

Domiciled in U.S.A. Yes ____ No ____ Address  545 Elizabeth    Author of  words and music
                                               Newark, N.J.    (State which: words, music, arrangement, etc.)

▶▶ **NOTE:** Leave all spaces of line 4 blank unless your work has been PUBLISHED. ◀◀

**4. (a) Date of Publication:** Give the date when copies of the work were first placed on sale, or publicly distributed. The date when copies were made sold, or publicly distributed. The date when copies were made

or printed, or the date when the work was performed should not be confused with the date of publication. (NOTE: The full date (month, day, and year) must be given.)

_____
(Month)    (Day)    (Year)

**(b) Place of Publication:** Give the name of the country in which this particular version of the work was first published.

▶▶ **NOTE:** Leave all spaces of line 5 blank unless the instructions below apply to your work. ◀◀

**5. Previous Registration or Publication:** If a claim to copyright in any substantial part of this work was previously registered in the U.S. Copyright Office in unpublished form,

or if any substantial part of the work was previously published anywhere, give requested information.

Was work previously registered? Yes _____ No _____ Date of registration _____ Registration number _____

Was work previously published? Yes _____ No _____ Date of publication _____ Registration number _____

Is there any substantial NEW MATTER in this version? Yes _____ No _____ If your answer is "Yes," give a brief general statement of the nature of the NEW MATTER in this version. (New matter may consist of compilation, arrangement, adaptation, editorial revision, and the like, as well as additional words and music.)

Plaintiffs' Appendix 94

EXAMINER

*Complete all applicable spaces on next page*

6. If registration fee is to be charged to a deposit account established in the Copyright Office, give name of account

7. Name and address of person or organization to whom correspondence or refund, if any, should be sent:

Name  LeBaron Taylor          Address  8832 Puritan, Detroit, Mich.
                                                                48238

8. Send certificate to:

(Type or print name and address)

Name    LeBaron Taylor

        8832 Puritan

Address Detroit          Michigan          48238
        (City)           (State)          (ZIP code)
                  (Number and street)

9. **Certification:**

(Application not acceptable unless signed)

I CERTIFY that the statements made by me in this application are correct to the best of my knowledge.

_____
(Signature of copyright claimant or duly authorized agent)

## Application Forms

Copies of the following forms will be supplied by the Copyright Office without charge upon request.

Class A    Form A—Published book manufactured in the United States of America.
Class A or B    Form A–B Foreign—Book or periodical manufactured outside the United States of America (except works subject to the ad interim provisions of the copyright law).
           Form A–B Ad Interim—Book or periodical in the English language manufactured and first published outside the United States of America.
Class B    Form B—Periodical manufactured in the United States of America.
           Form BB—Contribution to a periodical manufactured in the United States of America.
Class C    Form C—Lecture or similar production prepared for oral delivery.
Class D    Form D—Dramatic or dramatico-musical composition.
Class E    Form E—Musical composition the author of which is a citizen or domiciliary of the United States of America or which was first published in the United States of America.
           Form E Foreign—Musical composition the author of which is not a citizen or domiciliary of the United States of America and which was first not published in the United States of America.
Class F    Form F—Map.
Class G    Form G—Work of art or a model or design for a work of art.
Class H    Form H—Reproduction of a work of art.
Class I    Form I—Drawing or plastic work of a scientific or technical character.
Class J    Form J—Photograph.
Class K    Form K—Print or pictorial illustration.
           Form KK—Print or label used for an article of merchandise.
Class L or M    Form L–M—Motion picture.
           Form R—Renewal copyright.
           Form U—Notice of use of copyrighted music on mechanical instruments.

FOR COPYRIGHT OFFICE USE ONLY

Application received
AUG - 9 1967

One copy received
AUG - 9 1967

Two copies received

Fee received
11002 AUG -9'67

Renewal

U.S. GOVERNMENT PRINTING OFFICE: 1965—O-791-325

Page 2

---

Page 1

Applicat
in a musical
States of

Instructions:
completed be
be SIGNED
should not be
in line 4(a),
date. For fu
Pages 1 am
ink. Pages 3
as pages 1 a

1. Copyright
published wo

Name ----- LE

         88
Address -----

Name -----

Address -----

2. Title: -----

-----

3. Authors:
given. Whe
author. Org
law are U.S.

Name ----- Geo
              (Give

Domiciled in U

Name ----- Co
              (Give

Domiciled in U

Name ----- Bl
              (Give

Domiciled in U

4. (a) Date
this particula
sold, or publi

-----

(b) Place

-----

5. Previous
right in any
registered in

Was work previ
Was work previ
Is there any s
statement of t
tion, editorial

Plaintiffs' Appendix 95

# EXHIBIT 8

# EXHIBIT H

FORM E

Page 1

# Application for Registration of a Claim to Copyright

In a musical composition the author of which is a citizen or domiciliary of the United
States of America or which was first published in the United States of America

| CLASS | REGISTRATION NO. |
|---|---|
| E | Eu 975770 |
| | DO NOT WRITE HERE |
| | EP          EU |

**Instructions:** Make sure that all applicable spaces have been completed before you submit the form. The application must be SIGNED at line 9. For published works the application should not be submitted until after the date of publication given in line 4(a), and should state the facts which existed on that date. For further information, see page 4.
Pages 1 and 2 should be typewritten or printed with pen and ink. Pages 3 and 4 should contain exactly the same information as pages 1 and 2, but may be carbon copies.

Mail all pages of the application to the Register of Copyrights, Library of Congress, Washington, D.C., 20540, together with:

*(a)* If unpublished, one complete copy of the work and the registration fee of $6.

*(b)* If published, two copies of the best edition of the work and the registration fee of $6.

Make your remittance payable to the Register of Copyrights.

**1. Copyright Claimant(s) and Address(es):** Give the name(s) and address(es) of the copyright owner(s). In the case of published works the name(s) should ordinarily be the same as in the notice of copyright on the copies deposited.

Name ___Groovesville Music_____

Address ___517 Pavilion, 1 Lafayette Plaisance, Detroit, Michigan 48207___

Name _____

Address _____

**2. Title:** ___"I'LL WAIT"_____
(Give the title of the musical composition as it appears on the copies)

**3. Authors:** Citizenship and domicile information must be given. Where a work is made for hire, the employer is the author. Organizations formed under U.S. Federal or State law are U.S. citizens.

Authors include composers of music, authors of words, arrangers, compilers, etc. If the copyright claim is based on new matter (see line 5) give information about the author of the new matter.

Name ___George Clinton_____ Citizenship: U.S.A. _X_ Other _____
(Give legal name followed by pseudonym if latter appears on the copies)   (Check if U.S. citizen)   (Name of country)

Domiciled in U.S.A. Yes _X_ No ____ Address ___218 Plainfield Ave.___ Author of ___words and music___
___Plainfield, N.J.___   (State which: words, music, arrangement, etc.)

Name ___Pat Lewis_____ Citizenship: U.S.A. ____ Other _____
(Give legal name followed by pseudonym if latter appears on the copies)   (Check if U.S. citizen)   (Name of country)

Domiciled in U.S.A. Yes _X_ No ____ Address ___2263 Hazelwood___ Author of ___words and music___
___Detroit, Mich.___   (State which: words, music, arrangement, etc.)

Name ___Eddie Anderson_____ Citizenship: U.S.A. _X_ Other _____
(Give legal name followed by pseudonym if latter appears on the copies)   (Check if U.S. citizen)   (Name of country)

Domiciled in U.S.A. Yes _X_ No ____ Address ___1977 Tuxedo, #301___ Author of ___words and music___
___Detroit, Mich.___   (State which: words, music, arrangement, etc.)

➤➤ NOTE: **Leave all spaces of line 4 blank unless your work has been PUBLISHED.** ◄◄

**4. (a) Date of Publication:** Give the date when copies of this particular version of the work were first placed on sale, sold, or publicly distributed. The date when copies were made or printed, or the date when the work was performed should not be confused with the date of publication. (NOTE: The full date (month, day, and year) must be given.)

_____ _____ _____
(Month)        (Day)        (Year)

**(b) Place of Publication:** Give the name of the country in which this particular version of the work was first published.

_____

➤➤ NOTE: **Leave all spaces of line 5 blank unless the instructions below apply to your work.** ◄◄

**5. Previous Registration or Publication:** If a claim to copyright in any substantial part of this work was previously registered in the U.S. Copyright Office in unpublished form,

or if any substantial part of the work was previously published anywhere, give requested information.

Was work previously registered? Yes _____ No _____ Date of registration _____ Registration number _____

Was work previously published? Yes _____ No _____ Date of publication _____ Registration number _____

Is there any substantial **NEW MATTER** in this version? Yes _____ No _____ If your answer is "Yes," give a brief general statement of the nature of the **NEW MATTER** in this version. (New matter may consist of compilation, arrangement, adaptation, editorial revision, and the like, as well as additional words and music.)

| EXAMINER |
|---|
| W.99 |

*Complete all applicable spaces on next page*

Page 2

Plaintiffs' Appendix 98

6. If registration fee is to be charged to a deposit account established in the Copyright Office, give name of account:

7. Name and address of person or organization to whom correspondence or refund, if any, should be sent:

Name _Groovesville Music_   Address _517 Pavilion, 1 Lafayette Pl._
_Detroit, Mich._

8. Send certificate to:

(Type or print name and address)   Name _Groovesville Music,_

Address _517 Pavilion, 1 Lafayette Plaisance_
(Number and street)

_Detroit_ (City)   _Michigan_ (State)   _48207_ (ZIP code)

9. **Certification:**

(Application not acceptable unless signed)

I CERTIFY that the statements made by me in this application are correct to the best of my knowledge.

_(signature)_
(Signature of copyright claimant or duly authorized agent)

## Application Forms

Copies of the following forms will be supplied by the Copyright Office without charge upon request.

