UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRIDGEPORT MUSIC, INC. and WESTBOUND RECORDS, INC.,

Plaintiffs / Counterclaim-Defendants

- v -

TUFAMERICA, INC. d/b/a TUFF CITY RECORDS, and KAY LOVELACE TAYLOR, individually and on behalf of the Estate of LeBaron Taylor,

Defendants / Counterclaim-Plaintiffs.

**MEMORANDUM**
**OPINION & ORDER**

19 Civ. 01764 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

In this action, Plaintiffs and Counterclaim-Defendants Bridgeport Music, Inc. and Westbound Records, Inc. seek a declaratory judgment that (1) Plaintiffs are the rightful owners of certain George Clinton musical compositions (the "Compositions"); (2) Defendants do not have any valid ownership claims in the Compositions; and (3) Plaintiffs have not infringed upon any copyrights allegedly owned by Defendants in the Compositions. (Cmplt. (Dkt. No. 1))

Defendants TufAmerica, Inc. and Kay Lovelace Taylor have asserted counterclaims for (1) a declaratory judgment that TufAmerica is the rightful owner of the Compositions; (2) copyright infringement; and (3) an accounting of damages caused by Plaintiffs' alleged unauthorized commercial exploitation of the Compositions. (Am. Ansr. (Dkt. No. 32) ¶¶ 53-68)

Plaintiffs have moved for summary judgment on their claims and Defendants' counterclaims. (Pltf. Mot. (Dkt. No. 98); Pltf. Br. (Dkt. No. 99)) For the reasons stated below, Plaintiffs' motion will be granted in part and denied in part.

## BACKGROUND[1]

### I. FACTS

Plaintiffs are affiliated music companies based in Detroit, Michigan, and distributed soul and funk music in the late 1960s and early 1970s. (See Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 1-2, 4-7) Plaintiffs were founded and are owned by Detroit music producer Armen Boladian. (See id. ¶ 8)

Defendant TufAmerica, Inc. is a record label incorporated in New York. (Id. ¶ 9) Defendant Kay Lovelace Taylor, a/k/a Dr. Kay Oliver ("Oliver") is the widow of LeBaron Taylor. (Id. ¶ 10) LeBaron Taylor, who died in 2000, was a music producer, radio disc jockey, and record company executive. He owned Revilot Records, a Detroit-based record label that went bankrupt in the late 1960s. (Id. ¶¶ 11, 20, 100)

Renowned funk musician George Clinton – a non-party to this lawsuit – is the author or co-author of the Compositions: (1) "The Victor" a/k/a "Baby I Owe You Something Good"; (2) "Good Old Music"; (3) Let's Make It Last"; (4) "I'll Wait" a/k/a "I'll Stay; (5) "Can You Get To That" a/k/a "What You Been Growing"; and (6) "The Goose (That Laid the Golden Egg)." (Id. ¶ 3)

The parties agree that Clinton recorded music for Revilot in the late 1960s prior to Revilot's bankruptcy and pursuant to a 1965 agreement between Clinton and Revilot (the

---

[1] To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)). Where the non-moving party disputes the moving party's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the non-moving party's characterization of the evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)

"Revilot Agreement").  (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶¶ 134-35)  The Revilot

Agreement has not been submitted to the Court.  However, Clinton testified about the Revilot

Agreement at his June 2021 deposition.  (See Parness Decl., Ex. C ("Clinton Dep.") (Dkt. No.

104-3) at 47-49)[2]  Although Clinton did not have a copy of the Revilot Agreement and did not

recall many of its key terms, he testified that the agreement contained a "publishing component"

that involved an entity called "Groovesville."  (Id. at 48-49)  As is discussed in more detail

below, the evidence is not clear as to Groovesville's relationship with Revilot or the terms of any

agreements between or among Revilot, Groovesville, and Clinton.

      Defendants cite to five copyright registrations dated between 1967 and 1968 as

evidence of their ownership of the Compositions:

- "Good Old Music," United States Copyright Registration number EU56256, registered to LeBaron Taylor and dated May 31, 1968 (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 133; Parness Decl., Ex. I (Dkt. No. 104-9));

- "Let's Make it Last," United States Copyright Registration number EU8922, registered to LeBaron Taylor and dated August 9, 1967 (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 133; Parness Decl., Ex. K (Dkt. No. 104-11));

- "I'll Wait," (a/k/a "I'll Stay") United States Copyright Registration number EU976770, registered to Groovesville Music and dated January 25, 1967 (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 133; Parness Decl., Ex. M (Dkt. No. 104-13));

- "What You Been Growing" (a/k/a "Can You Get To That"), United States Copyright Registration number EU27527, registered to LeBaron Music, dated November 29, 1967 (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 133; Parness Decl., Ex. O (Dkt. No. 104-15)); and

- "The Goose (That Laid the Golden Egg)," (a/k/a "The Goose") United States Copyright Registration number EU27528, registered to LeBaron Music dated

---

[2]  Except as to deposition transcripts, the page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.  With respect to deposition transcripts, the Court cites to the page numbers originally assigned by the court reporter.

November 29, 1967 (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 133; Parness Decl., Ex. Q (Dkt. No. 104-17)).

As to "The Victor" (a/k/a "Baby, I Owe You Something Good"), Defendants claim ownership based on an image of a vinyl record label of a sound recording entitled "(I Owe You) Something." (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 39; Parness Decl., Ex. G (Dkt. No. 104-7)) Defendants cite this image (and images of other vinyl record labels bearing the Compositions' titles) as evidence that Taylor, or companies affiliated with him, also made and sold sound recordings of the Compositions in 1967 and 1968.[3] (Id. ¶ 138)

Revilot entered bankruptcy in the late 1960s (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 17-18), and Clinton then began recording music for Plaintiff Westbound Records. (Id. ¶ 18) The Compositions – except for "The Goose" – were then re-recorded by Clinton and his band, Funkadelic, and released on various Westbound Records albums during the 1970s. (Id. ¶¶ 36, 42, 49, 56, 64) "The Goose" was recorded by Clinton and another band, Parliament, and released by non-party Casablanca Records in 1974. (Id. ¶ 70) Plaintiffs have not alleged that they purchased any copyrights in Compositions or sound recordings from Taylor, Revilot, or any other affiliated entity.

Plaintiffs have submitted a series of agreements, dated between 1967 and 1991, in which Clinton, his publishing company, Malbiz Music, and certain co-writers assigned ownership in the Compositions to Bridgeport Music and exclusive recording rights to Westbound

[3] Plaintiffs dispute that Defendants' images of vinyl record labels support the statement that Taylor released the records in the late 1960s. (Pltf. R. 56.1 Resp. (Dkt. No. 102) ¶ 138) Drawing all factual inferences in favor of Defendants, as the Court must on Plaintiffs' motion for summary judgment, the images of vinyl record labels tend to support the factual assertion that Taylor and/or his companies released the records. See Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) ("'[The Court] resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"). The Court acknowledges that the record labels do not indicate when the records were released.

