UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRIDGEPORT MUSIC, INC. and
WESTBOUND RECORDS, INC.,

        Plaintiffs / Counterclaim-
        Defendants

        - v -

TUFAMERICA, INC. d/b/a TUFF CITY
RECORDS, and KAY LOVELACE
TAYLOR, individually and on behalf of the
Estate of LeBaron Taylor,

        Defendants / Counterclaim-
        Plaintiffs.

**ORDER**

19 Civ. 01764 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        This is a copyright ownership dispute in which Plaintiffs Bridgeport Music, Inc. and Westbound Records, Inc. seek a declaratory judgment that (1) Plaintiffs are the rightful owners of certain musical compositions authored by George Clinton (the "Compositions"); (2) Defendants do not have any valid ownership claims in the Compositions; and (3) Plaintiffs have not infringed upon any copyrights allegedly owned by Defendants in the Compositions. (Cmplt. (Dkt. No. 1))  Defendants TufAmerica, Inc. and Kay Lovelace Taylor have brought counterclaims for (1) a declaratory judgment that TufAmerica is the rightful owner of the Compositions; (2) copyright infringement; and (3) an accounting regarding the damages caused by Plaintiffs' alleged unauthorized commercial exploitation of the Compositions.  (Am. Ansr. (Dkt. No. 32) ¶¶ 53-69)  A jury trial is scheduled for October 2, 2023. (Dkt. No. 109)

        Plaintiffs moved for summary judgment on their claims and on Defendants' counterclaims.  (Pltf. Sum. J. Br. (Dkt. No. 91))  In a July 26, 2023 Memorandum Opinion and Order (the "Summary Judgment Opinion"), this Court granted Plaintiffs' motion for summary

judgment as to Defendants' counterclaims, finding that the counterclaims are time-barred.  (Sum. J. Opin. (Dkt. No. 106) at 31)[1]  Plaintiffs' motion was otherwise denied.  (Id. at 32)

Defendants have moved for reconsideration pursuant to Local Rule 6.3 (Dkt. Nos. 112-113), while Plaintiffs request that this Court "conditional[ly] dismiss[] Plaintiff's claims in this action under . . . Purdy v. Zeldes, 337 F.3d 253 (2d Cir. 2003), and its progeny."  (Dkt. No. 111)  Defendants join in Plaintiffs' request for a conditional dismissal, in the event that their motion for reconsideration is denied.  (Pltf. Recon. Br. (Dkt. No. 113) at 4 & n.1)

For the reasons stated below, Defendants' motion for reconsideration will be denied, and Plaintiffs' request for conditional dismissal will be granted, subject to the Court's receipt of an appropriate stipulation from the parties.

## **BACKGROUND**

### I.  **FACTS**[2]

Plaintiffs are affiliated music companies based in Detroit, Michigan, and distributed soul and funk music in the late 1960s and early 1970s.  Plaintiffs were founded and are owned by Detroit music producer Armen Boladian.  (Sum. J. Opin. (Dkt. No. 106) at 2)

Defendant TufAmerica, Inc. is a record label incorporated in New York.  Dr. Kay Oliver is the widow of LeBaron Taylor.  LeBaron Taylor, who died in 2000, was a music producer, radio disc jockey, and record company executive.  He owned Revilot Records, a Detroit-based record label that went bankrupt in the late 1960s.  (Id.)

---

[1]  The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

[2]  The Summary Judgment Opinion sets out the background to the parties' dispute in detail, and the Court assumes familiarity with that decision.

Renowned funk musician George Clinton – a non-party to this lawsuit – is the author or co-author of the Compositions:  (1) "The Victor" a/k/a "Baby I Owe You Something Good"; (2) "Good Old Music"; (3) Let's Make It Last"; (4) "I'll Wait" a/k/a "I'll Stay; (5) "Can You Get To That" a/k/a "What You Been Growing"; and (6) "The Goose (That Laid the Golden Egg)."  (Id.)

The parties agree that Clinton recorded music for Revilot in the late 1960s prior to Revilot's bankruptcy and pursuant to a 1965 agreement between Clinton and Revilot (the "Revilot Agreement").  (Id. at 2-3)  Defendants cite to five copyright registrations dated between 1967 and 1968 as evidence of their ownership of the Compositions.  (Id. at 3-4)

After Revilot entered bankruptcy in the late 1960s, Clinton began recording music for Plaintiff Westbound Records.  The Compositions – except for "The Goose" – were then re-recorded by Clinton and his band, Funkadelic, and released on various Westbound Records albums during the 1970s.  (Id. at 4)  "The Goose" was recorded by Clinton and another band, Parliament, and released by non-party Casablanca Records in 1974.  (Id.)