Class A   Form A—Published book manufactured in the United States of America.
Class A or B   Form A–B Foreign—Book or periodical manufactured outside the United States of America (except works subject to the ad interim provisions of the copyright law).
   Form A–B Ad Interim—Book or periodical in the English language manufactured and first published outside the United States of America.
Class B   Form B—Periodical manufactured in the United States of America.
   Form BB—Contribution to a periodical manufactured in the United States of America.
Class C   Form C—Lecture or similar production prepared for oral delivery.
Class D   Form D—Dramatic or dramatico-musical composition.
Class E   Form E—Musical composition the author of which is a citizen or domiciliary of the United States of America or which was first published in the United States of America.
   Form E Foreign—Musical composition the author of which is not a citizen or domiciliary of the United States of America and which was not first published in the United States of America.
Class F   Form F—Map.
Class G   Form G—Work of art or a model or design for a work of art.
Class H   Form H—Reproduction of a work of art.
Class I   Form I—Drawing or plastic work of a scientific or technical character.
Class J   Form J—Photograph.
Class K   Form K—Print or pictorial illustration.
   Form KK—Print or label used for an article of merchandise.
Class L or M   Form L–M—Motion picture.
   Form R—Renewal copyright.
   Form U—Notice of use of copyrighted music on mechanical instruments.

| FOR COPYRIGHT OFFICE USE ONLY |
|---|
| Application received JAN 25 1967 |
| One copy received JAN 25 1967 |
| Two copies received |
| Fee received 61240 JAN25 67 |
| Renewal |

---

Page 1

**Application**

In a musical comp
States of Ame

Instructions: Mak
completed before
be SIGNED at l
should not be subr
in line 4(a), and
date. For further
Pages 1 and 2 s
ink. Pages 3 and
as pages 1 and 2,

1. Copyright Cla
published works

Name _Groov_

Address _517_

Name ____

Address ____

2. Title: ____ "I

3. Authors: Cit
given. Where a
author. Organiz
law are U.S. citi

Name _Leon_
(Give le

Domiciled in U.S.

Name _Milke_
(Give le

Domiciled in U.S.

Name ____
(Give le

Domiciled in U.S.

4. (a) Date o
this particular
sold, or publicl

(b) Place ____

5. Previous R
right in any
registered in t
Was work previ
Was work previc
Is there any su
statement of th
tion, editorial

# EXHIBIT 9

# EXHIBIT J

Page 1

**FORM E**

| CLASS | REGISTRATION NO. |
|---|---|
| E | Eu  27527 |
| EP | DO NOT WRITE HERE |
| | (EU) |

# Application for Registration of a Claim to Copyright

in a musical composition the author of which is a citizen or domiciliary of the United
States of America or which was first published in the United States of America

**Instructions:** Make sure that all applicable spaces have been completed before you submit the form. The application must be **SIGNED** at line 9. For published works the application should not be submitted until after the date of publication given in line 4(a), and should state the facts which existed on that date. For further information, see page 4.

Pages 1 and 2 should be typewritten or printed with pen and ink. Pages 3 and 4 should contain exactly the same information as pages 1 and 2, but may be carbon copies.

Mail all pages of the application to the Register of Copyrights, Library of Congress, Washington, D.C., 20540, together with:

(a) If unpublished, one complete copy of the work and the registration fee of $6.

(b) If published, two copies of the best edition of the work and the registration fee of $6.

Make your remittance payable to the Register of Copyrights.

**1. Copyright Claimant(s) and Address(es):** Give the name(s) and address(es) of the copyright owner(s). In the case of published works the name(s) should ordinarily be the same as in the notice of copyright on the copies deposited.

Name    LEBARON MUSIC

Address    8832 PURITAN, DETROIT, MICHIGAN 48238

Name

Address

**2. Title:** WHAT YOU BEEN GROWING
(Give the title of the musical composition as it appears on the copies)

**3. Authors:** Citizenship and domicile information must be given. Where a work is made for hire, the employer is the author. Organizations formed under U.S. Federal or State law are U.S. citizens.

Authors include composers of music, authors of words, arrangers, compilers, etc. If the copyright claim is based on new matter (see line 5) give information about the author of the new matter.

Name    George Clinton
(Give legal name followed by pseudonym if latter appears on the copies)    Citizenship: U.S.A.  X    Other
(Check if U.S. citizen)    (Name of country)

Domiciled in U.S.A.  Yes ____  No ____  Address  545 Elizabeth  Apt. 161    Author of  words and music
Newark, N.J.    (State which: words, music, arrangement, etc.)

Name    Ernie Harris
(Give legal name followed by pseudonym if latter appears on the copies)    Citizenship: U.S.A.  X    Other
(Check if U.S. citizen)    (Name of country)

Domiciled in U.S.A.  Yes ____  No ____  Address  545 Elizabeth St. Apt. 101    Author of  words and music
Newark, N.J.    (State which: words, music, arrangement, etc.)

Name
(Give legal name followed by pseudonym if latter appears on the copies)    Citizenship: U.S.A. _____  Other
(Check if U.S. citizen)    (Name of country)

Domiciled in U.S.A.  Yes ____  No ____  Address    Author of
(State which: words, music, arrangement, etc.)

▶▶ NOTE: | Leave all spaces of line 4 blank unless your work has been PUBLISHED. | ◀◀

**4. (a) Date of Publication:** Give the date when copies of this particular version of the work were first placed on sale, sold, or publicly distributed. The date when copies were made

or printed, or the date when the work was performed should not be confused with the date of publication. (NOTE: The full date (month, day, and year) must be given.)

(Month)          (Day)          (Year)

**(b) Place of Publication:** Give the name of the country in which this particular version of the work was first published.

▶▶ NOTE: | Leave all spaces of line 5 blank unless the instructions below apply to your work. | ◀◀

**5. Previous Registration or Publication:** If a claim to copyright in any substantial part of this work was previously registered in the U.S. Copyright Office in unpublished form,

or if any substantial part of the work was previously published anywhere, give requested information.

Was work previously registered?  Yes _____  No _____  Date of registration _____  Registration number _____

Was work previously published?  Yes _____  No _____  Date of publication _____  Registration number _____

Is there any substantial **NEW MATTER** in this version?  Yes ____  No ____  If your answer is "Yes," give a brief general statement of the nature of the **NEW MATTER** in this version. (New matter may consist of compilation, arrangement, adaptation, editorial revision, and the like, as well as additional words and music.)

| EXAMINER |
|---|
| GH |

Page 2          *Complete all applicable spaces on next page*

Plaintiffs' Appendix 102

6. If registration fee is to be charged to a deposit account established in the Copyright Office, give name of account:

7. **Name and address of person or organization to whom correspondence or refund, if any, should be sent:**

Name  LEBARON MUSIC                    Address  8832 Puritan, Detroit, Mich. 48238

8. Send certificate to:

(Type or print name and address)

Name    LEBARON MUSIC

Address  8832 Puritan
                                    (Number and street)
         Detroit        Michigan           48238
         (City)          (State)          (ZIP code)

9. **Certification:**

(Application not acceptable unless signed)

I CERTIFY that the statements made by me in this application are correct to the best of my knowledge.

LeBaron Taylor

(Signature of copyright claimant or duly authorized agent)

## Application Forms

Copies of the following forms will be supplied by the Copyright Office without charge upon request.

Class A    Form A—Published book manufactured in the United States of America.

Class A or B    Form A–B Foreign—Book or periodical manufactured outside the United States of America (except works subject to the ad interim provisions of the copyright law).
Form A–B Ad Interim—Book or periodical in the English language manufactured and first published outside the United States of America.

Class B    Form B—Periodical manufactured in the United States of America.
Form BB—Contribution to a periodical manufactured in the United States of America.

Class C    Form C—Lecture or similar production prepared for oral delivery.

Class D    Form D—Dramatic or dramatico-musical composition.

Class E    Form E—Musical composition the author of which is a citizen or domiciliary of the United States of America or which was first published in the United States of America.
Form E Foreign—Musical composition the author of which is not a citizen or domiciliary of the United States of America and which was not first published in the United States of America.

Class F    Form F—Map.

Class G    Form G—Work of art or a model or design for a work of art.

Class H    Form H—Reproduction of a work of art.

Class I    Form I—Drawing or plastic work of a scientific or technical character.

Class J    Form J—Photograph.

Class K    Form K—Print or pictorial illustration.
Form KK—Print or label used for an article of merchandise.

Class L or M    Form L–M—Motion picture.

Form R—Renewal copyright.
Form U—Notice of use of copyrighted music on mechanical instruments.

| | FOR COPYRIGHT OFFICE USE ONLY |
|---|---|
| Application received  NOV 29 1967 | |
| One copy received  NOV 30 1967 | |
| Two copies received | |
| Fee received  44306 NOV 29 '67 | |
| Renewal | |

# EXHIBIT 10

**From:** Vernon Slaughter [mailto:slaughterv@cox.net]
**Sent:** Monday, August 15, 2011 11:01 PM
**To:** 'Brian Levenson'
**Subject:** FW: FW: Tuff City -w- Kay Taylor

Brian,

       Please adjust paragraph 4. Kay does not have any contracts and therefore cannot warrant and represent that she has. Call me if you want to discuss. I suggest that you remove the second sentence. V.


**From:** Lovelacetaylor@aol.com [mailto:Lovelacetaylor@aol.com]
**Sent:** Monday, August 15, 2011 5:17 PM
**To:** slaughterv@cox.net
**Subject:** Re: FW: Tuff City -w- Kay Taylor

Hi Vernon:

I read the contract and just have one additional comment. As stated on the telephone, I have no written documents, just the tapes. So I am a bit uncomfortable with #4.