Records (the "Bridgeport/Westbound Agreements"). (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 21-30) The Bridgeport/Westbound Agreements are as follows:

- **1967 Bridgeport Music Agreement:** Plaintiffs allege that on November 10, 1967, Clinton entered into an agreement wherein he assigned and transferred all rights in the Composition "Good Old Music" to Bridgeport. (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 21)

- **August 1, 1971 Bridgeport Music Agreement:** Plaintiffs allege that on August 1, 1971, Clinton and co-writer Ernie Harris, entered into an agreement wherein they assigned and transferred all rights in the Composition "Can You Get to That" to Bridgeport. (Id. ¶ 23)

- **August 31, 1971 Bridgeport Music Agreement:** Plaintiffs allege that on August 31, 1971, Clinton entered into an agreement wherein he "assigned to Bridgeport an undivided one-half interest in all rights to music compositions previously and/or subsequently written by [] Clinton, alone or in collaboration with others, and recorded by Westbound, during a period of five years from the date of **the agreement."** (Id. ¶ 22)

- **1972 Westbound Records Agreement:** Plaintiffs allege that on August 30, 1972, Clinton, individually and as a member of the group Funkadelic, entered into an exclusive sound recording agreement with Westbound Records. (Id. ¶ 24)

- **The 1974 Bridgeport Music Agreement**: Plaintiffs allege that on June 6, 1974, Clinton and a co-writer entered into an agreement wherein they sold, assigned, and transferred all rights in the Composition "I'll Stay" to Bridgeport Music. (Id. ¶ 27)

- **The 1975 Westbound Records Agreement**: Plaintiffs allege that in 1975, Clinton and Westbound Records entered into an agreement providing that Westbound Records "'shall retain in perpetuity the exclusive worldwide right, title, and interest in and to all master recordings and the copyrights thereon embodying the performances of the Group delivered to us [Westbound Records] prior to the date of this Agreement. . . .'" (Id. ¶ 28 (quoting Boladian Decl., Ex. 10 (Dkt. No. 100-2) at 33))

- **The 1983 Bridgeport Music Agreement:** Plaintiffs allege that on December 2, 1983, Clinton entered into an "Addendum" to a 1982 Agreement[4] with Bridgeport Music in which he "assign[ed] to [Bridgeport Music] all musical compositions previously written by George Clinton (prior to March 4, 1982) or such percentage of said musical compositions not vested by a binding written agreement in another

[4] The alleged 1982 agreement has not been submitted to the Court.

publisher." (See Boladian Decl., Ex. 11, (Dkt. No. 100-2) at 38-39; Pltf. R. 56.1 Stmt (Dkt. No. 100) ¶ 29)

- **The October 18, 1991 Agreement:** Plaintiffs allege that on October 18, 1991, Plaintiffs purchased the rights to "The Goose" from a third-party record label, which "recognized that Bridgeport owns an undivided one half interest in the copyright to certain musical compositions recorded by Mr. Clinton for Casablanca," the third-party's predecessor in interest, including "The Goose." (Pltf. R. 56.1 Stmt (Dkt. No. 100) ¶ 31)

Defendants dispute the validity of the Bridgeport/Westbound Agreements, pointing to Clinton's deposition testimony, in which he stated that he did not sign most of these agreements or does not recall signing these agreements. (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶¶ 21-30; see generally, Clinton Dep. (Dkt. No. 103-3) at 86-101)

Clinton testified that he recalled signing only a "contract label" agreement with Bridgeport/Westbound at some point between 1970 and 1972, and "some songwriter's agreements":

Q. You did sign certain agreements with Bridgeport, correct?
A. Certain songwriter's agreement and a '71 or '72 contract label, I think somewhere around in there, yes.
Q. So you signed certain agreements with Bridgeport and certain agreements with Westbound?
A. Yes. One agreement that's '72 or '70 – with Westbound and some songwriter's agreements, blank songwriter's agreements.

(Clinton Dep. (Dkt. No. 104-3) at 94)

As to other Bridgeport/Westbound Agreements, Clinton testified that he either did not sign, or did not recall signing, them:

Q. And this is a songwriter agreement between you and Bridgeport Music from November of 1967 with respect to, "Good Old Music". And –
A. No – I'm sorry.
Q. And my question to you, sir, is based upon your prior testimony, I thought that you understood that Groovesville Music had music publishing rights in this music composition as of 1967?
A. Yes. I didn't – that's not my – I didn't sign that. I'm not going to say it's not my signature but I didn't sign that.

(Id. at 86)

> Q. And if we look at the opening paragraph before paragraph 1, this is an agreement between Bridgeport Music and you, dated August 31st, 1971.
> . . . .
> Q. Is that your signature on the second page under Malbiz Music?
> . . . .
> A. . . . It looks like my signature but I can't be sure that any of these documents is my – that I signed it. I don't believe it's the same documents.

(Id. at 88)

> Q. And we don't need to read through every page of this but does this appear to be an August 30, 1972, agreement between you and Westbound Records?
> A. Yes.
> Q. Now turning to the last page of this document to the right, does that appear to be your signature, sir?
> A. Again, it appears to be my signature but I don't think I signed this contract and I think I said that already. . . . No. I didn't sign this one – this paper here.

(Id. at 91-92)

> Q. Okay. Let's turn to the last page of that document, which is WR00019. And is that your signature on that page?
> A. I don't think so. I don't think so.

(Id. at 93)

> Q. . . . [I]s this a songwriter's agreement for, "Can You Get To That"?
> A. Does it have a signature on it? Well, I didn't sign it.
> Q. We'll turn to the second page. Is that your signature?
> A. Yes, that looks like my signature but I didn't sign that. . . . That song was already out.
> Q. When you say it was already out, was that one of the songs that was released by Revilot?
> A. Yes.
> Q. Okay. And was it your understanding that song was already subject to a music publishing agreement?
> A. That was my understanding.

(Id. at 98-99)

Plaintiffs registered the six Compositions with the Copyright Office between the 1970s and early 1990s:

- "Baby I Owe You Something Good" (a/k/a "The Victor") United States Copyright Registration number PA0000557896 dated November 4, 1991 (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 39; Boladian Decl., Ex. 14 (Dkt. No. 100-3) at 38);

- "Good Old Music," United States Copyright Registration number EU232643 dated February 16, 1971, and renewed on September 30, 2003 (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 45; Boladian Decl., Ex. 17 (Dkt. No. 100-3) at 47);

- "Good Old Music," United States Copyright Registration number PA00000627685 dated August 8, 1992 (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 46; Boladian Decl., Ex. 16 (Dkt. No. 100-3) at 44);

- "Let's Make it Last," United States Copyright Registration number EU438646 dated October 17, 1973, and renewed on January 2, 2001 (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 52; Boladian Decl., Ex. 20 (Dkt. No. 100-3) at 55);

- "Let's Make it Last," United States Copyright Registration number PA0001050781 dated June 12, 1998 (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 53; Boladian Decl., Ex. 21 (Dkt. No. 100-3) at 58);

- "I'll Stay" (a/k/a "I'll Wait"), United States Copyright Registration number EU891961 dated October 9, 1974, and renewed on September 30, 2003 (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 59; Boladian Decl., Ex. 24 (Dkt. No. 100-4) at 4);