Plaintiffs have not alleged that they purchased any copyrights in Compositions or sound recordings from Taylor, Revilot, or any other affiliated entity.  Plaintiffs have instead submitted a series of agreements, dated between 1967 and 1991, in which Clinton, his publishing company, Malbiz Music, and certain co-writers assigned ownership in the Compositions – except as to "The Goose" – to Bridgeport Music and exclusive recording rights to Westbound Records (the "Bridgeport/Westbound Agreements").  (Id. at 4-5)  Plaintiffs further allege that on October 18, 1991, they purchased the rights to "The Goose" from a third-party record label.  (Id. at 6)

Plaintiffs registered the six Compositions with the Copyright Office between the 1970s and early 1990s.  (Id. at 7-8)  In the 1970s, Bridgeport Music also registered the

3

Compositions with Broadcast Music, Inc. ("BMI"), which sells blanket licenses for millions of musical compositions.  As a result of registering the Compositions with BMI, Bridgeport Music has been receiving royalties for the Compositions since that time.  (Id. at 9)

Defendants do not dispute that Taylor did not receive any royalties from BMI in connection with the Compositions.  (Id.)  It is likewise undisputed that Taylor was aware of Westbound Records' sound recordings of the Compositions; as a disc jockey in Detroit, he was provided with those recordings to play on the radio.  (Id.)

Taylor died in 2000 and is survived by Oliver and his four children.  In 2011, Oliver contacted Aaron Fuchs, the owner of Plaintiff TufAmerica, to discuss selling the estate's rights in the Compositions to TufAmerica.  Although Oliver possessed tape recordings of the Compositions, she did not have documents demonstrating that she held rights in the Compositions.  Indeed, when Fuchs asked Oliver if she "had any paperwork that went along" with the tapes, she said that she did not.  (Id. at 9-10)

In an August 9, 2011 agreement (the "TufAmerica Agreement"), TufAmerica paid Oliver $6,500 for a 50% ownership interest in all "worldwide copyright, renewals and/or other rights in and to all musical compositions, sound recordings, and audiovisual records solely owned or controlled by [Oliver, Taylor's estate, and all companies owned or controlled by LeBaron Taylor's Estate, including Revilot Records]. . . ."  (Id. at 10)

On August 15, 2011, after executing the TufAmerica Agreement, Oliver told her attorney that she wanted the following language in the TufAmerica Agreement to be deleted: "[Oliver] warrants and represents that she has valid signed agreements with each and every artist, producer and songwriter and any other copyright holder and/or rights owner associated with these copyrights and that those agreements transfer all right, title, and interest to [Oliver]. . . ."

4

Oliver felt "uncomfortable" making these representations because she had "no written documents [with respect to the Compositions], just the tapes."  Her attorney then instructed TufAmerica to remove that language from the TufAmerica Agreement.  (Id.)

In a December 11, 2017 letter to Plaintiffs – issued more than six years after signing the TufAmerica Agreement – TufAmerica claimed to own the Compositions and accused Plaintiffs of infringing TufAmerica's rights in the Compositions.  (Id. at 11)  Plaintiffs filed the instant case after further exchanges between Plaintiffs and TufAmerica failed to resolve the parties' dispute concerning ownership of the Compositions.  On December 9, 2019, after this action was filed, TufAmerica purchased Oliver's remaining 50% interest in the Compositions for an additional $6,000.  (Id.)

## II.   PROCEDURAL HISTORY

The Complaint was filed on January 11, 2018, in the Eastern District of Michigan and seeks a declaratory judgment that (1) Plaintiffs have not infringed upon any copyrights allegedly owned and/or controlled by Defendants by re-recording, commercially releasing, and/or otherwise exploiting the Compositions; (2) Plaintiffs are the rightful owners of the Compositions; and (3) Defendants do not have an interest in the copyrights to the Compositions. (Cmplt. (Dkt. No. 1))  On February 20, 2019, Defendants' motion to transfer venue was granted and the case was transferred to this District.  (Dkt. No. 21)  Defendants answered the Complaint on April 11, 2019, and on May 8, 2019, Defendants filed an amended answer asserting counterclaims for copyright infringement, an accounting, and a declaratory judgment that Defendants own the Compositions.  (Dkt. Nos. 28, 32)  Plaintiffs filed an answer to Defendants' counterclaims on May 29, 2019.  (Dkt. No. 33)  On January 18, 2021, Plaintiffs moved for

summary judgment on both their claims and on Defendants' counterclaims.  (Pltf. Mot. (Dkt. No. 98))

In the July 26, 2023 Summary Judgment Opinion, this Court granted Plaintiffs summary judgment on Defendants' counterclaims, finding that they were time-barred.  Plaintiffs' summary judgment motion was otherwise denied.  (Sum. J. Opin. (Dkt. No. 106) at 32)

In an August 8, 2023 letter, Plaintiffs request "a conditional dismissal of Plaintiff[s'] claims."  (Pltf. Aug. 8, 2023 Ltr. (Dkt. No. 111))[3]  On August 9, 2023, Defendants moved for reconsideration of this Court's decision granting Plaintiffs summary judgment on Defendants' counterclaims.  (Def. Mot. (Dkt. No. 112))  Defendants state that if this Court denies their "motion [for reconsideration,] so that the dismissal of Defendants' counterclaims is maintained, Defendants will join Plaintiffs' request for conditional dismissal of Plaintiffs' claims."  (Id. at 4 & n.1)