4. **Representations and Warranties.** Taylor warrants and represents that Taylor is the sole owner of all Songs being transferred in this agreement. Taylor warrants and represents that she has valid signed agreements with each and every artist, producer and songwriter and any other copyright holder and/or rights owner associated with these copyrights and that those agreements transfer all right, title, and interest to Taylor and that Taylor has the full right, power and authority to enter into and perform this agreement and that Taylor has not granted and will not grant to any other person or entity the rights granted herein. Taylor warrants and represents that each sound recording and musical composition listed in schedule "A" and "B" is fully owned by Taylor and does not and will not infringe upon the rights of any third party.

If this is not a problem, I can sign the document and fax to Tuff City.

Kay Taylor


In a message dated 8/15/2011 4:21:20 P.M. US Mountain Standard Time, slaughterv@cox.net writes:

Kay,

       Attached hereto please find the revised draft of the proposed above-referenced agreement for your review. Thanks, V.

**From:** Brian Levenson [mailto:levenson@tuffcity.com]
**Sent:** Monday, August 15, 2011 3:49 PM
**To:** slaughterv@cox.net
**Subject:** RE: Tuff City -w- Kay Taylor

Hi Vernon,

It was good speaking with you. Please find a revised draft reflecting the changes you discussed with Aaron. Let me know if you have any comments or if we are all set.

Best Regards,

Brian

**From:** Brian Levenson [mailto:levenson@tuffcity.com]
**Sent:** Thursday, August 11, 2011 4:14 PM
**To:** 'slaughterv@cox.net'
**Subject:** Tuff City -w- Kay Taylor

Hi Vernon,

i hope all is well. Please find a draft agreement attached reflecting your conversation with Aaron yesterday. Please let me know if you have any comments. If all looks ok I will arrange for signature copies.

Until we have a fully executed agreement, I reserve Tuff City's right to make changes.

Best Regards,

_____

Brian Levenson, Esq.

Tuff City Music Group

10 West 37th St., Suite 601

New York, NY 10018

p:(212) 586-0899 / f:(212) 586-1081

# EXHIBIT 11

```
Type of Work:        Sound Recording

Registration Number / Date:
                     SR0000318918 / 2002-02-13

Title:               Standing on the verge of getting it on / Funkadelic.

Imprint:             c1974.

Publisher Number:  Westbound Records WB 1001

Description:         Sound disc : 33 1/3 rpm ; 12 in.

Copyright Claimant:
                     ℗ on sound recording; Westbound Records, Inc. (employer
                        for hire)

Date of Creation:  1974

Date of Publication:
                     15Sep74

Copyright Note:    C.O. correspondence.

Contents:            Red hot momma -- Alice in my fantasies -- I'll stay -- Sexy
                        ways -- Standing on the verge of getting it on --
                        Jimmy's got a little bit of bitch in him -- Good
                        thoughts, bad thoughts.

Names:               Funkadelic
                     Westbound Records, Inc.

================================================================================
```

Plaintiffs' Appendix 108

# EXHIBIT 12

https://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi

```
Type of Work:       Sound Recording

Registration Number / Date:
                    SR0000318918 / 2002-02-13

Title:              Standing on the verge of getting it on / Funkadelic.

Imprint:            c1974.

Publisher Number:   Westbound Records WB 1001

Description:        Sound disc : 33 1/3 rpm ; 12 in.

Copyright Claimant:
                    ℗ on sound recording; Westbound Records, Inc. (employer
                       for hire)

Date of Creation:   1974

Date of Publication:
                    15Sep74

Copyright Note:     C.O. correspondence.

Contents:           Red hot momma -- Alice in my fantasies -- I'll stay -- Sexy
                    ways -- Standing on the verge of getting it on --
                    Jimmy's got a little bit of bitch in him -- Good
                    thoughts, bad thoughts.

Names:              Funkadelic
                    Westbound Records, Inc.

===============================================================================
```

Plaintiffs' Appendix 110

# EXHIBIT 13

11/5/21, 6:32 PM    Case 1:19-cv-01764-PGG-SLC    Document 93   Filed 11/08/21   Page 112 of 161

```
Type of Work:      Music

Registration Number / Date:
                   PA0001053067 / 1998-06-12

Title:             Can you get to that?

Appears in:        Maggot brain. Westbound Records WBCD 2007, c1971.  Compact
                      disc

Publisher Number:  Westbound Records WBCD 2007

Performer:         Performed by Funkadelic.

Copyright Claimant:
                   Bridgeport Music, Inc.

Date of Creation:  1971

Date of Publication:
                   1978-01-01

Authorship on Application:
                   words & music: George Clinton, Ernie Harris; arr.:
                      Westbound Records, employer for hire.

Previous Registration:
                   Prev. reg. 1971, EU274894.

Basis of Claim:    New Matter: 1st pub. ed.

Names:             Clinton, George
                   Harris, Ernie
                   Funkadelic
                   Bridgeport Music, Inc.
                   Westbound Records


===============================================================================
```

# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

GEORGE CLINTON, et al.,

      Plaintiffs,

v.                               CASE NO.   4:99cv242-RH

ARMEN BOLADIAN, et al.,

      Defendants.

_____/

**ORDER SETTING PROCEDURES FOR TRIAL ON COUNTERCLAIM AND
DIRECTING ENTRY OF JUDGMENT DISMISSING COMPLAINT**

    Following a bench trial on the issue of liability on
the complaint of plaintiff Malbiz Music, Inc. on January 29,
2001, it was determined, based on findings of fact and
conclusions of law set forth on the record, that Malbiz was
not entitled to recover in this action.  Based on those
findings of fact and conclusions of law, together with the
earlier granting of summary judgment against plaintiff

ENTERED ON DOCKET _1/30_ BY _LL_
[Rules 58 & 79(a) FRCP or 32(d)(1) & 55 FRCRP]
Copies mailed to: _Adams, Stewart,_
_Nelson Richard_
_Bickle, Kaman,_
_Della Maria_
_Sick - Cole -_

U.S. DISTRICT CT.
NORTHERN DIST. FLA.
TALLAHASSEE, FLA.
01 JAN 30  PM 12: 38

FILED

George Clinton as confirmed in the Pretrial Order of September 19, 2000, judgment now should be entered dismissing all plaintiffs' claims.  I hereby expressly determine that there is no just reason for delay and expressly direct the clerk to enter judgment as set forth in this order.

For these reasons,

IT IS ORDERED:

1.  The clerk shall enter judgment stating, "Pursuant to Federal Rule of Civil Procedure 54(b), all claims of plaintiffs are dismissed with prejudice."

2.  The counterclaim remains pending and remains scheduled for non-jury trial during the two-week trial period beginning Tuesday, February 20, 2001.  By not later than February 8, 2001, the parties shall <u>file</u> a joint report (a) setting forth the estimated length of the trial and (b) listing any days within the trial period for which there exists any scheduling conflict.  The joint report may be signed by attorneys for both sides or by the attorney for one side with the consent of the attorney for the other

2

side.  A date certain for trial within the trial period will

be determined after filing of the joint report.

SO ORDERED this $\underline{30}^{th}$ day of January, 2001.


Robert L. Hinkle
United States District Judge

3

1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


MALBIZ MUSIC, a Delaware Corporation, )
                                      )
                Plaintiff,            )
                                      )
vs.                                   )
                                      ) Case No.: 4:99cv242
ARMEN BOLADIAN, an individual, and    )
BRIDGEPORT MUSIC, INC., a Michigan    ) Tallahassee, Florida
corporation, and DOES 1 through 10,   ) January 29, 2001
inclusive,                            ) 9 A.M.
                                      )
                Defendants.           )
                                      )


** *TRIAL* **

TRANSCRIPT OF NON-JURY TRIAL
BEFORE THE HONORABLE ROBERT L. HINKLE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:      Law Offices of Johnnie L. Cochran
                        By:  DONALD WILSON
                             Attorney at Law
                        4929 Wilshire Boulevard
                        Suite 1010
                        Los Angeles, California   90010


For the Defendants:     Greenberg, Traurig, P.A.
                        By:  BARRY RICHARD
                             Attorney at Law
                        101 East College Avenue
                        P.O. Drawer 1838
                        Tallahassee, Florida   32301
                             -and-
                        Rothschild, Barry & Myers
                        By:  JOSEPH P. DELLA MARIA
                             Attorney at Law
                        55 W. Monroe Street
                        Suite 3900
                        Chicago, Illinois   60603-5012

JUDY A. ELLAN, RPR
Official United States Court Reporter
111 North Adams Street ° Tallahassee, Florida 32301-7730
(850) 561-6822 ° Fax (850) 561-6827

EXHIBIT
G

185

1    officer goes out and executes an extraordinary or unusual

2    type of contract, which I think this clearly is -- you give

3    away these valuable copyrights for nothing to the

4    corporation -- then the burden is on -- and the case I cited,

5    it was a licensee, because it was a license that was granted,

6    but -- it's the person, the party who executed the contract

7    with the corporation, the burden is on them to show that

8    there existed expressed authority by the corporate officer to

9    enter into that agreement.

10            THE COURT:  All right.  Thank you.

11            MR. WILSON:  Thank you, Your Honor.

12            THE COURT:  I'm going to take a recess.  It's my

13    intention, if I can, to get you a ruling today on the record.

14    I need to read the cases that Mr. Wilson has cited, spend a

15    little more time with the exhibits and go back over my notes.

16            Let's take a recess until 4:30; and I will expect,

17    if possible, to get you a ruling at that time.

18            We'll be in recess.

19        (A recess was taken from 3:27 p.m. to 4:42 p.m.)

20            THE COURT:  Please be seated.

21            Let me begin by telling you the result, and then

22    I'll back up and explain the reason for the decision.

23            Judgment will be entered in the case in favor of the

24    defendants.

25            The factual background of the case is this:

186

1    An agreement was entered between Bridgeport and

2 Malbiz on August 31st, 1971.  At that time Malbiz was a sole

3 proprietorship of Mr. Clinton.  That agreement, by its terms,

4 was for five years.