- "I'll Stay" (a/k/a "I'll Wait"), United States Copyright Registration number PA0000548294 dated December 13, 1991 (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 60; Boladian Decl., Ex. 23 (Dkt. No. 100-4) at 1);

- "Can You Get to That" (a/k/a "What You Been Growing"), United States Copyright Registration number EU274894 dated September 8, 1971, and renewed on January 4, 1999 (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 67; Boladian Decl., Exs. 26-27 (Dkt. No. 100-4) at 9-16);

- "Can You Get to That" (a/k/a "What You Been Growing"), United States Copyright Registration PA0001053067 dated June 12, 1998 (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 68; Boladian Decl., Ex. 28 (Dkt. No. 100-4) at 18);

- "The Goose" (a/k/a "The Goose (That Laid the Golden Egg)," United States Copyright Registration number PA0000612427 dated November 2, 1991 (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 73; Boladian Decl., Ex. 30 (Dkt. No. 100-4) at 23).[5]

---

[5] Plaintiffs also claim that Clinton and a co-writer registered "The Goose" on June 30, 1975, and that Plaintiffs renewed that copyright on September 30, 2003. (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 72-73) However, the cited document is not clearly a copyright registration, and to the extent

Bridgeport Music also registered the Compositions with Broadcast Music, Inc. ("BMI") – an organization that sells blanket licenses for millions of musical compositions – in the 1970s, and has been receiving royalties for the Compositions since that time. (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 41, 47-48, 55, 63, 69, 73, 76, 78) Defendants do not dispute the information contained in these registrations, but dispute their validity, citing the prior copyright registrations obtained by entities affiliated with Taylor as well as Clinton's testimony that he did not sign certain of the Bridgeport/Westbound Agreements. (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶¶ 36-74) Defendants do not dispute that Taylor did not receive any royalties from BMI in connection with the Compositions. (Id. ¶¶ 48, 78, 84) Taylor was aware of Westbound Records' sound recordings of the Compositions because he played them on the radio while working as a disc jockey in Detroit. (Id. ¶ 20; Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 20)

When Taylor died in 2000, he was survived by Oliver, his widow, and his four children. (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 100) Taylor disposed of his estate by way of a will that does not mention the Compositions or the record companies he owned, and directs that his residuary estate be distributed to his four children. (Pltf. R.56.1 Stmt. (Dkt. No. 100) ¶¶ 101-02; Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶¶ 101-02; see also Parness Decl., Ex. F, Taylor Will (Dkt. No. 104-6))

In 2011, Oliver contacted Aaron Fuchs, the owner of Plaintiff TufAmerica, to discuss selling the estate's rights in the Compositions to TufAmerica. (Def. R. 56.1 Stmt. (Dkt. No. 105) ¶ 103) Although Oliver possessed tape recordings of the Compositions, she did not have documents demonstrating her rights in the Compositions. (See id. ¶¶ 104, 110, 113) Oliver

that it is, the work listed is the Funkadelic album "Standing on the Verge of Getting It On." (Busch Decl., Ex. 12 (Dkt. No. 100-1) at 110) The document lists songs included on the album, but "The Goose" is not among them. (Id.)

also did not research her claims to the Compositions. (Id. ¶ 105) When Fuchs asked Oliver if she "had any paperwork that went along" with the tapes, she said that she did not. (Id. ¶¶ 106-07) TufAmerica did not search for copyright registrations for the Compositions before purchasing Oliver's rights in the Compositions. (Id. ¶ 109)

In an August 9, 2011 agreement (the "TufAmerica Agreement"), and in exchange for $6,500, Oliver sold to TufAmerica

> Fifty Percent (50%) of the ownership interest and all worldwide copyright, renewals and/or other rights in and to all musical compositions, sound recordings, and audiovisual records solely owned or controlled by [Oliver, Taylor's estate, and all companies owned or controlled by LeBaron Taylor's Estate, including Revilot Records, Red Cap Records, Solid Hit Records, Solid Hitbound Productions, LeBaron Music, Groovesville Music, and Brute Records] including but not limited to those listed in Schedules "A" and "B" . . . attached [to the TufAmerica Agreement]

(Parness Decl., Ex. D (Dkt. No. 104-4) at 2; Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 111)

On August 15, 2011, after executing the TufAmerica Agreement, Oliver told her attorney that she objected to the inclusion of the following language in the "Representations and Warranties" section of the agreement: "[Oliver] warrants and represents that she has valid signed agreements with each and every artist, producer and songwriter and any other copyright holder and/or rights owner associated with these copyrights and that those agreements transfer all right, title, and interest to [Oliver]. . . ." (Busch Decl., Ex. 11 (Dkt. No. 100-1) at 105; Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 113) Oliver felt "uncomfortable" making these representations because she had "no written documents [with respect to the Compositions], just the tapes." (Busch Decl., Ex. 11 (Dkt. No. 100-1) at 105; Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 113) Her attorney then instructed TufAmerica to remove that language from the TufAmerica Agreement. (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 114)

In a December 11, 2017 letter to Plaintiffs – issued more than six years after signing the TufAmerica Agreement – TufAmerica claimed to own the Compositions and accused the Plaintiffs of infringing TufAmerica's rights in the Compositions. (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 116; Busch Decl., Ex. 16 (Dkt. No. 100-1) at 137) Plaintiffs filed the instant case after further exchanges between Plaintiffs and TufAmerica failed to resolve the parties' dispute concerning ownership of the Compositions. (See Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 117-23) On December 9, 2019, after this action was filed, TufAmerica purchased Oliver's remaining 50% interest in the Compositions for an additional $6,000. (Id. ¶ 125; Parness Decl., Ex. E (Dkt. No. 104-5))

## II. PROCEDURAL HISTORY

The Complaint was filed on January 11, 2018, in the Eastern District of Michigan and seeks a declaratory judgment that (1) Plaintiffs have not infringed upon any copyrights allegedly owned and/or controlled by Defendants by re-recording, commercially releasing, and/or otherwise exploiting the Compositions; (2) Plaintiffs are the rightful owners of the Compositions; and (3) Defendants do not have an interest in the copyrights to the Compositions. (Cmplt. (Dkt. No. 1)) On February 20, 2019, Defendants' motion to transfer venue was granted and the case was transferred to this District. (Dkt. No. 21) Defendants answered the Complaint on April 11, 2021, and on May 8, 2019, Defendants filed an amended answer asserting counterclaims for copyright infringement, an accounting, and a declaratory judgment that Defendants own the Compositions. (Dkt. Nos. 28, 32) Plaintiffs filed an answer to Defendants' counterclaims on May 29, 2019. (Dkt. No. 33) Plaintiffs moved for summary judgment on January 18, 2021. (Pltf. Mot. (Dkt. No. 98))

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "'[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim.'" Lesavoy v. Lane, No. 02 Civ. 10162 (RWS), 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment . . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

## II.   COPYRIGHT OWNERSHIP

Plaintiffs contend that they are entitled to summary judgment on their request for a declaration that they own the Compositions.  As should be clear from the Court's factual recitation, however, there are material issues of fact that preclude resolving ownership as a matter of law.