## DISCUSSION

## I.    RECONSIDERATION STANDARD

"Motions for reconsideration are governed by Local Rule 6.3 and are committed to the sound discretion of the district court."  Liberty Media Corp. v. Vivendi Universal, S.A., 861 F. Supp. 2d 262, 265 (S.D.N.Y. 2012).  "Reconsideration of a previous order by the court is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'"  RST (2005) Inc. v. Research in Motion Ltd., 597 F. Supp. 2d 362, 365 (S.D.N.Y. 2009) (quoting In re Health Mgmt. Sys., Inc. Sec. Litig., 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)).  "A motion for reconsideration may not be used to advance new facts, issues

---

[3]  In their letter, Plaintiffs do not state what that condition is.  (See id.)  The Court assumes that the dismissal of Plaintiffs' claims would be on the condition that this Court's ruling concerning Defendants' counterclaims is not disturbed on appeal.

or arguments not previously presented to the Court, nor may it be used as a vehicle for relitigating issues already decided by the Court."  Davidson v. Scully, 172 F. Supp. 2d 458, 461 (S.D.N.Y. 2001).  "The major grounds justifying reconsideration are 'an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'"  Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992) (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478).  "To these ends, a request for reconsideration under Rule 6.3 must demonstrate controlling law or factual matters put before the court in its decision on the underlying matter that the movant believes the court overlooked and that might reasonably be expected to alter the conclusion reached by the court."  RST (2005) Inc., 597 F. Supp. 2d at 365 (citing Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)).

    "[Local] Rule 6.3 is intended to 'ensure the finality of decisions and to prevent the practice of a losing party . . . plugging the gaps of a lost motion with additional matters.'"  Id. (quoting S.E.C. v. Ashbury Capital Partners, L.P., 2001 WL 604044, at *1 (S.D.N.Y. May 31, 2001)).  "A court must narrowly construe and strictly apply Rule 6.3 so as to avoid duplicative rulings on previously considered issues and to prevent Rule 6.3 from being used to advance different theories not previously argued, or as a substitute for appealing a final judgment."  Id.

## II.  ANALYSIS

    In finding that Defendants' counterclaims are time-barred, this Court concluded that the counterclaims "accrued either in the 1970s, when Plaintiffs implicitly repudiated Defendants' ownership of the Compositions, or at the latest in 2011 when Defendants purchased Oliver's rights in the Compositions."  (Sum. J. Opin. (Dkt. No. 106) at 27)

Defendants argue that, in so concluding, the Court (1) "overlooked" certain "facts," including that Taylor's alleged knowledge of the Westbound Recordings is disputed; (2) improperly determined that Defendants were on inquiry notice, based on (a) Taylor's knowledge that the Compositions were being exploited by another record label, and (b) Defendants' knowledge that Oliver had no paperwork demonstrating an ownership interest in the Compositions; and (3) "overlooked the fact that its split decision regarding statute of limitations will result in the waste of party and judicial resources." (Def. Recon. Br. (Dkt. No. 113) (capitalization altered)).

A.    <u>Accrual of Taylor's Ownership Claim in the 1970s</u>

In concluding that Taylor's ownership claim in the Compositions accrued in the 1970s, the Court found as follows:

> For more than thirty years before Taylor's death, Plaintiffs received royalties based on their exclusive registration of the Compositions with BMI. (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 78, 84) While "an ownership claim is triggered by knowledge of an entitlement to royalties that are not being paid, rather than by mere knowledge of the exploitation [by another,] . . . learning that another [person or entity] . . . is exploiting the work is sufficient notice that royalties are due." <u>Gary Friedrich Enterprises, LLC</u>, 716 F.3d at 319.

> Here, Taylor had obtained copyright registrations for the Compositions and made and released sound recordings of the Compositions prior to Revilot's bankruptcy. (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 17-18; Parness Decl., Exs. G, H, J, L, N, P (Dkt. Nos. 104-7, 104-8, 104-10, 104-12, 104-14, 104-16)) After Revilot's bankruptcy, Clinton and Funkadelic re-recorded the Compositions, and Westbound Records released the new recordings on various albums during the 1970s. (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 36, 42, 49, 56, 64) It is undisputed that, after the Revilot bankruptcy, Taylor worked as a disc jockey in Detroit, and played Westbound's sound recordings of the Compositions on the radio. (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 20) Accordingly, Taylor was aware that the Compositions were being exploited by another record company. There is no evidence that Taylor ever received royalties in connection with his copyright registrations in the approximately thirty years between Plaintiffs and Casablanca Records' exploitation of the Compositions and Taylor's death. Despite knowing that the Compositions were being publicly exploited, there is no evidence that Taylor ever asserted his ownership rights.