5    There is some disagreement in the testimony about

6 whether it ran its course or was terminated by settlement

7 close to the end of that period.

8    In any event, Mr. Clinton entered agreements with

9 others in the mid '70s upon termination of the Bridgeport

10 agreement, including Warner Brothers.  He also did work for

11 or on labels of Gold Forever and Carnival.

12    In about 1977, Malbiz was incorporated.  At that

13 time Mr. Clinton was the sole shareholder.

14    In about 1980, he gave 75 percent of the shares to

15 Stephanie Clinton, who was not Ms. Clinton at that point, but

16 had a similar relationship with Mr. Clinton.

17    An agreement was entered on March 4th, 1982, between

18 Malbiz and Bridgeport.  I find that that was a valid and

19 binding agreement.  I find that Mr. Clinton signed it; that

20 he had actual authority of Malbiz to sign it.

21    That agreement initially listed six specific titles.

22 That agreement is a one-page document, the first page of

23 Defendants' Exhibit 18, also the first page of Plaintiff's

24 Exhibits 3 and 4, although Plaintiff's Exhibit 4 is a copy

25 that has had three additional songs added to the list.

1     The agreement is not all together clear on what it
2   was intended to provide.  It seems to have one or more
3   missing paragraphs.  In any event, there are parts of it that
4   are hard to understand.  In particular, there is a
5   subparagraph A that is missing a subject and verb, and seems
6   to have money being paid to the -- a hundred percent of all
7   money being paid to the owner.  It appears that there are
8   other provisions that somehow got omitted from that one page.
9     That is not important, because on December 2nd,
10  1983, Malbiz and Bridgeport entered an addendum to that
11  agreement that clarified the agreement and expanded the
12  agreement.  The parties intended that addendum to be
13  effective as of March 4, 1982, the same date as the original
14  agreement.
15    I find that Mr. Clinton signed that addendum on
16  behalf of Malbiz; that he had actual authority to do so.
17    My finding that Mr. Clinton had actual authority to
18  enter these agreements is based on all of the circumstances,
19  including the fact that he is the writer, whose work was the
20  very being of Malbiz.  He's the one that had the business
21  initially as a sole proprietorship and formed the
22  corporation.  Although he gave away 75 percent of the
23  corporation to his future wife, he was still, by his own
24  account, a corporate officer.  He signed at least one other
25  document on behalf of Malbiz that he has acknowledged validly

188

1    signing on behalf of Malbiz.

2        Based on all of those circumstances, I do not credit

3    the assertion that Mr. Clinton was acting beyond his

4    authority by entering agreements dealing with works he had

5    created.  I, therefore, conclude that he had actual

6    authority.  I note, parenthetically, that he almost surely

7    also had apparent authority to take those actions.

8        I have reviewed the New York cases that were cited.

9    None is quite like this.  There may be some question about

10   whether the applicable law is New York law or Michigan law.

11   Some of these papers provide that they will be governed by

12   Michigan law.  When someone enters a contract in Michigan on

13   behalf of a corporation, I suspect that the law of Michigan

14   may well control the validity of that contract, not the law

15   of New York.

16       But, in any event, the principle in New York, that

17   extraordinary contracts require actual authority of the

18   corporate officer, involves circumstances different than

19   these.  These are assignments of artistic works created by

20   the person who signed the agreement.  It would be an

21   extraordinary reading of New York law, or the law of any

22   other state, to suggest that Bridgeport could not enforce an

23   agreement entered under those circumstances.

24       In any event, as I indicated, my finding on the

25   facts is that Mr. Clinton had actual authority to enter these

189

1    contracts.

2         The March 4th, 1982, agreement, as clarified or

3    modified by the addendum executed on December 2nd, 1983, with

4    the statement that it was to be effective as of March 4th,

5    1982, recognizes the involvement of Malbiz with these works.

6         I assume, for purposes of my ruling, that

7    Mr. Clinton had assigned to Malbiz his rights in the works at

8    issue; and that Bridgeport recognized that by entering the

9    agreement with Malbiz.

10         I have not overlooked the testimony that Bridgeport

11   was not aware that Malbiz had been incorporated, and I note

12   that the March 4, 1982 agreement is with Malbiz, but then

13   has, in parentheses, George Clinton, which would provide some

14   support for the notion that the parties viewed Malbiz as a

15   proprietorship that was equivalent to Mr. Clinton rather than

16   as a separate corporation.  But I assume, for purposes of my

17   ruling, that Mr. Clinton had assigned his rights to Malbiz,

18   and that Bridgeport was dealing with Malbiz.

19         Still, the March 4, 1982 agreement, coupled with its

20   addendum, assigned to Bridgeport one hundred percent of all

21   rights in compositions created prior to March 4th, 1982.

22         Therefore, Malbiz has no right to recover any

23   payments with respect to such compositions.  There is nothing

24   in the March 4th, 1982 agreement that expressly creates a

25   right of any accounting, and that is not surprising in an

190

1    agreement that assigns the right of a hundred percent of the

2    proceeds to Bridgeport.  That is, it would make not very much

3    sense to require Bridgeport to account, when Bridgeport had

4    the right to receive all of the payments.

5        There was then another agreement entered on December

6    2nd, 1983.  It is entitled *"Writer's Agreement."*  It is

7    Defendants' Exhibit 16 and also Plaintiff's Exhibit 6.  I

8    find that it was signed by Mr. Clinton; that it is a valid

9    and binding agreement.  That agreement is between Bridgeport

10   and Mr. Clinton, himself.  Malbiz is not mentioned.

11       Malbiz apparently had been dissolved in the state of

12   New York.  The representation was made that that was at the

13   end of 1981.  I note that there is no proof in this trial

14   record about that.

15       The December 2nd, 1983, writer's agreement makes

16   Mr. Clinton the equivalent of an employee-for-hire of

17   Bridgeport with respect to the works created from that point

18   forward during the term of the agreement.  In the agreement,

19   Mr. Clinton warrants his title to such works.  In paragraph

20   5(a), Mr. Clinton warrants and represents to Bridgeport that

21   Mr. Clinton has the full right, power and authority to enter

22   into and perform the agreement, and to grant and vest in

23   publisher -- that is, Bridgeport -- all the rights referred

24   to free and clear of any and all claims, rights and

25   obligations, whatsoever.  That's not a direct quote, but

191

1    that's a paraphrase of the language of the agreement.

2          The agreement gives no indication by Mr. Clinton

3    that the rights to such songs belong to Malbiz rather than to

4    Mr. Clinton.

5          As set forth on the summary judgment ruling, any

6    rights of Mr. Clinton were rights that were required to be

7    disclosed in the bankruptcy proceeding.  By making no claim

8    that he had any such rights, Mr. Clinton lost the ability to

9    bring his claims here.  The fact that in this agreement he

10   warranted that those were his claims is inconsistent with any

11   assertion now that those claims for the songs created on or

12   after December 2nd, 1983, in fact, belong to Malbiz.

13         In any event, in this record there is no proof that

14   Malbiz became the owner of any rights in any composition

15   created after March 4th, 1982.  There is reason to doubt on

16   this record whether there were any creations during that

17   period.

18         Ms. Clinton, testified, for example, that she did

19   not recall any songs being written during that period, during

20   the period from 1980 to 1985.  But, in any event, there is no

21   proof in this record that there are -- that there were any

22   songs composed between March 4th, 1982, and December 2nd,

23   1983, in which Malbiz had any rights.

24         There was a later agreement entered between

25   Mr. Clinton and Bridgeport in 1985.  That agreement is not at

192

1    issue in this case.

2         The December 2nd, 1983, writer's agreement does have

3    an accounting provision in it, but the right to an accounting

4    under that agreement would be the right of Mr. Clinton, not

5    any right of Malbiz, who was not a party to that agreement.

6    For the reasons set forth in connection with summary

7    judgment, Mr. Clinton has no claim here for an accounting

8    under that agreement.  Malbiz clearly also does not have a

9    right to an accounting under that agreement or with respect

10   to rights in songs created after December 2nd, 1983, with

11   respect to which Mr. Clinton warranted that he himself had

12   all ownership and right.

13        I will enter a short order that will say, for the

14   reasons set forth on the record, judgment will be entered for

15   defendants.

16        Are there any other points on which any party wants

17   findings or anything else you would like me to address?

18        MR. WILSON:  Not at this time, Your Honor.

19        THE COURT:  We'll be in recess.

20        (The proceedings concluded at 5:01 p.m.)