### A.   Applicable Law

"For disputes as to ownership of copyright, a court applies the 1909 Act to works created and actions taken before 1978 (the effective date of the 1976 Act) and the 1976 Act to works created and actions taken after 1978." Stern v. Lavender, 319 F. Supp. 3d 650, 667 (S.D.N.Y. 2018)

Under the 1909 Act, the author of a work holds "state common law copyright [] protection until first publication, and thereafter the work [is] entitled to an initial 28-year term of statutory copyright, provided that adequate statutory notice was given at publication, or appropriate registration and deposit were made." Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemp. Dance, Inc., 380 F.3d 624, 632-33 (2d Cir. 2004) (citing 17 U.S.C. §§ 2, 10, 12, 19, 21, 24 (repealed))  The 1909 Act provides that a copyright may be "assigned, granted, or mortgaged by an instrument in writing signed by the proprietor of the copyright." 17 U.S.C. § 28 (repealed).  "In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.  The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court." 17 U.S.C. § 410(c); Gaste v. Kaiserman, 863 F.2d 1061, 1064 (2d Cir. 1988) ("[W]e follow the majority rule and hold that under section 209 of the 1909 Act, a

valid certificate of registration creates a rebuttable presumption of compliance with the requirements for validity.").

**B. Analysis**

Plaintiffs allege that they filed copyright registrations in the Compositions in the following years: (1) 1991 for "The Victor" (also known as "Baby I Owe You Something Good"); (2) 1971 for "Good Old Music" (3) 1973 for "Let's Make it Last"; (4) 1974 for "I'll Stay" (also known as "I'll Wait"); (5) 1971 for "Can You Get to That" (also known as "What You Been Growing"); and (6) 1991 for "The Goose." (Boladian Decl., Exs. 14, 17, 20, 24, 26, 30 (Dkt. Nos. 100-3, 100-4)) In addition to these original copyright registrations, Plaintiffs have submitted subsequent copyright registrations and renewal registrations, BMI registrations, and the agreements in which Plaintiffs allege that Clinton transferred ownership in the Compositions to Plaintiffs.

Defendants assert that they obtained copyright registrations for the Compositions in 1967 or 1968. (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 133; Parness Decl., Exs. I, K, M, O, Q (Dkt. Nos. 104-9, 104-11, 104-13, 104-15, 104-17))

Neither side has offered reliable evidence as to the date of first publication of the Compositions, however. Indeed, neither side has addressed when the Compositions were first published, and their submissions contain scant evidence on this point.

In moving for summary judgment, Plaintiffs take no position on the Compositions' date of first publication. It is undisputed, however, that all of the Compositions other than "The Goose" – which was published by non-party Casablanca – were released by Westbound Records on various Funkadelic albums between 1970 and 1975. (Def R. 56.1 Counterstmt. (Dkt. No. 105) ¶¶ 36, 42, 49, 56, 64)) As to "The Goose," Plaintiffs have not

submitted any admissible evidence as to when it was first published. (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 70 (citing the Complaint)) Given that Plaintiffs have submitted original copyright registrations filed as late as 1991, it is clear that certain of Plaintiffs' copyright registrations are not entitled to a presumption of validity, because they fall far outside the Copyright Act's five-year window. Gaste, 863 F.2d at 1064.

And while Defendants assert that the Compositions were first published in 1967 or 1968, and have submitted six images of vinyl record labels for the Compositions, none of these images show the year of the Composition's release. (Parness Decl., Exs. G, H, J, L, N, P (Dkt. Nos. 104-7, 104-8, 104-10, 104-12, 104-14, 104-16)) If Defendants are correct that the Compositions were first published in 1967 or 1968, their registrations would be entitled to a presumption of validity. But Defendants have not submitted reliable evidence concerning the date of first publication.

In any event, because Plaintiffs have not offered evidence sufficient to demonstrate that their copyright registrations were filed before or within five years of the Compositions' publication dates, the "statutory presumption of ownership does not attach to [Plaintiffs'] registration[s.]" See Stern, 319 F. Supp. 3d at 670.

Even if Plaintiffs' copyright registrations were entitled to a presumption of validity, Plaintiffs would not be entitled to summary judgment, because Defendants have offered evidence that creates material issues of fact as to ownership of the Compositions. See SAS Inst., Inc. v. World Programming Ltd., 64 F.4th 1319, 1329 (Fed. Cir. 2023) ("[T]he district court [correctly] found that WPL provided ample evidence to rebut SAS's prima facie evidence of duly issued copyright registrations.").

Defendants have offered evidence that Taylor had an interest in certain of the Compositions at the time of his death. This evidence includes (1) Clinton's testimony that he signed an agreement with Taylor's company, Revilot Records in approximately 1965 (Clinton Dep. (Dkt. No. 104-3) at 47-65); (2) copyright registrations for certain of the Compositions held by LeBaron Taylor or other entities that predate Plaintiffs' copyright registrations (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 133); and (3) images of vinyl record labels bearing the names of the Compositions which were apparently released by LeBaron Taylor and his affiliated companies. (Parness Decl., Exs. G, H, J, L, N, P (Dkt. Nos. 104-7, 104-8, 104-10, 104-12, 104-14, 104-16)) And, as discussed above, Clinton repeatedly testified that he had not signed certain Bridgeport/Westbound Agreements that purportedly bear his signature. (Clinton Dep. (Dkt. No. 104-3) at 86, 88, 91-93, 98-99)

While (1) Plaintiffs acknowledge that "Clinton recorded for Revilot Records in the 1960s before the label went bankrupt" (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 17), and (2) Defendants have submitted copyright registrations for five of the six Compositions that list LeBaron Taylor or associated entities as copyright claimants, Plaintiffs dispute the validity and effect of Defendants' copyright registrations, given Plaintiffs' own copyright registrations. (Pltf. Resp. to Def. R. 56.1 Counterstmt. (Dkt. No. 102) ¶ 133) However, Plaintiffs have not cited any case in which a court has granted a copyright claimant summary judgment in the face of competing, seemingly valid, and earlier copyright registrations regarding the same works.

Plaintiffs argue, however, that they "have [presented] a clear, direct, and documented chain of title for the Compositions . . . [while] Defendants . . . have produced no written agreements or documentation supporting any claim to the [] Compositions." (Pltf. Br. (Dkt. No. 99) at 15) As discussed above, however, because of Plaintiffs' failure to demonstrate

the date of first publication, Plaintiffs' copyright registrations have no presumption of validity.
And while (1) Plaintiffs contend that a written agreement assigning rights in the Compositions to
Taylor "is a requirement for Defendants' actions to have a shot at succeeding" (Pltf. Reply (Dkt.
No. 101) at 3-7); and (2) the 1909 Act provides that a copyright can be "assigned, granted, or
mortgaged by an instrument in writing signed by the proprietor of the copyright," 17 U.S.C. § 28
(repealed), Plaintiffs have cited no case law suggesting that Defendants are required to submit a
copy of such an agreement in order to defeat Plaintiffs' summary judgment motion.[6]  To the
contrary, it is Plaintiffs and not Defendants who bear the burden of proof here, and this Court is
required to consider the evidence in the light most favorable to Defendants, as the non-movants.
See Spinelli, 579 F.3d at 166 ("[At summary judgment, the Court] 'resolve[s] all ambiguities,
and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing
summary judgment.'") (quoting Brown, 257 F.3d at 251).