"Considering the depth of [Taylor's] experience in the music industry," when Clinton and Funkadelic released sound recordings of the Compositions, Taylor had "reason to know" that he had been injured by not receiving royalties for performances of the Compositions, if in fact he believed that he still owned copyrights in the Compositions.  See Mahan v. Roc Nation, LLC, 2015 WL 1782095, at *4 (S.D.N.Y. Apr. 15, 2015), aff'd, 634 F. App'x 329 (2d Cir. 2016) ("[T]he absence of any royalties sent to [p]laintiff [] gave him reason to know of his injury."); see also Howard v. Carter, 615 F. Supp. 3d 190, 195 (W.D.N.Y. 2022), appeal dismissed, 2022 WL 18283303 (2d Cir. Nov. 17, 2022) ("Howard should have known he was not receiving the royalties that he supposedly was entitled to when [the work in question was published and the defendant] 'conspicuously exploit[ed] the copyright[s] without paying royalties.' . . . [His] copyright ownership claim is, therefore, time-barred.") (quoting Gary Friedrich Enterprises, LLC, 716 F.3d at 317).  Accordingly, any claim of copyright ownership by Taylor or a Taylor-affiliated entity would be time-barred.

(Sum. J. Opin. (Dkt. No. 106) at 27-29 (footnotes omitted))

In seeking reconsideration, Defendants argue that this Court mistakenly relied on Defendants' admission in its counterstatement of material facts that Taylor "played Westbound's sound recordings of the Compositions on the radio."  (Def. Recon. Br. (Dkt. No. 113) at 11) According to Defendants, the Court "overlooked" that the corresponding assertion in paragraph 20 of Plaintiffs' Local Rule 56.1 Statement was unsupported.  (Id.)  Defendants made no such argument in their summary judgment briefing.

Having not argued at summary judgment that Plaintiffs' assertion that Taylor "played the Westbound Sound Recordings [of the Compositions] on air [while working as a radio DJ]" (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 20) was unsupported, Defendants cannot make this argument now.  If correct, this argument was available to Defendants at summary judgment and was not made.  (See Def. Sum. J. Opp. (Dkt No. 103))  As discussed above, reconsideration is only appropriate where the Court overlooked a fact; "[a] motion for reconsideration may not be used to advance new facts, issues or arguments nor previously presented to the Court," Davidson, 172 F. Supp. 2d at 461, nor may such a motion be used to "plug[] the gaps of a lost motion with additional matters."  RST (2005) Inc., 597 F. Supp. 2d at 365.  Accordingly,

Defendants' assertion provides no basis for granting reconsideration.  In any event, Plaintiffs'
assertions regarding Taylor's knowledge were properly supported and <u>were admitted by
Defendants</u>.

Set forth below is Plaintiff's Local Rule 56.1 assertion concerning Taylor's
knowledge, as well as Defendants' response:

> 20.  Mr. Taylor worked as a radio DJ in Detroit and played the Westbound Sound
> Recordings on air.  Busch Decl. ¶ 5 (Deposition of Boladian 18:16-23); Boladian
> Decl. ¶¶ 15-17.
>
> **Response**: Undisputed.

(Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 20) (emphasis in original))

Paragraphs 15 through 17 of the Boladian Declaration, on which Plaintiffs relied,
states:

> 15.  In the 60s and 70s, Taylor was a radio personality and DJ at a local Detroit
> radio station, WCHB in Inkster, Michigan.
>
> 16.  When Taylor worked at the radio station, I would take him Westbound
> records to play and promote them at the radio station he worked for, along with
> other radio stations in Detroit.
>
> 17.  I took him the sound recordings that Clinton recorded for Westbound to play
> and promote at his radio station.

(Boladian Decl. (Dkt. No. 100-1) at 163-64)

Plaintiffs' statement in paragraph 20 of their Local Rule 56.1 statement regarding
Taylor's knowledge of the Westbound Recordings is fully supported by Boladian's declaration,
in which Boladian states that he took "the sound recordings that Clinton recorded for
Westbound" to Taylor "to play and promote at his radio station."  (<u>Id.</u>)  The significance of
Taylor's playing of the Compositions – which Defendants admitted was "undisputed" – is that
"Taylor was aware that the Compositions were being exploited by another record company."
(Sum. J. Opin. (Dkt. No. 106) at 28)  As discussed above and in the Summary Judgment

Opinion, because of Taylor's knowledge, Defendants' copyright counterclaims accrued "[i]n the 60s and 70s," when Boladian gave Taylor the Westbound Recordings to play at his radio station. (Id.)  In sum, in their Local Rule 56.1 Counterstatement, Defendants admitted the facts that they now seek to dispute, and their complaint about this Court's decision to rely on their admission provides no basis for granting reconsideration.