21              *    *    *    *    *    *    *    *

22

23

24

25

193

1

2    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

3

4    Judy A. Ellan, RPR                          2-14-01
     Official U.S. Court Reporter                  Date

5

6

7

8                              INDEX

9    OPENING STATEMENT BY MR. WILSON...................... 2

10   OPENING STATEMENT BY MR. RICHARD..................... 3

11

12              *    *    *    *    *    *    *

13                  *PLAINTIFF'S CASE-IN-CHIEF*

14   WITNESSES FOR THE PLAINTIFF:

15   George Edward Clinton

16       Direct Examination by Mr. Wilson................. 6
         Cross-Examination by Mr. Richard................. 29
17       Redirect Examination by Mr. Wilson.............. 37

18

19   Stephanie Lynn Clinton

20       Direct Examination by Mr. Wilson................ 41
         Cross-Examination by Mr. Richard................ 54
21       Redirect Examination by Mr. Wilson.............. 58

22              *    *    *    *    *    *    *

23   PLAINTIFF RESTS..................................... 59

24              *    *    *    *    *    *    *

25

1      ## DEFENSE CASE-IN-CHIEF

2      WITNESSES FOR THE DEFENSE:

3      Armen Boladian

4          Direct Examination by Mr. Richard.................. 60
           Cross-Examination by Mr. Wilson.................... 66
5          Redirect Examination by Mr. Richard............... 99

6      Howard Hertz

7          Direct Examination by Mr. Richard................. 100
           Cross-Examination by Mr. Wilson................... 104
8
       Ruth Holmes

9
           Direct Examination by Mr. Richard................. 111
10         Cross-Examination by Mr. Wilson................... 126
           Redirect Examination by Mr. Richard............... 132
11         Examination by the Court.......................... 133
           Redirect Examination by Mr. Richard............... 135
12         Recross-Examination by Mr. Wilson................. 137
           Examination by the Court.......................... 138
13
       Howard Hertz (Recalled)
14
           Direct Examination by Mr. Richard................. 140
15         Cross-Examination by Mr. Wilson................... 141
           Examination by the Court.......................... 144
16
                       *   *   *   *   *   *   *   *
17

18     DEFENDANTS REST................................... 144

19     CLOSING ARGUMENT BY MR. WILSON.................... 145

20     CLOSING ARGUMENT BY MR. RICHARD................... 162

21     REBUTTAL ARGUMENT BY MR. WILSON................... 175

22     RULING............................................ 185

                       *   *   *   *   *   *   *   *
23

24

25

196

| | | | |
|---|---|---|---|
| 1 | 18 | Seven-page composite exhibit consisting of a one-page agreement, two-page document entitled, "Addendum," dated 3/4/82, two-page document entitled, "Exhibit A," and a two-page document entitled, "Exhibit B" | 65 |
| 2 | | | |
| 3 | | | |
| 4 | 152 | Resume of Ruth E. Holmes, CDE, consisting of two pages | 113 |
| 5 | | | |
| 6 | 166 | Notebook prepared by Ms. Holmes | 113 |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

GEORGE CLINTON, et al.,

       Plaintiffs,

v.                            CASE NO.  4:99cv242-RH

ARMEN BOLADIAN, et al.,

       Defendants.

_____/

## ORDER DENYING MOTION TO VACATE JUDGMENT

    Before the court is a motion to vacate, on the grounds
of fraud, a judgment entered after a bench trial.  I deny
the motion.

    The underlying contest is over the rights to certain
songs written by George Clinton.  The competing claimants
are plaintiff Malbiz Music, Inc., a corporation originally
formed by Mr. Clinton, on the one hand, and defendant

Entered on docket 12/5 by ML
(Rules 58 & 79(a) FRCP or 32(d) (1) & 55 FRCRP)
Copies sent to : *Adams,*
*Stewart, Wilson,*
*Conway, Richard,*
*Bielby, Korman,*
*Della Maria,* - 96 -
*Silk*

OFFICE OF CLERK
U.S. DISTRICT CT.
NORTHERN DIST. FLA.
TALLAHASSEE, FLA.

01 DEC -4  PM 4: 21

FILED

Plaintiffs' Appendix A301
BOLADIAN 312

Bridgeport Music, Inc., an unrelated corporation that claims

it took all rights in the songs by virtue of an assignment

executed by Mr. Clinton on behalf of Malbiz.  The assignment

was included in a document entitled "Addendum," which

modified a contract entered on March 4, 1982.  The

"Addendum" was explicitly made effective as of March 4,

1982, but it was in fact executed on December 2, 1983.

After a non-jury trial, I ruled in favor of Bridgeport,

finding that the "Addendum" was duly signed by Mr. Clinton

within the course and scope of his authority for Malbiz, and

that Malbiz thus had effectively assigned all its rights in

the songs.[1]

---

[1] Mr. Clinton joined the complaint in this action as a
plaintiff, claiming ownership of the songs as their writer.
I granted summary judgment against Mr. Clinton on the
grounds that he had filed a bankruptcy petition after
writing the songs, had failed to schedule the songs, and
apparently had asserted in the bankruptcy proceeding that
(or at least had not opposed the assertion that) all rights
in the songs had been transferred to Malbiz.  This precluded
Mr. Clinton from asserting in this litigation that, when he
filed the bankruptcy petition, he owned the songs.  By the
time of trial, Mr. Clinton apparently no longer claimed that
he owned the songs, asserting instead that, prior to the
filing of his bankruptcy petition, he had assigned all his
rights to Malbiz.

*Case No: 4:99cv242-RH*

BRIDAN01313

Judgment was entered on February 26, 2001.  Malbiz
filed a notice of appeal but failed to file a brief.  On May
14, 2001, the United States Court of Appeals for the
Eleventh Circuit issued its mandate dismissing the appeal
for failure to prosecute.  The litigation was over.

On October 31, 2001, Malbiz moved to vacate the
judgment.  In support of the motion, Malbiz essentially
rehashed the merits, now adding additional factual
assertions.  The new assertions were based primarily on
sources that could easily have been located prior to trial;
thus, for example, Malbiz cited extensive materials from
earlier litigation in California and New York.  Malbiz also
said it had conducted additional interviews, all apparently
with witnesses who were known and could easily have been
interviewed prior to trial.

In order to support a motion for a new trial based on
newly discovered evidence under Federal Rule of Civil
Procedure 60(b)(2), a movant must meet a five-part test:
(1) the evidence must be newly discovered since the trial;
(2) due diligence on the part of the movant to discover the

Plaintiffs' Appendix 132    BOLADIAN01314

new evidence must be shown; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material; and (5) the evidence must be such that a new trial would probably produce a new result. See Scutieri v. Page, 808 F.2d 785, 793 (11th Cir. 1987). Malbiz cannot meet this test, primarily because Malbiz's "new" evidence is not new at all, the evidence could have been found with reasonable diligence prior to trial, and the evidence if presented probably would not have changed the result. See, e.g., Johnson Waste Materials v. Marshall, 611 F.2d 593, 598 (5th Cir. 1980) (finding evidence that was "newly produced" after a more complete search following trial was not "newly found"). Presumably recognizing its inability to meet this test, Malbiz makes no claim under Rule 60(b)(2).

Malbiz asserts, however, that Bridgeport committed fraud at the trial, and Malbiz thus seeks to vacate the judgment under Federal Rule of Civil Procedure 60(b)(3).

A party seeking relief from a judgment under Rule 60(b)(3) based on fraud must establish by clear and convincing evidence (1) that the adverse party engaged in

Plaintiffs' Appendix A99
ADRIAN01315

*Page 5 of 6*

fraud or other misconduct and (2) that this misconduct
prevented the moving party from fully and fairly presenting
its case.  See Montgomery v. Hall, 592 F.2d 278, 278-79 (5th
Cir. 1979); First Nat'l Life Ins. Co. v. California Pacific
Life Ins. Co., 876 F.2d 877, 882 (11th Cir. 1989).  Malbiz
has not made either required showing.

Malbiz supports its fraud assertion partly by quoting
testimony out of context, and partly by attacking
Bridgeport's handling of the March 4, 1982 contract.  The
issue at trial, however, was the validity of the "Addendum"
executed on December 2, 1983.  Malbiz asserts that Mr.
Clinton did not sign the "Addendum" and that the document is
phony.  But that is precisely the issue that Malbiz tried
and lost at the original trial.  Malbiz has provided no
evidence that Bridgeport committed fraud in the trial of
that issue.

Malbiz had a full and fair opportunity to litigate this
case - and specifically the issue of whether the "Addendum"
was a valid document duly signed by Mr. Clinton - at the
original trial.  The evidence on which Malbiz now relies was

*Case No: 4:99cv242-RH*

BOLARIAN91316

available at that time, or would have been available with

reasonable diligence.  Malbiz lost not because any witness

for Bridgeport committed perjury, and not because anybody

committed fraud on this court.  Instead, Malbiz lost

because, after a full and fair trial at which both sides

were represented by counsel and had an opportunity to

present their best case, the evidence supported Bridgeport.

Malbiz is not entitled to a second bite at the apple.

     For these reasons,

     IT IS ORDERED:

     The motion of plaintiff Malbiz Music, Inc. (document

88) to vacate the judgment is DENIED.

     SO ORDERED this 4ᵗʰ day of December, 2001.


                    _Robert Hinkle_____
                    Robert L. Hinkle
                    United States District Judge


*Case No: 4:99cv242-RH*

BOLADIAN01317

# EXHIBIT 16



**Music Group**
439 W 43rd Street, #1
New York, NY 10036
P: 212.586.0899
F: 212.586.1081
www.tuffcity.com

December 11, 2017

Westbound Records, Inc. & Bridgeport Music, Inc.
18500 W. 10 Mile Road
Southfield, MI 48075-2662
Attn: Armen Boladian **(Sent via Certified Mail RRR and via email to westbound34@gmail.com)**

> **Re:** **TufAmerica, Inc. O/B/O Itself and as Administrator for LeBaron Music; Westbound Records, Inc. and Bridgeport Music, Inc. Copyright Infringement of Various Titles**

Dear Mr. Boladian:

Please be advised that I represent TufAmerica, Inc., both individually and as administrator for LeBaron Music (hereinafter collectively referred to as "TufAmerica"), in the above-referenced matter.

It has come to our attention that Westbound Records (hereinafter referred to as "Westbound") and Bridgeport Music (hereinafter referred to as "Bridgeport") infringed upon the following copyrights owned and controlled by TufAmerica by re-recording, commercially releasing and otherwise exploiting the following musical compositions for Westbound, without obtaining mechanical licenses, and by falsely crediting ownership to Bridgeport in violation of TufAmerica's rights:

1. "The Victor" a/k/a "Baby, I Owe You Something Good" – as recorded by Funkadelic and released as a Single;

2. "Good Old Music" – as recorded by Funkadelic on the Album entitled Funkadelic;

3. "Let's Make It Last" – as recorded by Funkadelic on the Album entitled "Cosmic Slop";

4. "I'll Wait" a/k/a "I'll Stay" – as recorded by Funkadelic on the Album entitled "Standing On the Verge of Getting It On"; and

5. "What You Been Growing" – as recorded by Funkadelic on the Album entitled "Maggot Brain".