      The evidence proffered by Defendants is sufficient to create a material issue of
fact as to whether Plaintiffs hold valid copyrights in the Compositions.  As discussed above,
Defendants have proffered copyright registrations that predate Plaintiffs' copyright registrations,
and show title passing from Clinton to Taylor or Taylor-affiliated entities.  (See Parness Decl.,
Exs. I, K, M, O, Q (Dkt. Nos. 104-9, 104-11, 104-13, 104-15, 104-17) (indicating Clinton and
others authored the Compositions and listing entities affiliated with LeBaron Taylor as

---

[6]  Jim Henson Productions, Inc. v. John T. Brady Assocs., Inc., cited by Plaintiffs (Pltf. Reply
(Dkt. No. 101) at 7-8), is not to the contrary. 16 F. Supp. 2d 259, 285 (S.D.N.Y. 1997).  In that
case, plaintiffs – the authors of the disputed works – possessed copyright registrations that
defendants sought to challenge, citing an agreement purporting to assign rights in the works to
the defendants.  Id.  Because of ambiguities in the alleged assignment agreement, the court held
that it did not assign copyright in the disputed works to defendants. Id. at 286-89.  In sum, Jim
Henson Productions does not hold that a party cannot assert copyright ownership absent
evidence of an agreement transferring ownership of the relevant copyright to that party.

claimants))  The "facts stated [in Defendants' copyright registrations], including the chain of title . . . [are] entitled to the presumption of truth."  See United Fabrics Int'l, Inc. v. C&J Wear, Inc., 630 F.3d 1255, 1258 (9th Cir. 2011).

And while Plaintiffs assert that they "have [presented] a clear, direct, and documented chain of title for the Compositions" (Pltf. Br. (Dkt. No. 99) at 15), they largely ignore Clinton's testimony that he did not sign many of the Bridgeport/Westbound Agreements. As Plaintiffs repeatedly point out, a copyright can only be "assigned, granted, or mortgaged by an instrument in writing signed by the proprietor of the copyright."  17 U.S.C. § 28 (repealed). Accordingly, Clinton's testimony that he did not sign many of the agreements on which Plaintiffs rely creates a material issue of fact as to Plaintiffs' claim of ownership.[7]

Plaintiffs argue, however, that Clinton's deposition testimony as to the Revilot Agreement is "confusing and contradictory," and suggests that any agreement was between Clinton and Groovesville, and not with Taylor.  (Pltf. Reply (Dkt. No. 101) at 4-5)  As discussed above, Clinton testified that he had an agreement with Revilot in about 1965.  (Clinton Dep. (Dkt. No. 104-3) at 47-48)  Beyond this basic fact, Clinton's testimony regarding Revilot, Groovesville, and Taylor is confusing.  Clinton variously testified that the Revilot Agreement had a "publishing component" with Groovesville; that he "didn't have a publishing agreement

---

[7] Plaintiffs contend that Clinton's testimony is irrelevant, because in a lawsuit between Clinton and Boladian "the United States District Court for the Northern District of Florida ruled that Mr. Clinton did assign certain musical compositions [written by him as of March 4, 1982], including those at issue here, . . . to Bridgeport."  (Pltf. Reply (Dkt. No. 101) at 3-9)  But there is no evidence that Defendants were a party to any prior lawsuit between Boladian and Clinton, and Plaintiffs have not argued, much less demonstrated, that non-party preclusion is appropriate here. See Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc., 571 F.3d 299, 312 (3d Cir. 2009).  Generally, "'[a] judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings.'"  Id. (quoting Richards v. Jefferson Cnty., Ala., 517 U.S. 793, 798 (1996)).

. . . [but only] a songwriter's agreement"; and that "Groovesville was that publisher . . . [and that he] didn't know anything about LeBaron Music or any other name." (Id. at 48-49, 57-58, 65 ("[Clinton] understood that songs that were released by Revilot were subject to at least a publishing agreement.")) Clinton also testified that Groovesville may or may not have been co-owned by Taylor and another person named Don Davis. (Id. at 111 ("Q. As far as Groovesville is concerned, is it correct that was a Don Davis owned company? A. My understanding [is that Taylor and Davis] were partners in the beginning and somewhere along the line they separated and it ended up being Don Davis.") While Plaintiffs suggest that Clinton's use of the term "publishing agreement" demonstrates that any copyright assignments were made to Groovesville and not Revilot (Pltf. Reply (Dkt. No. 101) at 5-6), Clinton did not testify as to the significance and terms of a "publishing agreement" as opposed to a "songwriter's agreement."

In sum, in testifying about events that took place sixty years ago, Clinton did not recall (1) the terms of the Revilot Agreement; (2) the nature of the relationship between Revilot and Groovesville; or (3) their arrangements with respect to copyright ownership in the Compositions. Clinton's testimony merely highlights the lack of clarity in the evidence regarding ownership of the Compositions.

Plaintiffs further contend that their "course of dealing" with respect to the Compositions, including registering them with BMI and collecting royalties – actions that Taylor never challenged – outweighs the evidence of Defendants' copyright registrations. (Pltf. Br. (Dkt. No. 99) at 18-20) However, it is not this Court's role at summary judgment to weigh the evidence. Roberts v. Genting New York LLC, 68 F.4th 81, 88 (2d Cir. 2023) ("[Courts] do 'not weigh evidence or assess the credibility of witnesses at the summary judgment stage.'") (quoting Jeffreys v. City of New York, 426 F.3d 549, 551 (2d Cir. 2005).

Plaintiffs argue, however, that Stern v. Lavender indicates that their course of dealing argument should be given weight.  Plaintiffs' reliance on Stern is misplaced.

In Stern, plaintiffs claimed that defendant had infringed on plaintiffs' copyright in certain photographs.  Stern, 319 F. Supp. 3d at 658.  The parties cross-moved for summary judgment as to ownership of the photographs, and the court concluded that Plaintiffs' copyright registrations in these photographs established a rebuttable presumption of copyright ownership.  Id. at 658, 675.  Defendants argued, however, that the author of the photographs had created them on a work-for-hire basis.  Id. at 667.  Plaintiffs contended that the work-for-hire assertion was "squarely at odds with" the long course of dealing between the author and Condé Nast, his publisher.  See id. at 675.  In particular, the author had granted Condé Nast licenses in his works, a fact that constituted "powerful circumstantial evidence" of copyright ownership by plaintiffs, who were the author's successors.  Id. at 675-76.  The court "held that . . . Stern[, the author and plaintiffs' predecessor in interest,] owned the copyright in the . . . photographs [in question.]"  Id. at 675-76 & n.18.

Here, Plaintiffs have no evidence comparable to the licenses that the author in Stern issued to Condé Nast, a course of dealing between the author and the publisher that directly rebutted the Stern defendant's argument that the author's photographs were work-for-hire. Acknowledging that Plaintiffs have "openly exploited" and collected royalties on the Compositions for decades, Defendants have proffered copyright registrations for the Compositions, have presented sound recordings of the Compositions, and have offered testimony from the author in which he denies conveying the copyrights in the Compositions to Plaintiffs. Defendants' showing is thus much more substantial than that proffered by the Stern defendant,

who offered the weak work-for-hire argument and "a deconstruction of [the photographer's] memoir." See id. at 675.