Moreover, Taylor's knowledge – "in the 60s and 70s" – that Westbound was exploiting the Compositions is binding on Defendants.  "[A] co-owner is aware of his claim of co-ownership from the moment the work is created, and thus, learning that another [] is exploiting the work is sufficient notice that royalties are due." Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc., 716 F.3d 302, 319 (2d Cir. 2013) (citation omitted).  The "knowledge of an entitlement to royalties that are not being paid" triggers the accrual of a "[copyright] ownership claim." Id.  Because Taylor became aware "during the 1970s" (Sum. J. Opin. (Dkt. No. 106) at 28) that Westbound was exploiting the Compositions, he had "knowledge [at that time] of [his] entitlement to royalties." Gary Friedrich Enterprises, 716 F.3d at 317.  Indeed, as an experienced record executive, Taylor was then on notice that he was "'entitled to royalties that [he was] not receiving.'" Mahan v. Roc Nation, LLC, 2015 WL 1782095, at *4 (S.D.N.Y. Apr. 15, 2015), aff'd, 634 F. App'x 329 (2d Cir. 2016) (quoting Gary Friedrich Enterprises, 716 F.3d at 317).

Defendants also repeat their argument that Clinton's deposition testimony that he "told Boladian – at an unspecified time – that Groovesville and Revilot had published the Compositions" (Sum. J. Opin. (Dkt. No. 106) at 31), creates a material issue of fact with respect to the accrual of Taylor's ownership claim.  (Def. Recon. Br. (Dkt. No. 113) at 13-14)  But this Court addressed this same argument in the Summary Judgment Opinion, and concluded that

11

Clinton's testimony on this point is "irrelevant to whether Taylor's ownership of the Compositions was ever publicly, privately, or implicitly repudiated by Plaintiffs," thereby triggering the statute of limitations.  (Sum. J. Opin. (Dkt. No. 106) at 31)  In sum, Plaintiffs' argument on this point provides no basis for granting reconsideration, see Davidson, 172 F. Supp. 2d at 461 ("A motion for reconsideration may not be used . . . as a vehicle for relitigating issues already decided by the Court."), and – in any event – Clinton's testimony is not probative as to Taylor's knowledge of the Westbound Recordings because it says nothing about Taylor's knowledge of the Westbound Recordings.

### B.    Accrual of Defendants' Ownership Claim in 2011

Defendants next contend that "the Court overlooked and therefore misapprehended facts concerning the events in 2011."  (Def. Recon. Br. (Dkt. No. 113) at 8 (capitalization altered))  Defendants do not say what facts the Court overlooked, however. Instead, they attempt to distinguish Kwan v. Schlein, 634 F.3d 224, 226 (2d Cir. 2011), a case this Court cited for, inter alia, the proposition that "[a copyright] 'ownership claim accrues only once, when a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right.'"  (Sum. J. Opin. (Dkt. No. 106) at 22 (quoting Kwan, 634 F.3d at 228))

The Court concluded that Defendant TufAmerica was on "inquiry notice" when it purchased Oliver's rights in the Compositions, citing the following undisputed facts:  (1) Oliver told TufAmerica "that she did not have 'any paperwork' confirming her ownership interest in the Compositions" id. at 29 (citing Def. R. 56.1 Stmt. (Dkt. No. 105) ¶¶103-07, 110); (2) "after signing the agreement with TufAmerica, Oliver . . . [asked] TufAmerica to remove . . . from the TufAmerica Agreement" certain "representations and warranties" that she had "valid signed agreements" showing transfer of title to Oliver (id. at 29-30 (citing Busch Decl., Ex. 11 (Dkt. No.

100-1) at 105; Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 113-14); (3) Aaron Fuchs, TufAmerica's

owner, considered "search[ing] the copyright catalog for registrations" at the time he purchased a

50% share of Oliver's interest in the Compositions in 2011, but decided not to, and did not

conduct such a search until a "few years" later (id. at 30); and (4) Fuchs' purchase of a "50%

ownership stake in 'all worldwide copyright, renewals, and/or other rights in certain musical

works' created by one of the most celebrated funk musicians of all time" for only $6,500.  (Id. at

31 (quoting Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 111)  Finally, the Court observed that "[a]s the

owner and operator of a record label, Fuchs . . . [has] substantial 'experience in the music

industry.'"  Given all of these circumstances, the Court concluded that Fuchs and TufAmerica

were "on inquiry notice that another party might have claimed ownership of the Compositions."

(Id.)

        In moving for reconsideration, Defendants argue that the "facts of the present case

are significantly different" from Kwan.  (Def. Recon. Br. (Dkt. No. 113) at 8-9)  But the

Summary Judgment Opinion does not analogize the facts of the instant case to those in Kwan.

Instead, as discussed above, this Court cites Kwan for a purely legal point:  when a claim for

copyright ownership accrues.

        Defendants argue, however, that Kwan has no application here because – unlike

in Kwan – the statute of limitations is being applied against a "senior copyright holder."  (Id.)