In addition, Bridgeport improperly claimed ownership of the Composition entitled "The Goose (That Laid the Golden Egg)" as recorded by Parliament on the Casablanca Records album entitled "Up For The Down Stroke".

In the event you claim rights in and to any of the above-listed musical compositions, then we ask you to provide us with any contracts or assignments upon which you base those rights.

You are further directed to immediately cease and desist from any manufacturing, distribution, sales, licensing and/or any other commercial exploitation in connection with the above master recordings and/or musical compositions, whether directly or through third party agents or licensees.

We ask that you have your legal representative contact us within ten (10) days of the date hereof so that we may attempt to discuss settlement.  Otherwise, please be assured that my client shall not hesitate to take any and all necessary steps, both at law and equity, to protect its rights. We hope that you will be guided accordingly.

The foregoing does not necessarily represent a complete statement of the facts and/or the law with respect to this matter and is written without prejudice to TufAmerica's legal and/or equitable rights and remedies, all of which, whether or not referred to hereinabove, are hereby expressly reserved.

Sincerely,

Evan Becker
Counsel, Tuff City Music Group

# EXHIBIT 17

# AGREEMENT

This agreement entered into as of August 9th 2011, by and between Tufamerica, Inc. ("Tuff City"), 10 West 37th Street, Suite 601, New York, NY 10018 and Kay Lovelace Taylor o/b/o herself, Revilot Records, Red Cap Records, Solid Hit Records, Solid Hitbound Productions, LeBaron Music, ███████████ Brute Records, The Estate of LeBaron Taylor and all other companies owned and/or controlled by the Estate (individually and collectively, "Taylor"), 11829 East Parkview Lane, Scottsdale, AZ 85255.

NOW THEREFORE, the parties hereto agree as follows:

## 1. Rights.

(a) Taylor hereby irrevocably conveys, sells, and assigns, in perpetuity, to Tuff City ███████████ of the ownership interest and all worldwide copyright, renewals and/or other rights in and to all musical compositions, sound recordings, and audiovisual recordings solely owned or controlled by Taylor including but not limited to those listed in Schedules "A" and "B" (individually and collectively, the "Songs") attached hereto and made a part hereof.

(b) In addition to the above and as part of the same grant Taylor hereby grants to Tuff City all exclusive rights under 17 U.S.C. § 106 and hereby appoints Tuff City as the sole and exclusive administrator in perpetuity, of all copyrights in and to the Songs, including but not limited to those granted under 17 U.S.C. § 106 and all moral rights. The term "administrator" as used herein includes, without limitation, the right, power and authority to i) collect and receive royalties in connection with the Songs; ii) exploit the Songs as audio-only recordings on its own label or any third party label; iii) seek and enter into agreements for third party exploitation of the Songs, including without limitation, in connection with synchronization with images and/or other materials in commercial advertisements, motion pictures, television shows, video games and other audio visual works and in connection with audio-only third party exploitations e.g., radio commercial advertisements, sample licenses, compilation albums; and iv) settle disputes in connection with the copyrights in the Songs. Any attempt to by Taylor to administer any of the copyrights in the Songs shall be null and void *ab initio*. Taylor authorizes and empowers Tuff City to register and/or renew pursuant to the copyright law any and all copyrights.

## 2. Fees and Deliveries. 
Tuff City shall pay Taylor a non-returnable recoupable advance payment in the amount of ███████████ upon full execution of this agreement. Taylor shall deliver to Tuff City all master tapes relating to these copyrights immediately after Taylor receives the advance payment. Taylor shall also deliver to Tuff City all physical property relating to these copyrights, including but not limited to all contracts, photos, recordings and other correspondence. Tuff City shall be responsible for the reasonable packing and shipping costs with respect to all such material.

1

3. **Royalties.**

(a) Conditioned upon Taylor's full and faithful performance of her obligations hereunder, in full consideration of all rights granted hereunder, ███ ███████████ of the "net income" earned in respect of the exploitation of any Songs will be retained by Tuff City or its designees and ████████████████ of such net income shall be paid to Taylor . For the purposes of this Agreement, "net income" shall mean all gross income earned and actually received by Tuff City in the United States derived from the exploitation of the Songs less all royalties, costs, and payments incurred in connection with exploitation of the Songs and an administration fee equal to ███████████████ of the gross income received, which shall be retained by Tuff City. Tuff City shall have the obligation to account to all the writers, publishers and performers of such Songs out of the gross income received.

(b) Notwithstanding any provisions to the contrary contained herein, Taylor will not be entitled to receive any advance payments, guarantee payments or minimum royalty payments which Tuff City may receive in connection with any distribution agreements, settlement agreements, collection agreements, licensing arrangements or other agreements covering the Songs.

(c) Tuff City will account to Taylor on a bi-annual basis and pay Taylor all royalties shown to be due consistent with Tuff City's accounting standards. No statement shall be due for amounts payable that are less than $100.

4. **Representations and Warranties.** Taylor warrants and represents that Taylor is the sole owner of all Songs being transferred in this agreement and that Taylor has the full right, power and authority to enter into and perform this agreement and that Taylor has not granted and will not grant to any other person or entity the rights granted herein. Taylor warrants and represents that each sound recording and musical composition listed in schedule "A" and "B" is fully owned by Taylor and does not and will not infringe upon the rights of any third party.

5. **Indemnification.** Taylor agrees to indemnify and hold Tuff City harmless from all claims suits, liability, loss, damage, judgments, recoveries, costs and expenses, including reasonable attorneys' fees, which may be made or brought, paid or incurred by reason of any breach or proposed breach of Taylor's representations, warranties, and/or obligations hereunder.

6. **Trademarks, Trade Names, Name and Likeness.** Taylor hereby irrevocably conveys, sells, and assigns, in perpetuity, to Tuff City ████████████████ of all ownership interest in and to the trademarks and trade names Revilot Records, Red Cap Records, Solid Hit Records, Solid Hitbound Productions, LeBaron Music, ████████████████ and Brute Records for use on or in connection with musical recordings and musical compositions, provided that the musical recordings and musical compositions issued by Tuff City Records under those marks shall be substantially of the same character and quality as the recordings and compositions

2

heretofore sold under those marks. Without limiting the generality of the foregoing, Tuff City shall have the right to use Taylor's name and likeness, trade names, professional names, biographical information, the trademarks and trade names of Revilot Records, Red Cap Records, Solid Hit Records, Solid Hitbound Productions, LeBaron Music, ██████████ and Brute Records, and the names, likenesses and biographical information of all parties related thereto, for advertising and promotional purposes in connection with the Songs and Tuff City's institutional advertising.

**9. Assignment.** This agreement may not be assigned by Taylor to any other person, firm, or entity without the prior written consent of Tuff City. This Agreement may be assigned by Tuff City to any third party. This Agreement shall be binding upon, and inure to the benefit of the parties' respective successors and permitted assigns.

**10. Breach & Cure.** The parties hereto shall not be entitled to recover damages or terminate this agreement by reason of any breach, unless the breaching party has failed to remedy such breach within 60 days following its receipt of notice thereof.

**11. Entire Agreement.** This Agreement contains the entire understanding of the parties, and supersedes all prior agreements and understandings between the parties. This Agreement may be amended only by a written instrument signed by the parties. If any of the covenants contained herein, or any parts thereof are held to be unenforceable by a court of competent jurisdiction, that decision shall not affect the remainder of the covenant or covenants contained herein, which shall be given full effect, without regard to the invalid portions. The waiver by either party of any term or condition of this Agreement, or any part hereof, shall not be deemed a waiver of any other term or condition of this Agreement, or of any later breach of this Agreement, or of any part thereof.

**12. Applicable Law.** This Agreement shall be governed by the laws of the State of New York applicable to agreements made and wholly performed therein. The parties hereto agree to submit to the jurisdiction of the state and federal courts located in the State of New York.

**13. Counterparts.** This Agreement may be executed in counterparts, and all such counterparts shall constitute one Agreement, binding on the parties hereto. Facsimile copies or photocopies of an executed version of this Agreement shall have the same force and effect as the original version.

**14. Informed Consent.** Each of the parties hereto agrees that this agreement is being freely and voluntarily given by each without duress or coercion, after each party has had an opportunity to consult with legal counsel of its choice. Taylor is an experienced veteran of the music industry and warrants that she understands all of the terms and conditions contained herein.

3

**15. Agency.** Neither the making of this Agreement nor the performance of any of its provisions shall be construed to constitute Taylor as an agent, employee or legal representative of Tuff City for any purpose nor shall this Agreement be deemed to have established a joint venture or a partnership between the parties hereto. Additionally, neither the making of this Agreement nor the performance of any of its provisions shall be construed to constitute Tuff City as an agent, employee or legal representative of Taylor, except as specifically stated in this agreement, for any purpose.

Accepted and agreed to as of the date first written above:

TUFAMERICA, INC., d/b/a TUFF CITY RECORDS, ("Tuff City")
By Aaron Fuchs, President

Ms. Kay Lovelace Taylor o/b/o herself, Revilot Records, Red Cap Records, Solid Hit Records, Solid Hitbound Productions, LeBaron Music, Groovesville Music, Brute Records, The Estate of LeBaron Taylor and all other companies owned and/or controlled by the Estate

S.S. # ███████████

4

These are Schedules A and B to that certain agreement by and between Tufamerica, Inc. and Ms. Kay Lovelace Taylor o/b/o herself, Revilot Records, Red Cap Records, Solid Hit Records, Solid Hitbound Productions, LeBaron Music, Groovesville Music, Brute Records, The Estate of LeBaron Taylor and all other companies owned and/or controlled by LeBaron Taylor or his estate, dated August 9, 2011.