The Court concludes that Plaintiffs are not entitled to summary judgment on their claim that they own the Compositions.

## III. WHETHER THE PARTIES' CLAIMS AND COUNTERCLAIMS ARE TIME-BARRED

Plaintiffs contend that they are entitled to summary judgment on Defendants' counterclaims, because the counterclaims are time-barred under the Copyright Act's statute of limitations. (Pltf. Br. (Dkt. No. 99) at 23-24) Defendants contend that Plaintiffs' motion for summary judgment on Plaintiffs' claims should be denied, because Plaintiffs' claims are time-barred under the Copyright Act. (Def. Opp. (Dkt. No. 103) at 21-22) For the reasons stated below, this Court concludes that Defendants' counterclaims are time-barred but that Plaintiffs' claims are not.

### A. Applicable Law

The Copyright Act provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). The Copyright Act's statute of limitations "is an affirmative defense" for which the party asserting it bears "the burden of proof." United States v. Livecchi, 711 F.3d 345 (2d Cir. 2013).

To establish an action for infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publications, Inc. v. Rural Telephone Serv. Co., Inc., 499 U.S. 340 (1991). Where ownership is not disputed and an infringement claim turns solely on copying, "an infringement is actionable within three years, and only three years, of its occurrence." Petrella v.

Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 671 (2014).  Where "'copyright ownership is not conceded,'" however, "'ownership, and not infringement, is the gravamen of the plaintiff's claim to which the statute of limitations is applied.'"  Kwan v. Schlein, 634 F.3d 224, 226 (2d Cir. 2011) (quoting Ortiz v. Guitian Bros. Music Inc., 2008 WL 4449314, at *3 (S.D.N.Y. Sept. 29, 2008)).  Accordingly, "a time-barred ownership claim will bar a claim for copyright infringement where . . . the infringement claim cannot be decided without adjudication of a genuine dispute as to the plaintiff's ownership of the copyright." Id.; Merchant v. Levy, 92 F.3d 51, 56 (2d Cir. 1996) ("[Plaintiffs are] time-barred three years after accrual of their claim from seeking a declaration of copyright co-ownership rights and any remedies that would flow from such a declaration.").

 "An ownership claim accrues only once, when 'a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right.'"  Kwan, 634 F.3d at 228 (quoting Stone v. Williams, 970 F.2d 1043, 1048 (2d Cir. 1992)).  "[A]t least three types of events [] can put a potential plaintiff on notice and thereby trigger the accrual of an ownership claim:  public repudiation; private repudiation in communications between the parties; and implicit repudiation 'by conspicuously exploiting the copyright without paying royalties.'"  Wilson v. Dynatone Publ'g Co., 892 F.3d 112, 118 (2d Cir. 2018) (quoting Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc., 716 F.3d 302, 317 (2d Cir. 2013)); Horror Inc. v. Miller, 15 F.4th 232, 257 (2d Cir. 2021) (noting that the "accrual rule is slightly different for authorship claims" as opposed to ownership claims, such that an author "'does not need to bring suit until there has been an express repudiation of that claim'") (quoting Gary Friedrich Enterprises, 716 F.3d at 317).

**B. Whether Plaintiffs' Claims are Time-Barred**

Plaintiffs filed the instant case in January 2018, a month after Defendants sent Plaintiffs a letter claiming ownership of the copyrights in the Compositions. (See Busch Decl., Ex. 16 (Dkt. No. 100-1) at 137 (Defendants' December 11, 2017 letter); Cmplt. (Dkt. No. 1)) Defendants have not offered evidence that Plaintiffs were earlier "put on inquiry [notice] as to the existence of a right" or that Defendants' predecessors in interest (1) publicly repudiated Plaintiffs' alleged ownership of the copyrights; (2) privately repudiated Plaintiffs' claimed ownership; or (3) implicitly repudiated Plaintiffs' ownership claim by "by conspicuously exploiting the copyright without paying royalties." Gary Friedrich Enterprises, 716 F.3d at 317.

In support of their argument that Plaintiffs' claims are time-barred, Defendants point to Clinton's deposition testimony "that Mr. Boladian knew that the rights had already been conveyed to Mr. Taylor, both because Mr. Boladian was Mr. Taylor's distributor, and because Mr. Clinton told him that he had conveyed the rights." (Def. Opp. (Dkt. No. 103) at 21 (emphasis omitted)) Clinton's testimony on this point is as follows:

> Q. Did you ever tell Armen Boladian that "I'll Wait," "I'll Stay" was published by Groovesville?
>
> A. He already knew that, he was the distributor.
>
> Q. Did you ever tell him?
>
> A. Yes.
>
> Q. Okay. Did you ever tell Mr. Boladian that "(I Owe You) Something" was published by Groovesville?
>
> A. He knew that.
>
> Q. Did you ever tell him?
>
> A. Yes.

Q.  Did you ever tell Mr. Boladian that "Let's Make It Last" was published by Groovesville?

A.  Again, he already knew, but, yes.

Q.  Did you ever tell Mr. Boladian that "The Goose" was published by Groovesville?

A.  Yes. Yes.

. . . .

Q.  Did you ever communicate with Armen Boladian directly concerning any of these compositions?

A.  "Good Old Music," he knew that. He was the distributor of the record. He already knew that. He was the distributor of Revilot's record.

Q.  Did you ever tell Mr. Boladian that "What You Been Growing" was published by Groovesville?

A.  Yes. He was the distributor, he would have known, period.

Q.  Did you ever tell Mr. Boladian that "Good Old Music" was published by Groovesville?

A.  Yes.

(Clinton Dep. (Dkt. No. 104-3) at 81-82, 145)

Courts treat the Copyright Act's statute of limitations as "something like adverse possession [for] copyright ownership." Zuill v. Shanahan, 80 F.3d 1366, 1370 (9th Cir. 1996) (noting that "[a]n express or implicit ouster of a cotenant by an unequivocal act of ownership starts the adverse possession statute of limitations running"); Gary Friedrich Enterprises, 716 F.3d at 319 (citing Zuill for the same proposition).  "Copyright, like real estate, lasts a long time, so stability of title has great economic importance," and "'Congress' paramount goal in revising the 1976 Act [was] enhancing [the] predictability and certainty of copyright ownership.'" Zuill,

80 F.3d at 1370 (quoting Community for Creative Non-Violence v. Reid, 490 U.S. 730, 749 (1989)).

Clinton's testimony indicates that he told Boladian – at some unspecified point in the past – that Groovesville and Revilot had published sound recordings of the Compositions. (See Clinton Dep. (Dkt. No. 104-3) at 81-82, 145)  But Clinton's testimony does not suggest that Groovesville or Revilot were exploiting the Compositions during the time period for which Plaintiffs have claimed title.  Indeed, it is undisputed that since the early 1970s, Plaintiffs alone have exploited the Compositions by publishing them and collecting royalties based on their use and performance.  (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶¶ 48, 78, 84)  Clinton's testimony does not suggest that he told Boladian that Taylor or entities affiliated with Taylor were actively claiming ownership of the Compositions during a time period in which Plaintiffs were claiming ownership.  See Everly v. Everly, 958 F.3d 442, 451 (6th Cir. 2020) ("An ownership claim therefore must be brought within three years after the purported owner's status as such is challenged by a party with a competing claim of ownership.")  In sum, Clinton's testimony that he had told Boladian that Groovesville and Revilot had published the Compositions does not suggest that Taylor or any entity affiliated with Taylor had "ousted" Plaintiffs from ownership, made a claim of ownership adverse to Plaintiffs, or engaged in any other "unequivocal act of ownership."  See Zuill, 80 F.3d at 1370.