According to Defendants, "[the] senior copyright holder should not be placed on inquiry notice

without substantial evidence of repudiation."  (Def. Recon. Br. (Dkt. No. 113) at 8-11

(capitalization altered))  As discussed above and in the Summary Judgment Opinion, however,

that is ample evidence of repudiation here.  In any event, Defendants ignore the fact that

"[c]ourts treat the Copyright Act's statute of limitations as 'something like adverse possession

[for] copyright ownership.'" (Sum. J. Opin. (Dkt. No. 106) at 24 (quoting Zuill v. Shanahan, 80 F.3d 1366, 1370 (9th Cir. 1996))

Here, the undisputed facts demonstrate that Taylor sat on whatever copyright interests he retained following Revilot's bankruptcy for more than thirty years. It is likewise undisputed that, in that time, Plaintiffs re-recorded the Compositions, released the Westbound Recordings to the public – with Taylor's knowledge – and were the exclusive beneficiaries of royalties in connection with the Compositions. Given these circumstances and the ample evidence of repudiation, finding that Defendants' counterclaims are time-barred is fully consistent with "'Congress's paramount goal in revising the 1976 Act [of] enhancing [the] predictability and certainty of copyright ownership.'" Id. (quoting Zuill, 80 F.3d at 137).

Finally, Defendants did not raise their "senior copyright holder" argument at summary judgment, and a motion for reconsideration "may not be used to advance new . . . arguments not previously presented to the Court." Davidson, 172 F. Supp. 2d at 461.

C.     **Waste of Party and Judicial Resources**

Defendants also contend that reconsideration is necessary because the Summary Judgment Opinion "will result in the waste of party and judicial resources." According to Defendants, the Court's opinion "force[s] the parties to go through a trial that benefits neither side." (Def. Recon. Br. (Dkt. No. 113) at 6)

But in determining that Defendants' counterclaims are time-barred, this Court merely applied the applicable law. This Court cannot decline to apply the law merely because a particular litigation is wasteful and unlikely to be productive. It was the parties' choice to proceed with this litigation, and it will be the parties' decision whether it continues. For the Court's part, the presence of material issues of fact – as explained in the Summary Judgment

Opinion (Sum. J. Opin. (Dkt. No. 106) at 14-21) preclude ruling as a matter of law on Plaintiffs' claims.[4]

## III.   INTERLOCUTORY APPEAL

Defendants request permission to pursue an interlocutory appeal under 28 U.S.C. § 1292(b) in the event that their motion for reconsideration is denied.  (Def. Recon. Br. (Dkt. No. 113) at 14)  Interlocutory appeals are presumptively disfavored, and only "'exceptional circumstances justify a departure from the basic policy of postponing appellate review.'" Martens v. Smith Barney, 238 F. Supp. 2d 596, 599 (S.D.N.Y. 2002) (quoting Coopers v. Livesay, 437 U.S. 463, 475 (1975)); see also Prout v. Vladeck, 319 F. Supp. 3d 741, 746 (S.D.N.Y. 2018) (interlocutory appeals are "rare, and reserved for exceptional circumstances") (internal quotation marks omitted).  Indeed, the "Second Circuit has 'urge[d] the district courts to exercise great care in making a § 1292(b) certification,'" Santiago v. Pinello, 647 F. Supp. 2d 239, 243 (E.D.N.Y. 2009) (quoting Westwood Pharmaceuticals, Inc. v. National Fuel Gas Dist. Corp., 964 F.2d 85, 88-89 (2d Cir. 1992)), because "§ 1292(b) is a 'rare exception to the final judgment rule that generally prohibits piecemeal appeals.'"  Id. (quoting Koehler v. The Bank of Bermuda, Ltd., 101 F.3d 863, 865-66 (2d Cir. 1996)); see also Williston v. Eggleston, 410 F. Supp. 2d 274, 276 (S.D.N.Y. 2006) ("'Interlocutory appeal was not intended as a vehicle to

---

[4]  Defendants' citation to Stevens v. City of New York, 2012 WL 5862659, at *1 (S.D.N.Y. Nov. 14, 2012) and similar cases is misguided.  (Def. Recon. Br. (Dkt. No. 113) at 7)  While Judge Forrest granted reconsideration in that case based on "a legal argument not [] raised" at summary judgment, she did so because defendant's argument was "clearly correct" and disposed of certain of plaintiffs' claims.  Stevens, 2012 WL 5862659, at *1.  Judge Forrest overlooked defendant's failure to raise that argument, despite the "strict" standard on a motion for reconsideration, because if "the Court [did] not [] revisit its earlier decision, the outcome of the issue is so clear that the Court would have to grant a motion for directed verdict on the same basis at the close of plaintiff's case."  Id.  There are no such circumstances here.  For the reasons explained above, the arguments raised by Defendants in seeking reconsideration have no merit.

provide early review of difficult rulings in hard cases. . . . The benefit to the district court in avoiding an unnecessary trial must be weighed against the inefficiency of having the Court of Appeals hear multiple appeals in the same case.'") (quoting <u>Wausau Bus. Ins. Co. v. Turner Const. Co.</u>, 151 F. Supp. 2d 488, 492 (S.D.N.Y. 2001)).  Accordingly, under 28 U.S.C. § 1292(b), a district court may certify an order for interlocutory appeal only if it concludes that "(1) the order 'involves a controlling question of law;' (2) 'as to which there is substantial ground for difference of opinion;' and (3) 'that an immediate appeal of the order may materially advance the ultimate termination of the litigation.'"  <u>Martens</u>, 238 F. Supp. 2d at 599 (quoting 28 U.S.C. § 1292(b)).