## SCHEDULE A

### Master Recording & Musical Composition Copyrights:



1. ████████████████████████
2. (I Wanna) Testify (As Performed By Parliaments)
3. A New Day Begins (As Performed By Parliaments)
4. ████████████████████████
5. All Your Goodies Are Gone (The Loser's Seat) (As Performed By Parliaments, J.J. Barnes)
6.
7.
8.
9.
10.
11. Don't Be Sore At Me (As Performed By Parliaments)
12.
13. Good Old Music (As Performed By Parliaments)
14.
15.
16.
17.
18.
19. I Can Feel The Ice Melting (As Performed By Parliaments)
20.
21.
22.
23.
24.
25.
26.
27.
28.
29. I'll Wait (As Performed By Parliaments, Pat Lewis)
30.
31.
32.
33.
34.
35. Little Man (As Performed By Parliaments)
36. Look At What I Almost Missed (As Performed By Parliaments, Pat Lewis)
37.
38.
39.
40.
41.
42.
43.

5



44.
45.
46.
47.
48.
49.
50.
51.
52.
53.
54.
55.
56. The Goose (That Laid The Golden Egg) (As Performed By Parliaments)
57.
58. Time (As Performed By Parliaments)
59.
60.
61. What You Been Growing (As Performed By Parliaments)
62.
63.
64.
65.

## SCHEDULE B

Master Recording & Musical Composition Copyrights and Master Tapes:



1.
2.
3.
4.
5.
6.
7.
8. I'll Love You Forever (As Performed By The Parliaments)
9.
10.
11. Lovin' You Takes All My Time (As Performed By The Parliaments)
12. Making It Home to You (As Performed By The Parliaments)
13. New Day Begins (As Performed By The Parliaments)
14. No Escape (As Performed By The Parliaments)
15.
16. Sgt. Pepper (As Performed By The Parliaments)
17. Stranger Than Friction (As Performed By The Parliaments)
18.
19.
20.
21.
22.
23.
24.
25.
26.
27.

6

Plaintiffs' Appendix 145
**BM00296**

# EXHIBIT 18

# LAST WILL AND TESTAMENT
## OF
### H. LEBARON TAYLOR

I, H. LeBaron Taylor, of Voorhees, New Jersey, revoke my former Wills and Codicils and declare this to be my Last Will and Testament.

## ARTICLE I
## PAYMENT OF DEBTS AND EXPENSES

I direct that my just debts, funeral expenses and expenses of last illness be first paid from my estate.

## ARTICLE II
## DISPOSITION OF PROPERTY

A. *Specific Bequests*.  I direct that the following specific bequests be made from my estate.

1. All homes shall be distributed to Kay Lovelace Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be added to my residuary estate.

2. Mercedez Benz shall be distributed to Tiffani N. Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be distributed to Eric Barron Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be added to my residuary estate.

3. Rolex watch shall be distributed to Eric Barron Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be distributed to Jason Richardson.  If this beneficiary does not survive me (or is not in existence), this bequest shall be added to my residuary estate.

4. All home furnishings and art shall be distributed to Kay Lovelace Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be added to my residuary estate.

5. Boat (Regal 360) shall be distributed to Kay Lovelace Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be added to my residuary estate.

6.  Deceased wife's jewelry shall be distributed to Tiffani N. Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be distributed to Eric Barron Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be added to my residuary estate.

7.  All Sony retirement plan money  shall be distributed to Kay Lovelace Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be distributed to Tiffani N. Taylor & Eric Barron Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be added to my residuary estate.

8.  Fifty percent of my Sony 401 (k) shall be distributed to Kay Lovelace Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be distributed to Tiffani N. Taylor & Eric Barron Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be added to my residuary estate.

9.  Twenty five percent of my Sony 401 (k) shall be distributed to Tiffani N. Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be distributed to Eric Barron Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be added to my residuary estate.

10.  Twenty five percent of my Sony 401 (k) shall be distributed to Eric Barron Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be distributed to Tiffani N. Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be added to my residuary estate.

11.  Twenty five thousand dollars shall be distributed to Laura Davis.  If this beneficiary does not survive me (or is not in existence), this bequest shall be distributed to Jason. Richardson.  If this beneficiary does not survive me (or is not in existence), this bequest shall be added to my residuary estate.

12.  Sixty percent of life insurance shall be distributed to Kay Lovelace Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be distributed to Tiffani N. Taylor & Eric Barron Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be added to my residuary estate.

13.  Twenty percent of my life insurance shall be distributed to Tiffani N. Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be distributed to Eric Barron Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be added to my residuary estate.

14.  Twenty percent of my life insurance shall be distributed to Eric Barron Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be

2

distributed to Tiffani N. Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be added to my residuary estate.

15.  All investment and bank accounts shall be distributed to Kay Lovelace Taylor. If this beneficiary does not survive me (or is not in existence), this bequest shall be distributed to Tiffani N. Taylor & Eric Barron Taylor.  If this beneficiary does not survive me (or is not in existence), this bequest shall be added to my residuary estate.

16.  Twenty five thousand dollars shall be distributed to Jason. Richardson.  If this beneficiary does not survive me (or is not in existence), this bequest shall be distributed to Laura Davis.  If this beneficiary does not survive me (or is not in existence), this bequest shall be added to my residuary estate.

*B.  Residuary Estate.*
I direct that my residuary estate be distributed to the following beneficiaries in the percentages as shown:

25.00% - Tiffani N. Taylor, Washington, DC.  If this person or organization does not survive me or is not in existence, this share shall be distributed to Eric Barron Taylor, Voorhees, NJ.

25.00% - Jason. Richardson, Tempe, Arizona.  If this person or organization does not survive me or is not in existence, this share shall be distributed to Laura Davis,, Farmington, Michigan.

25.00% - Eric Barron Taylor, Voorhees, NJ.  If this person or organization does not survive me or is not in existence, this share shall be distributed to Laura Davis, Farmington, Michigan.

25.00% - Laura Davis, Farmington, Michigan.  If this person or organization does not survive me or is not in existence, this share shall be distributed proportionately to the other distributee(s) listed under this provision.

Percentages Total - 100.00.

## ARTICLE III
## NOMINATION OF EXECUTOR

I nominate Kay Lovelace Taylor, of Voorhees, New Jersey, as the Executor, without bond or security.  If such person or entity does not serve for any reason, I nominate Charisse Lilley McGill, of Philadelphia, , Pennsylvania, to be the Executor, without bond or security.

3

If such person or entity does not serve for any reason, I nominate Thomas McGill, of Philadelphia, Pennsylvania, to be the Executor, without bond or security.

## ARTICLE IV
## EXECUTOR POWERS

My Executor, in addition to other powers and authority granted by law or necessary or appropriate for proper administration, shall have the right and power to lease, sell, mortgage, or otherwise encumber any real or personal property that may be included in my estate, without order of court and without notice to anyone.

## ARTICLE V
## MISCELLANEOUS PROVISIONS

*I. Paragraph Titles and Gender.* The titles given to the paragraphs of this Will are inserted for reference purposes only and are not to be considered as forming a part of this Will in interpreting its provisions. All words used in this Will in any gender shall extend to and include all genders, and any singular words shall include the plural expression, and vise-versa, when the context or facts so require, and any pronouns shall be taken to refer to the person or persons intended regardless of gender or number.

*II. Thirty Day Survival Requirement.* For the purposes of determining the appropriate distributions under this Will, no person or organization shall be deemed to have survived me, unless such person or entity is also surviving on the thirtieth day after the date of my death.

*III. Liability of Fiduciary.* No fiduciary who is a natural person shall, in the absence of fraudulent conduct or bad faith, be liable individually to any beneficiary of my estate, and my estate shall indemnify such natural person from any and all claims or expenses in connection with or arising out of that fiduciary's good faith actions or nonactions as the fiduciary, except for such actions or nonactions which constitute fraudulent conduct or bad faith.

*IV. Beneficiary Disputes.* If any bequest requires that the bequest be distributed between or among two or more beneficiaries, the specific items of property comprising the respective shares shall be determined by such beneficiaries if they can agree, and if not, by my Executor.

IN WITNESS WHEREOF, I have subscribed my name below, this *1st* day of *November*, 19*99*.

4

Plaintiffs' App. KAY0004

# EXHIBIT 19

KING & BALLOW
LAW OFFICES
315 UNION STREET
SUITE 1100
NASHVILLE, TENNESSEE 37201

TELEPHONE: 615/259-3456
FACSIMILE: 615/254-7907

www.kingballow.com

December 22, 2017

*Via FedEx and E-Mail*
Tuff City Music Group
439 W 43rd Street, #1
New York, NY 10036
Attn: Evan Becker (evan@tuffcity.com)

### Re: Bridgeport's Response to TufAmerica's December 11, 2017 Letter

Mr. Becker:

I represent Bridgeport Music, Inc. and Westbound Records (collectively, "Bridgeport") in all litigation matters and am writing in response to TufAmerica, Inc.'s recent Letter on behalf of itself and as administrator for LeBaron Music (collectively, "TufAmerica") dated December 11, 2017. It is my hope that we can work together to quickly resolve any issues you believe exist.

TufAmerica's Letter centers on the rights to six songs composed by George Clinton ("Clinton"), among others, and recorded by Funkadelic and Parliament in the 1970s, including: (1) "The Victor" a/k/a Baby I Owe You Something Good"; (2) "Good Old Music"; (3) "Let's Make It Last"; (4) I'll Wait" a/k/a "I'll Stay"; (5) "What You Been Growing"; and (6) "The Goose (That Laid the Golden Egg") (collectively, minus "What You Been Growing," "the musical works at issue"). Regarding "What You Been Growing," Bridgeport has no record of this title, and it was not released on *Maggot Brain* as claimed in TufAmerica's letter.