Citing Latin Am. Music Co., Inc. v. Spanish Broad. Sys., Inc., 232 F. Supp. 3d 384, 389 (S.D.N.Y. 2017), Defendants argue that Plaintiffs were "on notice of the first rounds of copyright registrations and released sound recordings of the Compositions, all of which predate [Plaintiffs'] registrations and contracts."  (Def. Opp. (Dkt. No. 103) at 20)  The Second Circuit has rejected the notion that a copyright registration alone can put a putative owner on notice of

an adverse claim of ownership, however.  See Wilson, 892 F.3d at 119 ("If mere registration of a copyright without more sufficed to trigger the accrual of an ownership claim, then rightful owners would be forced to maintain constant vigil over new registrations.  Such a requirement would be vastly more burdensome than the obligations that 'a reasonably diligent plaintiff' would undertake.") (quoting Kwan, 634 F.3d at 228); Wilson v. Dynatone Publ'g Co., 908 F.3d 843, 844 (2d Cir. 2018) (denying rehearing and rejecting the argument "that registration, without more, triggers accrual of an ownership claim").  In sum, Taylor's registration of copyrights in the Compositions is not sufficient to trigger accrual of Plaintiffs' rights in the Compositions.[8]

The Court concludes that Plaintiffs' claims are not time-barred under the Copyright Act's three-year statute of limitations.  17 U.S.C. § 507(b).

---

[8] In a throw-away assertion, Defendants argue that the "sound recordings" of the Compositions released by Taylor – like Taylor's copyright registrations – should have put Plaintiffs "on notice" of Taylor's competing ownership claim in the Compositions such that Plaintiffs' claims are time barred.  (Def. Opp. (Dkt. No. 103) at 20 ("Plaintiffs should have been on notice of the first rounds of copyright registrations [by Taylor] and released sound recordings of the Compositions."))  In support of this argument, Defendants cite Latin Am. Music Co., 232 F. Supp. 3d 384, which, as discussed above, only discusses the significance of copyright registrations to notice and accrual of an ownership claim.  (Id. at 20-21).  Latin Am. Music Co., 232 F. Supp. 3d 389 ("A copyright registration certificate 'put[s] the world on constructive notice' of the facts stated in the certificate, including ownership of the copyright.") (quoting Complex Sys., Inc. v. ABN Ambro Bank N.V., 979 F. Supp. 2d 456, 472 (S.D.N.Y. 2013)).  Moreover, Defendants have not offered evidence that Revilot's sound recordings were being marketed and promoted after Plaintiffs registered their copyrights or otherwise made a claim of ownership with respect to the Compositions.

Defendants' "argument that [P]laintiff[s'] copyright infringement claims must be dismissed on statute of limitations grounds 'is an affirmative defense for which [Defendants] bear[] the burden of proof.'"  Parisienne v. Scripps Media, Inc., 2021 WL 3668084, at *2 (S.D.N.Y. Aug. 17, 2021) (quoting Lefkowitz v. McGraw-Hill Global Educ. Holdings, LLC, 23 F. Supp. 3d 344, 358 (S.D.N.Y. 2014)).  Defendants have not carried their burden to show that Taylor's release of sound recordings of the Compositions before Revilot's bankruptcy – alone or in combination with the prior copyright registrations – triggered accrual of Plaintiffs' ownership claims for purposes of the Copyright Act's statute of limitations.

C.    **Whether Defendants' Counterclaims are Time-Barred**

Plaintiffs have moved for summary judgment on Defendants' counterclaims, which (1) seek a declaratory judgment that TufAmerica "is the rightful owner of the copyrights in the Compositions"; (2) allege copyright infringement; and (3) seek an accounting in connection with Plaintiffs' commercial exploitation of the Compositions.  (Pltf. Br. (Dkt. No. 99) at 4; Am. Ansr. & Counterclaims (Dkt. No. 32) ¶¶ 53-69)

Plaintiffs argue that Defendants' counterclaims are barred by the statute of limitations.  (Pltf. Br. (Dkt. No. 99) at 23)  Because "copyright ownership is not conceded" in this case, "ownership, and not infringement, is the gravamen" of Defendants' counterclaims. Kwan, 634 F.3d at 230.  Accordingly, if Defendants' ownership claim is time-barred, their "attendant infringement claims must fail." Id.  The Court concludes that Defendants' counterclaims accrued either in the 1970s, when Plaintiffs implicitly repudiated Defendants' ownership of the Compositions, or at the latest in 2011 when Defendants purchased Oliver's rights in the Compositions.

For more than thirty years before Taylor's death, Plaintiffs received royalties based on their exclusive registration of the Compositions with BMI.  (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 78, 84)  While "an ownership claim is triggered by knowledge of an entitlement to royalties that are not being paid, rather than by mere knowledge of the exploitation [by another,] . . . learning that another [person or entity] . . . is exploiting the work is sufficient notice that royalties are due." Gary Friedrich Enterprises, LLC, 716 F.3d at 319.

Here, Taylor had obtained copyright registrations for the Compositions and made and released sound recordings of the Compositions prior to Revilot's bankruptcy.  (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 17-18; Parness Decl., Exs. G, H, J, L, N, P (Dkt. Nos. 104-7, 104-8, 104-

10, 104-12, 104-14, 104-16)) After Revilot's bankruptcy, Clinton and Funkadelic re-recorded the Compositions, and Westbound Records released the new recordings on various albums during the 1970s.[9] (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 36, 42, 49, 56, 64) It is undisputed that, after the Revilot bankruptcy, Taylor worked as a disc jockey in Detroit, and played Westbound's sound recordings of the Compositions on the radio. (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 20) Accordingly, Taylor was aware that the Compositions were being exploited by another record company. There is no evidence that Taylor ever received royalties in connection with his copyright registrations in the approximately thirty years between Plaintiffs and Casablanca Records' exploitation of the Compositions and Taylor's death.[10] Despite knowing that the Compositions were being publicly exploited, there is no evidence that Taylor ever asserted his ownership rights.