> "[T]he party seeking an interlocutory appeal has the burden of showing 'exceptional circumstances,'" and showing that each of § 1292(b)'s requirements are met. <u>Williston</u>, 410 F. Supp. 2d at 276 (citations omitted).  "The [ultimate] determination of whether § 1292(b) certification is appropriate under these standards lies within the discretion of the district court."  <u>Martens</u>, 238 F. Supp. 2d at 599.  "[E]ven if a 'district court concludes that the three factors in § 1292(b) are met, it nevertheless retains unfettered discretion to deny leave to appeal.'"  <u>Green v. Humana at Home, Inc.</u>, 2019 WL 3729390, at *3 (S.D.N.Y. Aug. 8, 2019) (quoting <u>Frederick v. New York City</u>, 2013 WL 310441, at *5 (S.D.N.Y. Jan. 24, 2013)).

> Defendants argue that this Court should certify an interlocutory appeal because "trial would have little practical value to Plaintiffs even if they prevail . . . and no practical value if they do not prevail."  (Def. Recon. Br. (Dkt. No. 113) at 14)  Regardless of the outcome at trial, Defendants state they will appeal the Court's statute of limitations ruling, thereby leading to

the vain expenditure of "'substantial resources.'"  (Id. at 14-15 (quoting In re Dynex Cap., Inc.

Sec. Litig., 2006 WL 1517580, at *2 (S.D.N.Y. June 2, 2006))

        In seeking permission to pursue an interlocutory appeal, Defendants make no

effort to satisfy that first two prongs of the certification test:  they do not argue that this case

"involves a controlling question of law[]' [] 'as to which there is substantial ground for

difference of opinion.'"  Martens, 238 F. Supp. 2d at 599 (quoting 28 U.S.C. § 1292(b); see also

Whyte v. Wework Companies, Inc., 2020 WL 4383506, at *2 (S.D.N.Y. July 31, 2020) ("The

trouble is that Plaintiff has not shown a substantial ground for difference of opinion on [a]

question [of law].  'A substantial ground for difference of opinion exists where (1) there is

conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression

for the Second Circuit.'") (quoting Youngers v. Virtus Inv. Partners Inc., 228 F. Supp. 3d 295,

299 (S.D.N.Y. 2017)).  While Defendants disagree with the Court's conclusion that their claims

are time-barred, "the mere presence of a disputed issue . . . is insufficient to demonstrate a

substantial ground for difference of opinion."  In re Flor, 79 F.3d 281, 284 (2d Cir. 1996).[5]

        Finally, while district courts "'have found that certification under section 1292

will materially advance the ultimate termination of the litigation when reversal would end the

litigation,'" Analect LLC v. Fifth Third Bancorp, 2009 WL 2568540, at *5 (E.D.N.Y. Aug. 19,

2009) (quoting In re Methyl Tertiary Butyl Ether Prod. Liab. Litig., 2008 WL 2511038, at *5

---

[5]  In re Dynex Cap., Inc. Sec. Litig., 2006 WL 1517580, at *2, cited by Defendants (Def. Recon.
Br. (Dkt. No. 113) at 14-15), does not support their application for permission to pursue an
interlocutory appeal.  Indeed, that case shows why their request is unfounded.  In In re Dynex,
the district court found that "defendants have demonstrated that the permissibility of pleading
corporate or collective scienter within this Circuit constitutes 'a controlling question of law as to
which there is substantial ground for difference of opinion.'"  In re Dynex, 2006 WL 1517580, at
*2 (quoting 28 U.S.C. § 1292(b)).

(S.D.N.Y. June 18, 2008)), reversal would not end the litigation here, because the case would then be remanded for trial as to copyright ownership of the Compositions.

In sum, Defendants have not met their burden to show "exceptional circumstances" justifying the certification of an interlocutory appeal under Section 1292(b). Martens, 283 F. Supp. 2d at 599.  Accordingly, their application is denied.

## IV.    CONDITIONAL DISMISSAL

In an August 8, 2023 letter, Plaintiffs state that "[t]he sole reason this action was filed has now been mooted by the Court's dismissal of Defendant[s'] counterclaims," and request dismissal of their claims conditional on "the outcome of Defendant[s'] . . . appeal" of the Summary Judgment Opinion under Purdy v. Zeldes, 337 F.3d 253 (2d Cir. 2003).  (Pltf. Aug. 8, 2023 Ltr. (Dkt. No. 111) at 1)  Defendants join in Plaintiffs' application.  (See Def. Recon. Br. (Dkt. No. 113) at 4 n.1)  Regardless of the outcome at trial, Defendants state that they will "take up an appeal of [the] final judgment in order to take up an appeal of the non-final July 26, 2023 [Summary Judgment Opinion], the goal being to secure a reversal so that they can go to trial with a jury empowered to affirmatively decide whether TufAmerica owns the copyrights." (Id. at 6)

The Court construes Plaintiffs' "request" (Pltf. Aug. 8, 2023 Ltr. (Dkt. No. 111)) as a motion for voluntary dismissal under Fed. R. Civ. P. 41(a)(2).  Rule 41(a)(2) provides as follows:

> Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper. . . . Unless the order states otherwise, a dismissal under this paragraph (2) is without prejudice.