To provide some context to the objections raised in TufAmerica's Letter, Bridgeport has had registered copyrights in each of the musical works at issue for nearly 50 years, and has openly exploited each since the 1970s without any objection or claim to ownership by TufAmerica, LeBaron Music, or anyone else for that matter. Furthermore, Bridgeport registered the musical works at issue with BMI in the 1970s, and has been receiving royalties on these works since that time. This information, and other information, related to Bridgeport's claim to ownership and exploitation of the musical works at issue would have been available to anyone, including TufAmerica, LeBaron Music, or anyone else with purported rights in the musical works at issue. Despite this, it is Bridgeport's understanding that TufAmerica's demand letter dated December 11, 2017 represents the first claim by TufAmerica, LeBaron Music, or anyone else for that matter, relating to alleged ownership of the musical works at issue, and the first assertion of alleged copyright infringement by Bridgeport related to the same.

Plaintiffs' Appendix 152
BM00037

Bridgeport's Response to TufAmerica's December 11, 2017 Letter
December 22, 2017
Page 2 of 2

It is my opinion that a person or entity acting with reasonable diligence would have discovered Bridgeport's claim to ownership and/or exploitation of the musical works at issue in the 1970s. Bridgeport did not commit any affirmative acts or misrepresentations designed to prevent subsequent discovery of any rights to the musical works at issue. Similarly, Bridgeport did not fraudulently conceal the existence or identity of Bridgeport's ownership and/or exploitation of the musical works at issue. As a result, any failure by TufAmerica, LeBaron Music, or anyone else for that matter, to discover and raise their objections to Bridgeport's ownership and exploitation of the musical works at issue is a result of their own neglect.

Despite the above, Bridgeport is willing to work with TufAmerica in good faith to sort out any issues TufAmerica believes exist, including providing contracts and/or assignments pertaining to Bridgeport's rights in the musical works at issue, assuming, of course, that TufAmerica is willing to provide Bridgeport the same. I look forward to working with you in resolving this matter expeditiously.

Given the upcoming Holidays, I recognize that now may not be the best time to sort through these issues. To that end, please schedule a time for us to speak at your earliest convenience. This Response is not an attempt to provide a full recitation of the facts surrounding TufAmerica's Letter. Bridgeport does not waive, and hereby expressly reserves, all rights they may have related to those issues contained in TufAmerica's Letter and this Response. All rights reserved.

Respectfully,

Richard S. Busch

Richard S. Busch

cc:    Jeremy D. Ray (jray@kingballow.com)
       Armen Boladian (westbound34@gmail.com)

# EXHIBIT 20



**Music Group**
439 W 43rd Street, #1
New York, NY 10036
P: 212.586.0899
F: 212.586.1081
www.tuffcity.com

January 5, 2018

King & Ballow
315 Union Street, Suite 1100
Nashville, TN 37201
Attn: Richard S. Busch (**Sent via email to rbusch@kingballow.com**)

> Re:    TufAmerica, Inc. O/B/O Itself and as Administrator for LeBaron Music:
>        Westbound Records, Inc. and Bridgeport Music, Inc. Copyright Infringement of
>        Various Titles

Dear Mr. Busch:

In response to your letter of December 22, 2017 in the above-referenced matter, please be advised that we disagree with the statements and contentions contained therein.

In point of fact, Tufamerica, Inc. ("Tufamerica") entered into an agreement dated August 9, 2011 (the "Agreement") with Kay Taylor on behalf of herself, Revilot Records, Red Cap Records, Solid Hit Records, Solid Hitbound Productions, LeBaron Music, Brute Records, the estate of LeBaron Taylor, and all other companies and/or entities controlled by such estate (individually and collectively, the "LeBaron Entities"). Under the Agreement, Tufamerica was explicitly granted exclusive administration rights in and to certain musical compositions including, without limitation, those aforementioned in our letter dated December 11, 2017 (the "Work(s)"), as well as the master recordings which were owned and/or controlled by the LeBaron Entities embodying the Works (the "LeBaron Recordings"). At the time of the Agreement, the LeBaron Recordings had all been commercially released by at least one of the LeBaron Entities.

Since entering into the Agreement, it has come to our attention that several of the compositions whose rights were conveyed to Tufamerica including, without limitation, the Works, have been rerecorded by Funkadelic as derivative works or outright covers for Westbound Records (the "Funkadelic Recordings"). Indeed, it is patently obvious upon listening to the Funkadelic Recordings that they embody the Works. As a point of clarification, the LeBaron Recording entitled "What You Been Growing" was rerecorded by Funkadelic as "Can You Get To That" from the 1971 album *Maggot Brain*.

Although there may not have been a formal objection or claim brought against Westbound or Bridgeport prior to this point by any of the LeBaron Entities, nothing precludes Tufamerica from asserting its rights. The Funkadelic Recordings constitute an infringement on our copyrights, which infringement has been ongoing since the creation of the Funkadelic Recordings. LeBaron Taylor registered copyrights in the Works with the copyright office prior to any Westbound or Bridgeport registrations. Further, any BMI registrations by Bridgeport in respect of the Works were done without proper authority, and any royalties in connection therewith should be allocated to Tufamerica pursuant to the Agreement.

Moreover, we regard the infringements in question as flagrant and willful. It is difficult to consider that Mr. Boladian, having built his career in the music industry as a distributor in Detroit, would not have been aware of the Works and/or the LeBaron Recordings prior to his seeking to claim ownership. Mr. Boladian either knew or should have known to seek the consent of LeBaron Music before releasing any recordings of the Works for commercial exploitation. This egregious lack of regard for one of the leading tenets of copyright law and established music industry standards serves to illustrate the willfulness of these infringements.

Accordingly, Tufamerica requests that you provide us with any and all documentation pertaining to the Works, including but not limited to royalty statements, sample license agreements, and synchronization license agreements entered into in connection with the Works. Please call me in the event that you wish to discuss this matter further.

The foregoing does not necessarily represent a complete statement of the facts and/or the law with respect to this matter and is written without prejudice to TufAmerica's legal and/or equitable rights and remedies, all of which, whether or not referred to hereinabove, are hereby expressly reserved.

Sincerely,

Evan Becker
Counsel, Tuff City Music Group

CC:    Aaron Fuchs

# EXHIBIT 21

TufAmerica, Inc.
439 W. 43rd St.
Ground Floor
New York, NY 10036

Dated as of December 9th, 2019

Dr. Kay Lovelace Taylor Oliver
11829 East Parkview Lane
Scottsdale, AZ 85255

Dear Dr. Oliver:

Reference is made to the agreement entered into as of August 9, 2011, by and between TufAmerica, Inc. ("Tuff City"), and you o/b/o yourself as well as Revilot Records, Red Cap Records, Solid Hit Records, Solid Hitbound Productions, Hitbound Productions, LeBaron Music, Groovesville Music, Brute Records, The Estate of LeBaron Taylor and all other companies owned and/or controlled by the Estate (individually and collectively, "Taylor"), as amended (the "Agreement").

For and in consideration of the mutual promises contained herein, as well as additional consideration, the prior receipt of which is hereby mutually acknowledged, Tuff City and Taylor hereby agree to amend the Agreement as follows:

1.    All capitalized words and phrases which are contained below which are defined in the Agreement shall have the same definitions as set forth in the Agreement, except as may otherwise be expressly provided below.

2.    Notwithstanding anything to the contrary contained in, or implied by, the Agreement, the parties agree that:

(a)    Taylor hereby irrevocably conveys, sells, and assigns, in perpetuity, to Tuff City the remaining Fifty Percent (50%) balance of Taylor's ownership interest not previously sold to Tuff City under the Agreement, and all remaining worldwide copyrights, renewals and/or other rights in and to all musical compositions, sound recordings, and audiovisual recordings owned or controlled by Taylor including but not limited to those listed in Schedules "A" and "B" (individually and collectively, the "Songs") attached to the Agreement and made a part thereof.

1

(b)     Tuff City shall pay Taylor Six Thousand Dollars ($6,000) upon full execution of this amendment.

(c)     Taylor agrees to reasonably cooperate with Tuff City in the event that any third party (including, but not limited to Bridgeport Music Inc.) challenges Tuff City's ownership and/or administration interest in the Songs in any manner.

(d)     Tuff City shall be solely responsible to pay for the costs and expenses of the current litigation in the U.S. District Court for the Southern District of NY, Bridgeport Music Inc., et. al. adv. TufAmerica, Inc., et. al., No. 19-cv-01764-PGG, (the "Current Litigation") including attorneys' fees payable to Tuff City's litigation counsel Reitler Kailas & Rosenblatt LLC o/b/o of both Tuff City and Taylor. Tuff City shall defend and indemnify Taylor from any such costs and expenses which are solely and directly related to the Current Litigation.

3.     As hereinabove modified and amended, the Agreement is hereby ratified and confirmed, and all of the terms and conditions thereof shall remain in full force and effect.

Accepted and agreed to as of the date first written above:

TUF AMERICA, INC., d/b/a TUFF CITY RECORDS

By:_____
       Aaron Fuchs, President

DR. KAY LOVELACE TAYLOR OLIVER

By:_____
       Dr. Kay Lovelace Taylor Oliver

o/b/o herself, individually as well as Revilot Records, Red Cap Records, Solid Hit Records, Solid Hitbound Productions, Hitbound Productions, LeBaron Music, Groovesville Music, Brute Records, The Estate of LeBaron Taylor (the "Estate") and all other companies owned and/or controlled by the Estate.

2

# EXHIBIT 22

11/5/21, 6:12 PM

```
Type of Work:      Music

Registration Number / Date:
                   PA0000527433 / 1991-03-18

Title:             Cosmic slop.

Notes:             Cataloged from appl.

Copyright Claimant:
                   Bridgeport Music, Inc.

Date of Creation:  1978

Date of Publication:
                   1978-01-01

Authorship on Application:
                   words & music: George Clinton, Jr. & Bernard G. Worrell.

Copyright Note:    C.O. correspondence.

Names:             Clinton, George, Jr.
                   Worrell, Bernard G.
                   Bridgeport Music, Inc.

================================================================================
```

Plaintiffs' Appendix 161