"Considering the depth of [Taylor's] experience in the music industry," when Clinton and Funkadelic released sound recordings of the Compositions, Taylor had "reason to know" that he had been injured by not receiving royalties for performances of the Compositions, if in fact he believed that he still owned copyrights in the Compositions. See Mahan v. Roc Nation, LLC, 2015 WL 1782095, at *4 (S.D.N.Y. Apr. 15, 2015), aff'd, 634 F. App'x 329 (2d Cir. 2016) ("[T]he absence of any royalties sent to [p]laintiff [] gave him reason to know of his injury."); see also Howard v. Carter, 615 F. Supp. 3d 190, 195 (W.D.N.Y. 2022), appeal dismissed, 2022 WL 18283303 (2d Cir. Nov. 17, 2022) ("Howard should have known he was not receiving the royalties that he supposedly was entitled to when [the work in question was

[9] As noted above, "The Goose" was recorded and released by non-party Casablanca Records in 1974. (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 70)

[10] Indeed, the evidence shows that Bridgeport Music has been receiving royalties for the Compositions since the 1970s. (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 41, 48, 55, 63, 69, 73, 76, 78)

published and the defendant] 'conspicuously exploit[ed] the copyright[s] without paying royalties.' . . . [His] copyright ownership claim is, therefore, time-barred.") (quoting Gary Friedrich Enterprises, LLC, 716 F.3d at 317). Accordingly, any claim of copyright ownership by Taylor or a Taylor-affiliated entity would be time-barred.

Here, Defendants assert that they are Taylor's successors in interest.[11] (Def. Opp. (Dkt. No. 103) at 4) Accepting Defendants' assertion, their counterclaims alleging ownership and infringement of the Compositions are time-barred. See Seven Arts Filmed Ent. Ltd. v. Content Media Corp. PLC, 733 F.3d 1251, 1257 (9th Cir. 2013) (repudiation of a predecessor in interest's claim of ownership more than three years prior barred successor's claim for copyright infringement); TMTV Corp. v. Pegasus Broad. of San Juan, 490 F. Supp. 2d 228, 232 (D.P.R. 2007) (infringement claim time-barred based on predecessor-in-interest's knowledge of earlier infringements).

Even if Defendants were not bound by Taylor's knowledge that the Compositions were being exploited by another record company, their claims accrued – at the latest – in 2011, when TufAmerica purchased rights in the Compositions from Oliver. As a result of their dealings with Oliver, Defendants were on "inquiry as to the existence of a right" at that time. Kwan, 634 F.3d at 228. When TufAmerica purchased half of Oliver's rights in the Compositions in 2011, she told Aaron Fuchs – TufAmerica's owner – that she did not have "any paperwork" confirming her ownership interest in the Compositions. (Def. R. 56.1 Stmt. (Dkt. No. 105) ¶¶ 103-07, 110) And after signing the agreement with TufAmerica, Oliver was sufficiently

[11] Plaintiffs dispute that Defendants are Taylor's successors in interest. (Pltf. Br. (Dkt. No. 99) at 20-22) Because the Court concludes that Defendants' counterclaims are time-barred, it does not reach Plaintiffs' argument that Oliver did not effectively transfer any rights in the Compositions to TufAmerica.

"uncomfortable" that she directed her attorney to ask TufAmerica to remove from the "representations and warranties" section of the TufAmerica Agreement a sentence providing that Oliver "warrants and represents that she has valid signed agreements with each and every artist, producer, and songwriter and any other copyright holder and/or rights owner associated with these copyrights and that those agreements transfer all right, title, and interest to [Oliver]. . . ." (Busch Decl., Ex. 11 (Dkt. No. 100-1) at 105; Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 113-14)

Before signing the agreement with Oliver, Fuchs "reviewed the discography and discussed with [Oliver] her rights[,] [and] knew that she was [Taylor's] wife and she was his successor in interest . . . [and] that she had tapes." (Busch Decl., Ex. 1 (Fuchs Dep.) (Dkt. No. 100-1) at 43) At the time, that was "sufficient for [Fuchs] to move forward." (Id.) Despite Oliver's expressed concern that she lacked documents showing Taylor's ownership interest in the Compositions (Busch Decl., Ex. 2 (Oliver Dep.) (Dkt. No. 100-1) at 28), Fuchs did not search the copyright catalog for registrations until a "few years" after purchasing a 50% share of Oliver's interest in the Compositions. (Busch Decl., Ex. 1 (Fuchs Dep.) (Dkt. No. 100-1) at 35-36) Fuchs testified that he may have wanted to conduct such a search before purchasing a 50% share of Oliver's interest, but he lacked the resources to do so. (Id. ("Q. Why did you not [search for copyright registrations] before you purchased the catalog? A. When you run a small label in the record business in New York City, you can't always do what you want to when you want to.") Had Fuchs searched the register of copyrights at that time, he would have discovered multiple copyright registrations for the Compositions. More than six years after the agreement with Oliver was executed, TufAmerica sent a letter to Plaintiffs claiming ownership of the compositions, having conducted a search of the copyright registry. (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 116)

As the owner and operator of a record label, Fuchs – like Taylor – had substantial "experience in the music industry." Mahan, 2015 WL 1782095, at *4. For $6,500, he was able to purchase a 50% ownership stake in "all worldwide copyright, renewals, and/or other rights in certain musical works" created by one of the most celebrated funk musicians of all time. (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 111) Given Fuchs' knowledge of the music industry, and the price he paid Oliver, the notion that Fuchs was not on inquiry notice that another party might have claimed ownership of the Compositions "strains credulity." Mahan, 2015 WL 1782095, at *4.

Defendants argue, however, that there are material issues of fact concerning the accrual of Defendants' ownership claim in the Compositions, and that these issues of fact preclude granting Plaintiffs summary judgment on Defendants' counterclaims. (See Def. Opp. (Dkt. No. 103) at 20-21) In this regard, Defendants cite only Clinton's testimony that he told Boladian – at an unspecified time – that Groovesville and Revilot had published the Compositions. (Id. (citing Clinton Dep. (Dkt. No. 104-3) at 81-82, 145)) As discussed above, Clinton's alleged statements to Boladian do not constitute a repudiation of Plaintiffs' ownership claims. In any event, Clinton's testimony on this point is irrelevant to whether Taylor's ownership of the Compositions was ever publicly, privately, or implicitly repudiated by Plaintiffs, or whether Defendants were on inquiry notice of a right in 2011.

Because (1) Defendants' ownership claims accrued in 2011 at the latest, and (2) the instant lawsuit was not initiated until 2018, Defendants' counterclaims are time-barred under the Copyright Act's three-year statute of limitations.

Accordingly, Plaintiffs will be granted summary judgment on Defendants' counterclaims.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment is granted as to Defendant's counterclaims and is otherwise denied. The Clerk of Court is directed to terminate the motion (Dkt. No. 98).

This case will proceed to trial on **September 5, 2023 at 9:30 a.m.** in Courtroom 705 of the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York. The parties are directed to comply with this Court's Individual Rules concerning the preparation of a pre-trial order. The joint pre-trial order, motions in limine, voir dire requests, and requests to charge are due on **August 11, 2023**. Responsive papers, if any, are due on **August 18, 2023**. A final pretrial conference will be conducted on **August 31, 2023 at 4:30 p.m**.

Dated: New York, New York
   July 26, 2023          SO ORDERED.

                 Paul G. Gardephe
                 United States District Judge