Fed. R. Civ. P. 41(a)(2).

The Second Circuit has articulated five factors that district courts should consider when addressing a motion for voluntary dismissal under Rule 41(a)(2):

> "(1) the plaintiff's diligence in bringing the motion; (2) any undue vexatiousness on plaintiff's part; (3) the extent to which the suit has progressed, including the defendant's effort and expense in preparation for trial; (4) the duplicative expense of relitigation; and (5) the adequacy of plaintiff's explanation for the need to dismiss."

Podlin v. Ghermezian, 2014 WL 3844629, at *1 (S.D.N.Y. July 29, 2014), aff'd, 601 F. App'x 31 (2d Cir. 2015) (quoting Zagano v. Fordham Univ., 900 F.2d 12, 14 (2d Cir.1990))

Plaintiffs submitted their request for a conditional dismissal on August 8, 2023, shortly after this Court's July 26, 2023 Summary Judgment Opinion was issued. (Pltf. Aug. 8, 2023 Ltr. (Dkt. No. 111)) There is no claim here that Plaintiffs have acted vexatiously in seeking a conditional dismissal. Indeed, Plaintiffs support Defendants' application. Both Plaintiffs and Defendants have expressed a strong desire to avoid trial, and both have stated that their dispute will be resolved by a Second Circuit decision addressing this Court's ruling that Defendants' counterclaims are time-barred. (Id. at 2 ("[Conditional dismissal] will [] conserve the resources of both parties and the Court."); Def. Recon. Br. (Dkt. No. 113) at 5-6 ("[T]he practical effect of the [Summary Judgment Opinion] is to force the parties to go through a trial that benefits neither side, but which Defendants must go through in order to appeal the very point on which they now seek reconsideration [], namely, the timeliness of their counterclaims.") (emphasis in original)) There appears to be little risk of duplicative litigation. Finally, a Second Circuit ruling that Defendants' counterclaims are time-barred would end the litigation without the need for a trial. And Defendants represent that – if they are not permitted to lay their counterclaims before the Second Circuit now – they will appeal this Court's statute of limitations ruling after trial.

"[W]hen a plaintiff is completely free to relitigate voluntarily dismissed claims, the final judgment rule ordinarily precludes [a Court of Appeals] from reviewing any adverse determination by the district court in that case." Purdy, 337 F.3d at 258. Purdy holds, however,

that "where, as here, a plaintiff's ability to reassert a claim is made conditional on obtaining a reversal from this court, the finality rule is not implicated in the same way. . . . [T]herefore [] a conditional waiver . . . creates a final judgment reviewable by [a Court of Appeals]."  Id.; Podlin, 2014 WL 3844629, at *2.

In Purdy, it was plaintiff who sought to appeal an order granting the defendants summary judgment as to some, but not all, of plaintiff's claims.  Purdy, 337 F.3d at 255 ("The [district] court granted summary judgment to defendants only on [two of] Purdy's [] claims . . . [and] denied summary judgment without prejudice [as to a malpractice claim] . . . .  Purdy runs the risk that if his appeal is unsuccessful, his malpractice case comes to an end.").  Here, Plaintiffs wish to condition dismissal of their claims on the outcome of Defendants' appeal. (Pltf. Aug. 8, 2023 Ltr. (Dkt. No. 111) at 1-2)

The Court sees no reason why this factual distinction should make a difference. Here, as in Purdy, Plaintiffs "run[] the risk" that their claims will be dismissed with prejudice if Defendants' appeal of the Summary Judgment Opinion is unsuccessful.  Plaintiffs' "ability to reassert a claim is [still] conditional on [] a reversal" by the Second Circuit, thereby "creat[ing] a final judgment reviewable" by the Second Circuit.  Purdy, 337 F.3d at 258.

Plaintiffs' request for a conditional dismissal is therefore granted.  By September 12, 2023, the parties will jointly file a proposed stipulation and order providing that Plaintiffs' claims are dismissed with prejudice, except that if the Second Circuit reverses this Court's ruling in the Summary Judgment Opinion that Defendants' counterclaims are time-barred, Plaintiffs' claims will have been dismissed without prejudice.

## **<u>CONCLUSION</u>**

For the reasons stated above, Defendants' motion for reconsideration is denied.

The Clerk of Court is directed to terminate the motion (Dkt. No. 112).  Plaintiffs' request for

conditional dismissal (Dkt. No. 111) is granted as set forth above.

Dated:  New York, New York
     September 10, 2023

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

21